# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRENT DUKE, JOSEPH PARKHURST, JACYN GREEN, DONNA TAYLOR, BYRON HILL, PATRICIA PYE, WAYNE BUTTS, RONALD SHELTON, JUSTIN DUNNE, ASHBY MONCURE, EDWARD BRISCOE, DANIELLE WEBSTER, JEREMY CAVOLO, STACEY PYSOCK, DERYLYN STOKES, SCOTT ZACK, ANTONIO DEENA, and JASON HOWELL, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>CURALEAF HOLDINGS, INC., a British Columbia, Canada corporation and CURALEAF, INC., a Delaware corporation,<br><br>    Defendants. | Case No. 3:26-cv-684 |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION.................................................................................................1

II.     PARTIES.............................................................................................................4

III.    JURISDICTION AND VENUE ........................................................................16

IV.     FACTUAL ALLEGATIONS.............................................................................17

        A. Cannabis and Its Uses.................................................................................17

        B. Federal Cannabis Law................................................................................20

        C. State Cannabis Laws ..................................................................................22

        D. Cannabis and Health...................................................................................26

                i.    Psychosis and Schizophrenia.................................................26

                ii.   Suicidal Ideation, Depression, PTSD, and Anxiety ..............37

                iii.  Cannabis and Cardiovascular Health ....................................43

                iv.   Cannabis and Pain .................................................................44

                v.    Glaucoma...............................................................................46

                vi.   Hyperemesis ..........................................................................47

                vii.  Cannabis Use Disorder..........................................................48

                viii. Prenatal Cannabis Exposure Risks to Fetuses and Children...............49

        E. Defendants' Unlawful and Deceptive Marketing Practices .........................50

        F. Summary of Defendants' Untrue, False, and Misleading Statements...........68

V.      INTERSTATE AND INSTRASTATE COMMERCE .......................................71

VI.     CLASS ALLEGATIONS...................................................................................71

        A. Multi-State Class ........................................................................................71

        B. State Subclasses..........................................................................................72

        C. Class Exclusions.........................................................................................74

VII.    RULE 23 PREREQUISITES .............................................................................74

VIII.   CAUSES OF ACTION Multi-State Class .........................................................77

IX.     CAUSES OF ACTION STATE SUB-CLASSES...............................................99

        A. Violations of Arizona Law Brought on Behalf of Arizona Subclass. ...........99

        B. Violations of Connecticut Law Brought on Behalf of Connecticut Subclass ..............112

        C. Violations of Illinois Law Brought on Behalf of Illinois Subclass. ...........128

        D. Violations of Maryland Law Brought on Behalf of Maryland Subclass......154

E. Violations of Massachusetts Law Brought on Behalf of Massachusetts Subclass.......169

F. Violations of Nevada Law Brought on Behalf of Nevada Subclass. ...........................189

G. Violations of New Jersey Law Brought on Behalf of New Jersey Subclass................202

H. Violations of New York Law Brought on Behalf of New York Subclass. ..................217

I. Violations of Ohio Law Brought on Behalf of Ohio Subclass....................................234

X. PRAYER FOR RELIEF.................................................................................................248

XI. LACK OF ADEQUATE REMEDIES AT LAW..............................................................249

XII. DEMAND FOR JURY ..................................................................................................249

## CLASS ACTION COMPLAINT

The Plaintiffs, Brent Duke, Joseph Parkhurst, Jacyn Green, Donna Taylor, Byron Hill, Patricia Pye, Wayne Butts, Ronald Shelton, Justin Dunne, Ashby Moncure, Edward Briscoe, Danielle Webster, Derylyn Stokes, Scott Zack, Antonio Deena, and Jason Howell, individually and on behalf of all similarly situated Arizona, Connecticut, Illinois, Maryland, Massachusetts, Nevada, New Jersey, New York, and Ohio residents who purchased one or more cannabis products in Arizona, Connecticut, Illinois, Maryland, Massachusetts, Nevada, New Jersey, New York and Ohio within the applicable statute of limitations period manufactured, distributed, sold, or offered for sale by Curaleaf Holdings, Inc. and Curaleaf, Inc., by and through their attorneys allege the following facts and claims upon personal knowledge, investigation of counsel, and/or information and belief.

## I.     INTRODUCTION

1.     Cannabis purveyors market and promote their cannabis products to an unsuspecting public through a public relations megaphone as the antidote to ailments of all kinds, including, among others, insomnia, narcolepsy, over-eating, cancer, auto-immune disorders, neuropathy, pain, anger, boredom, sadness, shyness, irritable bowel syndrome, grief, opioid addiction. These claims are part of a calculated strategy in which the cannabis industry, including Defendants Curaleaf Holdings, Inc. ("CHI") and Curaleaf, Inc. ("CI"), have unleashed an acute intoxicant— tetrahydrocannabinol ("THC")—at unprecedently high concentrations on their customers.

2.     But CHI and CI have known at all relevant times that their cannabis products have not been approved as a treatment for a single medical disorder by the Food and Drug Administration ("FDA") and that no credible scientific research has established that cannabis is safe and effective in treating mental or other health disorders in the manner described by the CHI and CI. A 2025 narrative review and meta-analysis published in the Journal of the American Medical Association

of 124 recent randomized controlled trials found that the evidence that cannabis "treats" disorders such as pain, anxiety, post-traumatic stress disorder ("PTSD"), insomnia, and most other hyped uses is weak or non-existent.  The position of the American Psychiatric Association ("APA") as of December of 2025 is that "[t]here is insufficient evidence that cannabis is an effective treatment for any psychiatric disorder."

3.    In fact, contrary to CHI and CI's public claims about the purported health benefits of their products, and as they knew or should have known, medical research demonstrates that the use of cannabis causes and exacerbates the development of schizophrenia, psychosis,[1] bipolar disorder, suicidal ideation, depression, anxiety,[2] and other serious health disorders, including adverse cardiovascular events, cannabis hyperemesis syndrome, and cannabis use disorder; it also poses significant risks to fetuses and children from prenatal exposure.  CHI and CI also knew or should have known that cannabis was not a safe or effective medicine or therapy for mental health disorders or many other medical conditions identified by CHI and CI but in fact makes symptoms worse, as shown by a large body of credible scientific research.

4.    Despite its actual and constructive knowledge, CHI and CI failed to adequately warn their customers of the long-term, devastating mental and physical health risks of their products. Quite the opposite.  In their enterprise to profoundly expand the cannabis market and realize extravagant profits, CHI and CI deceptively marketed cannabis as medicine capable of alleviating or treating the very mental health disorders CHI and CI knew or should have known were caused

---

[1] These would include, but not be limited to, disorders as described in sections 297.1, 298.8, 295.40, 295.70, 295.90, 298.8, and 298.9 of the *Diagnostic and Statistical Manual of Mental Health Disorders*. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013) [hereinafter DSM-5].

[2] These would include disorders as described in sections 296.40-46, 296.50-57, 296.89, 296.20-26, 296.30-36, 300.4, 300.23, 300.01, 300.00, 300.02, 300.02, 300.09 of the DSM-5. *Id*.

or exacerbated by the use of their products, including bipolar disorder, depression, anxiety, PTSD, and/or other medical disorders.

5.    This deceptive marketing stands in stark contrast to the mounting empirical evidence demonstrating the serious mental health risks associated with increased use of cannabis. Cannabis use has significantly increased across all age groups and categories in every state where recreational use has been legalized.

6.    A 2025 study found that states that legalized recreational marijuana with open dispensaries experienced a 12% increase in the number of people admitted to state mental health facilities for schizophrenia and other psychotic disorders.

7.    Tracking national trends, persons with mental illnesses have the highest rates of frequent cannabis use.

8.    Since legalization in New York, cannabis use, and specifically daily or near daily use, has increased among those 18 years old or older.  Rates of cannabis use among New Yorkers reporting frequent mental distress (those reporting problems with stress, depression, or emotions on at least 14 of the previous 30 days) was more than double the cannabis use rates for those not reporting such distress.

9.    Amid this tragedy and human misery, the cannabis industry grows ever richer. In 2024, total cannabis sales in the United States exceeded $30 billion and generated $4.4 billion in tax revenues.

10.  This class action lawsuit seeks to hold CHI and CI responsible for promoting their products as safe and appropriate for widespread use despite scientific evidence to the contrary. The truth, as will be established in a court of law through scientific presentation of evidence, is that:

    a.   Cannabis is not the medicine as CHI and CI claim that it is, least of all medicine for mental health disorders; and

    b.   Cannabis is and has always been a dangerous drug that requires sufficiently clear and adequate warnings for informed use.

11.   This suit seeks damages and injunctive relief on behalf of Plaintiffs and class members as described below, including as follows:

    a.   Damages for consumers who purchased cannabis products from a recreational or adult-use dispensary, market, shop, store, online or other retail platform but overpaid due to, or were misled into purchasing cannabis by, CHI and CI's deceptions, including their material omissions.

    b.   An order prohibiting CHI and CI from making any further misrepresentations or omissions regarding the medicinal, health, or therapeutic benefits of marijuana sold through a recreational or adult-use dispensary, market, shop, store, online or other retail platform in those states where applicable.

    c.   An order requiring CHI and CI to adequately warn consumers who purchase their products from a recreational or adult-use dispensary, market, shop, store, online or other retail platform, in those states where applicable, of their cannabis products' dangers, especially the dangers to users' mental and physical health.

12.   This complaint does not seek relief for purchases of cannabis pursuant to a physician's prescription or order.

## II.    <u>PARTIES</u>

13.   Plaintiff Brent Duke is a citizen of the United States and domiciled in Arizona. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brands Curaleaf,

4

Grassroots, and Select in Arizona.[3]  Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct. Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical conditions.  Plaintiff brings this action on behalf of himself, the Multi-State Class, and the Arizona Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through his counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

14.  Plaintiff Joseph Parkhurst is a citizen of the United States and domiciled in Arizona. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brands B Noble, Curaleaf, Grassroots, and Select in Arizona.  Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct.  Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical conditions.  Plaintiff brings this action on behalf of himself, the Multi-State Class, and the Arizona Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through his counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

15.  Plaintiff Jacyn Green is a citizen of the United States and domiciled in Connecticut. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brands Curaleaf and Grassroots in Connecticut.  Plaintiff paid money for the products and suffered

---

[3] Curaleaf throughout this Complaint collectively refers to CHI and CI and their subsidiaries, affiliates, and related entities identified in this Complaint that operate under CHI and CI's control, direction, branding, labeling, quality control, and business and promotional strategy.

pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct. Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical conditions. Plaintiff brings this action on behalf of himself, the Multi-State Class, and the Connecticut Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through his counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

16. Plaintiff Donna Taylor is a citizen of the United States and domiciled in Connecticut. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brands Curaleaf in Connecticut. Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct. Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical conditions. Plaintiff brings this action on behalf of herself, the Multi-State Class, and the Connecticut Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through her counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

17. Plaintiff Byron Hill is a citizen of the United States and domiciled in Illinois. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brands Curaleaf, Find, and Grassroots in Illinois. Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct. Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical

6

conditions. Plaintiff brings this action on behalf of himself, the Multi-State Class, and the Illinois Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through his counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

18.  Plaintiff Patricia Pye is a citizen of the United States and domiciled in Illinois. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brand Curaleaf in Illinois. Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct. Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical conditions. Plaintiff brings this action on behalf of herself, the Multi-State Class, and the Illinois Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through her counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

19.  Plaintiff Wayne Butts is a citizen of the United States and domiciled in Maryland. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brand Curaleaf, Find, and Grassroots in Maryland. Plaintiff paid money for the product and suffered pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct. Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical conditions. Plaintiff brings this action on behalf of himself, the Multi-State Class, and the Maryland Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their

7

cannabis products in or about February, 2026. Plaintiff sent notice through his counsel to CHI and CI of the claimed breaches of warranties on or about April 15, 2026 by FedEx.

20.   Plaintiff Ronald Shelton is a citizen of the United States and domiciled in Maryland. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brand Curaleaf in Maryland.  Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct.  Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical conditions.  Plaintiff brings this action on behalf of himself, the Multi-State Class, and the Maryland Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through his counsel to CHI and CI of the claimed breaches of warranties on or about April 15, 2026 by FedEx.

21.   Plaintiff Justin Dunne is a citizen of the United States and domiciled in Massachusetts. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brand Curaleaf in Massachusetts.  Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct.  Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical conditions.  Plaintiff brings this action on behalf of himself, the Multi-State Class, and the Massachusetts Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through his counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

8

22. Plaintiff Ashby Moncure is a citizen of the United States and domiciled in Massachusetts. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brands Curaleaf, Find, and Grassroots in Massachusetts. Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct. Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical conditions. Plaintiff brings this action on behalf of himself, the Multi-State Class, and the Massachusetts Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through his counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

23. Plaintiff Edward Briscoe is a citizen of the United States and domiciled in Nevada. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brands B Noble, Find, Grassroots, Select, and Zero Proof Seltzers in Nevada. Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct. Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical conditions. Plaintiff brings this action on behalf of himself, the Multi-State Class, and the Nevada Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through his counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

24. Plaintiff Danielle Webster is a citizen of the United States and domiciled in Nevada. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brand Curaleaf in Nevada. Plaintiff paid money for the products and suffered pecuniary injury as a direct

and proximate result of Curaleaf's tortious and unlawful conduct. Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical conditions. Plaintiff brings this action on behalf of herself, the Multi-State Class, and the Nevada Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through her counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

25. Plaintiff Derylyn Stokes is a citizen of the United States and domiciled in New Jersey. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brands B Noble, Curaleaf, find, Grassroots, and Select in New Jersey. Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct. Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical conditions. Plaintiff brings this action on behalf of herself, the Multi-State Class, and the New Jersey Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through her counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

26. Plaintiff Scott Zack is a citizen of the United States and domiciled in New Jersey. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brands Find, Grassroots, and Select in New Jersey. Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct. Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious

10

medical conditions.  Plaintiff brings this action on behalf of himself, the Multi-State Class, and the New Jersey Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through his counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

27.  Plaintiff Jeremy Cavolo is a citizen of the United States and domiciled in New York. During the applicable limitations period, Plaintiff purchased Curaleaf Holdings, Inc. products under the brands Curaleaf, Find, and Grassroots in New York.  Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf Holdings, Inc.'s tortious and unlawful conduct. Plaintiff brings this action on behalf of himself, the Multi-State Class, and the New York Class. Plaintiff discovered that Curaleaf Holdings, Inc. had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through his counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

28.  Plaintiff Stacey Pysock is a citizen of the United States and domiciled in New York. During the applicable limitations period, Plaintiff purchased Curaleaf Holdings, Inc. products under the brands B Noble and Curaleaf in New York. Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf Holdings, Inc.'s unlawful conduct. Plaintiff brings this action on behalf of herself, the Multi-State Class, and the New York Class. Plaintiff discovered that Curaleaf Holdings, Inc. had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through her counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

29.  Plaintiff Antonio Deena is a citizen of the United States and domiciled in Ohio. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brands Curaleaf,

11

Grassroots, and Select in Ohio.  Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct.   Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical conditions.  Plaintiff brings this action on behalf of himself, the Multi-State Class, and the Ohio Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through his counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

30.  Plaintiff Jason Howell is a citizen of the United States and domiciled in Ohio. During the applicable limitations period, Plaintiff purchased Curaleaf products under the brands Curaleaf, Grassroots, and Select in Ohio.  Plaintiff paid money for the products and suffered pecuniary injury as a direct and proximate result of Curaleaf's tortious and unlawful conduct.  Plaintiff reviewed the packaging and/or labeling on the cannabis product, which contained inadequate warnings that the use of cannabis is associated with, causes, and exacerbates serious medical conditions.  Plaintiff brings this action on behalf of himself, the Multi-State Class, and the Ohio Class. Plaintiff discovered that Curaleaf had breached its warranties regarding their cannabis products in or about February, 2026. Plaintiff sent notice through his counsel to CHI and CI of the claimed breaches of warranties on or about March 11, 2026 by FedEx.

31.  Defendant Curaleaf Holdings, Inc. is a corporation organized under the laws of British Columbia, Canada, with its principal place of business located at 290 Harbor Drive in Stamford, Connecticut. CHI is a vertically integrated cannabis operator engaged in the cultivation, processing, distribution, and retail sale of cannabis and cannabis-derived products in multiple U.S. markets under brands including, but not limited to, Curaleaf, Find, JAMS, B Noble, Grassroots,

12

Select and its line of Zero Proof seltzers. CHI conducts its business and cannabis-related operations in the United States through CI in which it holds a controlling interest and over which it exercises control. CHI and CI control and direct company-wide branding, labeling, quality control, and business and promotional strategy through CHI and CI's subsidiaries.

32. Defendant Curaleaf, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 290 Harbor Drive in Stamford, Connecticut. CHI holds a controlling interest in CI through which it manages its vertically integrated cannabis business throughout the United States. CI conducts its business through its wholly-owned subsidiaries (and those in which it holds a controlling interest) over which it exercises control and that are engaged in cannabis-related operations, including the following entities: CLF AZ Management, LLC, an Arizona limited liability company; Curaleaf Florida, LLC, a Florida limited liability company; Cura Partners, Inc., an Oregon corporation; GR Companies, Inc., a Delaware corporation; Curaleaf Massachusetts, Inc., a Massachusetts corporation; Curaleaf NJ II, Inc., a Delaware corporation; Curaleaf Holdings LLC, a New York limited liability company; Curaleaf NY, LLC, a New York limited liability company; CLF NY, Inc., a Delaware corporation; Tryke Companies, LLC, an Arizona limited liability company, Tryke Companies SO NV, LLC, a Nevada limited liability company, Tryke Companies Reno, LLC, a Nevada limited liability company, and Tryke Companies Utah, LLC, a Utah limited liability company; CLF AZ, Inc., a Delaware corporation; Curaleaf MD, LLC, a Maryland limited liability company; Curaleaf OGT, Inc., a Delaware corporation; PalliaTech CT, Inc., a Delaware corporation; PT Nevada, Inc., a Delaware corporation; GR Companies, Inc., a Delaware corporation; Curaleaf Compassionate Care VA, LLC, a Virginia limited liability company; Curaleaf DH, Inc., a Delaware corporation; Curaleaf Stamford, Inc., a Connecticut corporation; and Windy City Holding Company, LLC, an

13

Illinois limited liability company. CHI and CI control and direct a company-wide branding, labeling, quality control, and business and promotional strategy through each of the foregoing wholly-owned entities (or entities in which it holds a controlling interest) that are engaged in activities forming part of CHI and CI's vertically integrated cannabis business.

33.  CHI and CI control company-wide cannabis production, policies, marketing, branding, quality control, and business strategy.  CHI and CI, through their employees and/or agents, manage, direct, conduct and/or control operations relating to their subsidiaries' participation in the process by which cannabis products are produced, branded, marketed and/or sold to consumers. CHI and CI also control company-wide decisions on production, branding, marketing, and sales of cannabis products.  CHI's and CI's management, direction, conduct and/or control is exercised through a variety of means, including through their employees' and/or agents' implementation of policies, procedures, and programs relating to their cannabis products and to marketing, branding, and sales of such products specifically.  CHI states in its 2025 Form 40-F Exhibit 99.2 filed with the U.S. Securities and Exchange Commission ("SEC") that it is "a vertically integrated, high-growth cannabis operator" whose brands include "Curaleaf, JAMS, Grassroots, Select, and its line of Zero Proof Seltzers."  CHI states in its Form 40-F for the years ending in 2023 and 2024 Exhibit 99.2 filed with the SEC that the "Company remains focused on developing a trusted global brand." CHI further states in that document that CHI "through its controlling interest in Curaleaf, Inc. [CI] derives the majority of its revenues from operations in the U.S. As of December 31, 2024, over 92% of the Company's consolidated Total revenues, net were generated in the U.S." CHI further states in the same document: "Through its team of physicians, pharmacists, medical experts and industry innovators, the Company has developed a portfolio of branded cannabis-based therapeutic offerings in multiple formats and a strategic network of branded retail dispensaries. The Company

14

is also committed to leading the industry in education and advancement through research and advocacy and leverages its extensive research and development capabilities to distribute cannabis products with the highest standard for safety, effectiveness, consistent quality and customer care." CHI states in the same document that the "Company's primary method of sales in the U.S. currently occurs through its U.S. state-licensed dispensaries. Most of the Company's U.S. state-licensed dispensaries offer customers the option to order online to pick-up in store." CHI states that its compliance department reports to its Chief Legal Officer and through its compliance officers: "designs and implements strategies in response to regulatory changes" and "report[s] developments to the CLO." CHI further states: "The Company believes that it has developed the in-house resources to ensure its licensed entities maintain best practices in cannabis cultivation, processing and dispensing, and the Company is dedicated to staying at the forefront of technology in the industry. The Company continues to invest strategically in infrastructure to ensure its licensed entities maintain low overall production costs and adaptability in product mix to ensure timely response to the rapidly evolving cannabis markets. The Company intends to use its footprint to leverage know-how and technology throughout its operations." With respect to "Formulation and Quality Control" in this same SEC filing, CHI states: "The Company's processing facilities produce a wide spectrum of solid, liquid and inhaled products. By combining expert cultivation, manufacturing and analytical laboratory operations, the Company has developed a completely in-house quality assurance and quality control program. In-house quality assurance enables rapid product development cycles and production of higher quality consumer products." CHI also states that the "Company's research and development activities primarily focus on (i) optimizing cannabis cultivation and manufacturing techniques, (ii) developing new manufactured cannabis products and (iii) understanding the potential medical benefits of cannabis." Curaleaf states on its

15

website that "[p]roviding patients with quality cannabis for health and wellness has been our focus for the last decade" and that "[a]t Curaleaf, we focus on your relationship with cannabis." Curaleaf also states on its website: "**We're Here to Guide You.** Everyone walks in to a dispensary looking for something, and it's our goal to meet your needs. We work WITH you to curate your own, one-of-a-kind cannabis experience. One that's uncomplicated, approachable, and as unique as you are." Curaleaf's website further states: "Our mission is to provide clarity around cannabis and confidence around consumption."

34. As a result of their management, direction, conduct and/or control of operations relating to company-wide cannabis production, policies, marketing, branding, quality control, and business strategy, CHI and CI are responsible for their subsidiaries' past and current production, branding, marketing, and sales of cannabis products.

## III.    **JURISDICTION AND VENUE**

35. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendants, there are more than 100 class members nationwide; and the aggregate amount in controversy exceeds $5,000,000.

36. This Court has personal jurisdiction over CHI and CI, which are headquartered in Stamford, Connecticut, thus making them subject to the general jurisdiction of this Court. CHI and CI also maintain continuous and systematic contacts with the District of Connecticut through, among other things, its marketing, distribution, and sale of cannabis products to consumers within this District. CHI and CI have purposefully availed themselves of the privilege of conducting business in this District.

37. CHI and CI have further subjected themselves to personal jurisdiction in every state in which it operates by materially participating in conduct that caused intended and foreseeable effects on Plaintiffs and the putative class members residing in those states. CHI and CI have marketed, sold, and distributed their cannabis products through a nationwide network of dispensaries and retail outlets, and CHI and CI knew or should have known that their conduct would reach and injure consumers across multiple jurisdictions.

38. The amount in controversy exceeds $75,000.

39. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in this District. CHI and CI actively marketed, distributed, and sold the cannabis products at issue to consumers in the District of Connecticut, and the injuries and damages alleged herein were suffered, in part, within this District. Further, the interests of judicial economy and convenience of the parties support venue here.

## IV.    FACTUAL ALLEGATIONS

### A.    Cannabis and Its Uses

40. Cannabis, generally, is the greenish-gray mixture of dried flowers from the *Cannabis sativa* plant. For purposes of this Complaint, "cannabis" is defined as marijuana, hashish, and other substances that are identified as including any parts of the plant *Cannabis sativa* and including derivatives or subspecies and any compound manufacture, salt, derivative, mixture, concentrate or preparation of the plant, its seeds, or resin that contains delta-9-tetrahydrocannabinol ("Δ9-THC") that is not otherwise "hemp" under applicable law. All Defendants' cannabis products are materially identical for purposes of the injuries alleged. Every

17

product manufactured, sold, or offered for sale by Defendants is derived from the cannabis plant and contains the same psychoactive compound, Δ9-THC.

41. The *Cannabis sativa* plant contains 545 constituent compounds, the most prominent of which is the cannabinoid and psychoactive substance Δ9-THC.  Δ9-THC exerts its effects on the body's endocannabinoid system, a ubiquitous, endogenous system of neurotransmitters in the human body.

42. The two most important cannabinoid receptors are called CB1 and CB2.  CB1 receptors are most abundant in the central nervous system, most notably the basal ganglia, cerebellum, hippocampus, and cerebral cortex portions of the brain.  CB2 receptors are generally found in the body's immune cells and tissues.

43. Δ9-THC, by binding to CB1 receptors in the central nervous system, affects executive functioning, decision making, sensory responsiveness, motor function, learning, memory, and emotional reactions.  Short-term effects include altered senses and perception, distorted sense of time, mood fluctuations, impaired body movement, disorganized thinking and problem-solving, diminished memory, hallucinations, delusions, and psychosis.

44. Cannabis can be inhaled or digested.  The effects and adverse reactions differ based on the method of administration.  Inhalation is the fastest method of delivery and is preferred by many consumers. [4]  The effect from smoking or vaping is near instantaneous and may last up to

---

[4] Marijuana can also be ingested orally through edibles, tinctures, capsules, concentrates, or oils. Oral ingestion requires the extraction of the desired constituents of cannabis, generally Δ9-THC and CBD.  Extraction involves the use of solvents such as ethanol, butane, methanol, or propane that are then distilled leaving Δ9-THC and CBD, usually after further chemical refinement. Modern techniques not involving solvents include ultrasound-assisted extraction, supercritical extraction, and pressurized hot water extraction. Depending on the process used for extraction, different types of concentrates are produced. These include shatter, rosin, BHO, $CO_2$ oil, wax, crumble, and live resin. Other solvent-free extraction methods include manually separating or grinding and sieving to isolate the trichomes, which contain the highest level of Δ9-THC and CBD

four hours, with the peak effects manifesting one hour after inhalation. [5]

45. Cannabis edibles (i.e. Δ9-THC-bearing food) produce a different pharmacokinetic profile than smoking or vaping. The effect onset is delayed by 30 to 60 minutes and the high can last for over six hours and is generally stronger. Edibles are often preferred by those who wish to avoid the caustic effect of smoking or by those seeking to consume without the tell-tale aroma of smoked cannabis. "Dosing" with edibles is much more difficult due to the delayed and varied onset of the effects. Consequently, edibles have recently been tied to cannabis "overdoses" following ingestion of additional doses because of the misperception that the initial dose had not produced the desired effect.

46. Cannabis users tend to use cannabis far more frequently and in higher amounts than drinkers consume alcohol. Nearly 40% of cannabis users consume at least once daily whereas only about 10% of drinkers use alcohol daily. One group of researchers representing Carnegie Mellon University, the RAND Corporation, and New York University explained that "normal marijuana use more closely resembles binge drinking than it does mere drinking."

47. Cannabis has become a more popular drug since cannabis purveyors, including Defendants, have begun openly marketing and touting the benefits of their products.

---

and is commonly referred to as "kief." Cannabis concentrate can also be smoked or vaporized or "dabbed." Marijuana can also enter the blood stream when placed under the tongue and absorbed by the large blood vessels in the mouth. Common examples of these types of products include dissolvable strips, sublingual sprays, or medicated lozenges or tinctures.

[5] There are two ways to inhale cannabis—smoking or vaporizing/vaping. Smoking involves burning cannabis and inhaling the active components of the plant that are released. Vaporization/vaping involves inhaling an aerosol or vapor produced from Δ9-THC-bearing oil or wax or dry cannabis that is heated in an electronic powered device such as an e-cigarette or vape pen.

19

B. **Federal Cannabis Law**

48. The U.S. Drug Enforcement Administration (DEA) currently classifies cannabis as a Schedule I controlled substance.[6] Under federal law, sale and possession of cannabis and all derivatives is illegal.[7] The production, possession, and distribution of cannabis are felony violations of the Controlled Substances Act (CSA), punishable by fines and imprisonment or both.

49. On July 19, 2016, the DEA denied a petition to initiate rulemaking proceedings to permit the medicinal use of marijuana through reclassification. The DEA's conclusion was based on the consistent findings that cannabis: (1) "has a high potential for abuse;" (2) "has no currently accepted medical use in treatment in the United States;" and (3) "lacks accepted safety for use under medical supervision."

50. Though illegal, the United States Justice Department generally has a policy not to enforce federal cannabis laws against those possessing and distributing cannabis in accordance with a state's regulatory framework for medicinal or recreational use. The 2013 Cole Memorandum, entitled "Guidance Regarding Marijuana Enforcement," shifted governmental priorities from tough enforcement of federal cannabis law towards a more hands-off approach in those "jurisdictions that have enacted laws legalizing marijuana in some form and that have also

---

[6] *Drug Scheduling*, U.S. DRUG ENF'T ADMIN., https://www.dea.gov/drug-scheduling (last visited May 1, 2025). Schedule I drugs are substances or chemicals that are defined as drugs with no currently accepted medical use and high potential for abuse. *Id.* Other Schedule I drugs include heroin, lysergic acid diethylamide (LSD), 3,4-methlenedioxymethamphetamine (ecstasy), methaqualone, and peyote. *Id.* As addressed below, FDA-approved marijuana products and state-licensed medical marijuana products that are not the subject of this complaint have been re-classified to Schedule III.

[7] 21 U.S.C. §§ 801–901. Congress passed the Controlled Substances Act by a bipartisan vote of 341 to 6. To Pass H.R. 18583, Comprehensive Drug Abuse Prevention and Control Act of 1970, GOVTRACK.US, https://www.govtrack.us/congress/votes/91-1970/h355 (last visited May 1, 2025).

implemented strong and effective regulatory and enforcement systems to control the cultivation, distribution, sale and possession of marijuana." The Memorandum further provided:

> [A] robust system may affirmatively address [federal] priorities by, for example, implementing effective measures to prevent diversion of marijuana outside the regulated system and to other states, prohibiting access to marijuana by minors, and replacing an illicit marijuana trade that funds criminal enterprises with a tightly regulated market in which revenues are tracked and accounted for.

51. The Cole Memorandum was later rescinded by Attorney General Jeff Sessions who drafted his own memorandum to all U.S. Attorneys in 2018. In practice, however, very little changed.

52. In 2024, however, the DEA under the Biden Administration initiated rulemaking proceedings to reschedule marijuana from Schedule I of the Controlled Substances Act to Schedule III, which would have permitted its medicinal use. Evidentiary hearings were slated to start on January 21, 2025, but were postponed due to legal challenges concerning participant inclusion. The process remained on hold pending resolution of the procedural appeals.

53. On December 18, 2025, President Trump signed an executive order titled *Increasing Medical Marijuana and Cannabidiol Research*, directing the Attorney General and federal agencies to expedite the longstanding effort to reschedule cannabis from Schedule I to Schedule III under the Controlled Substances Act. The order explicitly accelerates the rulemaking process by setting strict timelines and requiring agencies to prioritize regulatory review.[8] On April 23, 2026, Acting Attorney General Todd Blanche implemented this directive by immediately moving FDA-approved marijuana products and state-licensed medical marijuana products to Schedule III, while initiating an expedited DEA administrative hearing (beginning June 29, 2026) for broader

---

[8] *Id.*

rescheduling of marijuana. These actions pertain to non-recreational uses of certain marijuana products which are not the subject of this complaint.

**C. State Cannabis Laws**

54. The following states have enacted laws or regulations related to cannabis as described below:

a. Arizona[9]
- Smart and Safe Arizona Act, Ariz. Rev. Stat. § 36-2850 *et seq*.
- Arizona Medical Marijuana Act, Ariz. Rev. Stat. § 36-2801 *et seq.*
- Ariz. Admin. Code tit. 9, ch. 18 (Department of Health Services—Medical Marijuana Program).
- Ariz. Admin. Code tit. 9, ch. 17 (Department of Health Services—Adult-Use Marijuana Program).
- Ariz. Admin. Code tit. 3, ch. 4, art. 9 (Department of Agriculture—Hemp Program, Cannabis-Related Regulations).

b. Connecticut[10]

---

[9] Arizona law requires that marijuana and marijuana products be sold in clearly and conspicuously labeled containers that include warnings regarding their use, including the statement: "ARIZONA DEPARTMENT OF HEALTH SERVICES' WARNING: Marijuana use can be addictive and can impair an individual's ability to drive a motor vehicle or operate heavy machinery. Marijuana smoke contains carcinogens and can lead to an increased risk for cancer, tachycardia, hypertension, heart attack, and lung infection. Marijuana use may affect the health of a pregnant woman and the unborn child. KEEP OUT OF REACH OF CHILDREN." Ariz. Rev. Stat. Ann. § 36-2854 (LexisNexis 2026). Arizona also requires pregnancy-specific warnings accessible via QR code stating: "Using Marijuana during pregnancy could cause birth defects or other health issues to your unborn child." Ariz. Admin. Code § R9-18-314 (2026). Additionally, retail establishments must post signage warning: "WARNING: There may be potential dangers to fetuses caused by smoking or ingesting marijuana while pregnant or to infants while breastfeeding" and "WARNING: Use of marijuana during pregnancy may result in a risk of being reported to the Department of Child Safety during pregnancy or at the birth of the child by persons who are required to report." Ariz. Admin. Code § R9-18-402 (2026).

[10] Connecticut requires that cannabis product labels include rotating warning statements addressing health risks. Conn. Gen. Stat. Ann. § 21a-420j (LexisNexis 2026). The required warnings include: "Children, or those who are pregnant or breastfeeding, should avoid using such product prior to consulting with a health care professional concerning such product's safety"; "Products containing cannabinoids should be kept out of reach of children"; and "The U.S. Food and Drug Administration has not evaluated this product for safety or efficacy." Conn. Agencies Regs. § 21a-420-25 (2026). Connecticut additionally requires that products intended for inhalation bear the warning: "Smoking or vaporizing is hazardous to human health." *Id*. Further required rotating

22

- Responsible and Equitable Regulation of Adult-Use Cannabis Act, Conn. Gen. Stat. § 21a-420 *et seq*.
- Palliative Use of Marijuana Act, Conn. Gen. Stat. § 21a-408 *et seq*.
- Conn. Agencies Regs. §§ 21a-408-1 to 21a-408-72 (Department of Consumer Protection—Palliative Use of Marijuana Program Regulations).
- Conn. Agencies Regs. §§ 21a-421j-1 to 21a-421j-99 (Department of Consumer Protection—Adult-Use Cannabis Program Regulations).
- Conn. Agencies Regs. §§ 21a-421jj-1 to 21a-421jj-99 (Department of Consumer Protection—Cannabis Product Safety, Packaging, and Labeling Requirements).

c. Illinois[11]
   - Cannabis Regulation and Tax Act, 410 ILCS 705, *et seq*.

---

warnings include: "Warning: Consumption while pregnant or breastfeeding may be harmful"; and "Warning: Cannabis has intoxicating effects and may be habit-forming and addictive." *Id.*
[11] Illinois requires cannabis products to be labelled in a sufficient manner to "ensure that purchasers are informed and protected" including that "purchasers will be informed of any known health risks associated with the use of cannabis, as concluded by evidence-based, peer reviewed research." 410 ILCS 705/1-5. Cannabis product labels for cannabis products must contain the following warnings:

> This product contains cannabis and is intended for use by adults 21 and over. Its use can impair cognition and may be habit forming. This product should not be used by pregnant or breastfeeding women. It is unlawful to sell or provide this item to any individual, and it may not be transported outside the State of Illinois. It is illegal to operate a motor vehicle while under the influence of cannabis. Possession or use of this product may carry significant legal penalties in some jurisdictions and under federal law.

Illinois requires every dispensary to display a placard stating:

> Cannabis consumption can impair cognition and driving, is for adult use only, may be habit forming, and should not be used by pregnant or breastfeeding women.

> Edible cannabis-infused products were produced in a kitchen that may also process common food allergens.

> The effects of cannabis products can vary from person to person, and it can take as long as two hours to feel the effects of some cannabis-infused products. Carefully review the portion size information and warnings contained on the product packaging before consuming.

8 Ill. Adm. Code 1300.940.

- Compassionate Use of Medical Cannabis Program Act, 410 ILCS 130, *et seq.*
- Ill. Admin. Code tit. 8, Part 1300 (Subparts A–J) (Agriculture & Animals)—Cannabis Regulation and Tax Act.
- Ill. Admin. Code tit. 68, pt. 1291 (Cannabis Regulation and Tax Act, Adult-Use – Dispensary Licensing, Social Equity, Vendor Rules).
- Ill. Admin. Code tit. 68, pt. 1291 (Cannabis Regulation and Tax Act—Adult-Use: Dispensary Licensing, Social Equity, Vendor Rules).
- Ill. Admin. Code tit. 68, pt. 1290 (Rules for Administration of the Compassionate Use of Medical Cannabis Program).

d. Maryland[12]
- Cannabis Reform Act of 2023, Md. Code, Alcoholic Beverages & Cannabis § 36-101 *et seq*.
- Natalie M. LaPrade Medical Cannabis Commission Statute, Md. Code, Health–General § 13-3301 *et seq*.
- COMAR 14.17.01–.18 (Maryland Cannabis Administration—Adult-Use and Medical Cannabis Regulations).

e. Massachusetts[13]
- Regulation of the Use and Distribution of Marijuana Not Medically Prescribed Act, Mass. Gen. Laws ch. 94G, § 1 *et seq*.
- Massachusetts Medical Use of Marijuana Program, Mass. Gen. Laws ch. 94I, § 1 *et seq*.
- 935 Mass. Code Regs. 500.000–500.180 (Cannabis Control Commission—Adult-Use Marijuana).
- 935 Mass. Code Regs. 501.000–501.180 (Cannabis Control Commission—Medical Use of Marijuana).

---

[12] Maryland regulations require cannabis product labels to include multiple health and safety warnings. Md. Code Ann., Alcoholic Beverages & Cannabis § 36-801 (LexisNexis 2026). Required label statements include: "The contents may only be lawfully consumed by a consumer 21 years old or older, or a registered medical cannabis patient"; "Consumption of cannabis may impair your ability to drive a car or operate machinery. Please use extreme caution"; "There may be health risks associated with cannabis use, especially during pregnancy or breastfeeding"; and "This package contains cannabis. Keep out of the reach of children and animals." Md. Code Regs. 14.17.11.07 (2026). Labels must also include the Maryland Poison Center emergency telephone number. *Id.*

[13] Massachusetts requires comprehensive warning statements on all marijuana products. 935 Mass. Code Regs. 500.105 (2026). The primary warning statement must read: "This product has not been analyzed or approved by the FDA. There is limited information on the side effects of using this product, and there may be associated health risks. Marijuana use during pregnancy and breast-feeding may pose potential harms. It is against the law to drive or operate machinery when under the influence of this product. KEEP THIS PRODUCT AWAY FROM CHILDREN." *Id.* Labels must also include the general warning: "There may be health risks associated with consumption of this product." *Id.* All warnings must appear in at least ten-point font, and the statement "KEEP OUT OF REACH OF CHILDREN" must be prominently displayed. *Id.*

    f. Nevada[14]
- Regulation and Taxation of Marijuana Act, Nev. Rev. Stat. § 453D.010 *et seq.*
- Nevada Medical Marijuana Act, Nev. Rev. Stat. § 453A.010 *et seq.*
- Nev. Admin. Code ch. 453A (Medical Marijuana) and ch. 453D (Adult-Use Marijuana) (Cannabis Compliance Board Regulations).

    g. New Jersey[15]
- New Jersey Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act, N.J. Stat. Ann. § 24:6I-31 *et seq.*
- Compassionate Use Medical Cannabis Act, N.J. Stat. Ann. § 24:6I-1 *et seq.*
- N.J. Admin. Code tit. 17, ch. 30 (Cannabis Regulatory Commission—Adult-Use and Medical Cannabis Rules).

---

[14] Nevada requires cannabis product labels to include health warnings in at least 12-point font and not in italics. Nev. Admin. Code § 678B.510 (2026). Required warnings include: "Cannabis and cannabis products must be kept out of the reach of children"; "Cannabis and cannabis products can cause severe illness in children"; "Allowing children to ingest cannabis or cannabis products, or storing them in an accessible location, may result in an investigation by a child welfare agency or criminal prosecution for child abuse or neglect"; "THE INTOXICATING EFFECTS OF CANNABIS MAY BE DELAYED BY 2 HOURS OR MORE AND USERS OF CANNABIS PRODUCTS SHOULD INITIALLY INGEST A SMALL AMOUNT OF THE PRODUCT CONTAINING NO MORE THAN 10 MILLIGRAMS OF THC, THEN WAIT AT LEAST 2 HOURS BEFORE INGESTING ANY ADDITIONAL AMOUNT OF THE PRODUCT"; "This product may have intoxicating effects and may be habit forming. Smoking is hazardous to your health"; "Ingesting cannabis or cannabis products with alcohol or other drugs, including prescription medication, may result in unpredictable levels of impairment and a person should consult with a physician before doing so"; "There may be health risks associated with consumption of this product"; "Pregnant women should consult with a physician before ingesting cannabis or cannabis products"; "Cannabis or cannabis products can impair concentration, coordination and judgment. Do not operate a vehicle or machinery under the influence of cannabis or cannabis products"; and "Ingestion of any amount of cannabis or cannabis products before driving may result in criminal prosecution for driving under the influence." *Id.*

[15] New Jersey requires cannabis items to bear specific warning statements on labels. N.J. Stat. Ann. § 24:6I-35 (LexisNexis 2026). Required warnings include: "This product contains cannabis"; "This product is intended for use by adults 21 years of age or older and is not intended for resale"; "Keep out of the reach of children"; "There may be health risks associated with cannabis use, especially for women who are pregnant, breastfeeding, or planning on becoming pregnant"; "Do not drive a motor vehicle or operate heavy machinery while using this product"; and "Poison Control: 1-800-222-1222." N.J. Admin. Code § 17:30-14.4 (2026). For high-potency products containing more than 40% THC, an additional warning in at least 10-point font on the front of the package must state: "This is a high potency product and may increase your risk for psychosis." *Id.* For ingestible cannabis products, labels must include the warning: "The intoxicating effects of this product may be delayed by two or more hours." *Id.*

25

h. New York[16]
- Marihuana Regulation and Taxation Act, N.Y. Cannabis Law § 1 et seq.
- Compassionate Care Act, N.Y. Pub. Health Law § 3360 *et seq*.
- N.Y. Comp. Codes R. & Regs. tit. 9, subtit. B (Office of Cannabis Management—Adult-Use and Medical Cannabis Regulations).

i. Ohio[17]
- Regulate Marijuana Like Alcohol Amendment (2023), Ohio Rev. Code Ann. § 3780.01 *et seq*.
- Ohio Medical Marijuana Control Program, Ohio Rev. Code Ann. § 3796.01 *et seq*.
- Ohio Admin. Code chs. 3796:1-1 to 3796:8-4 (Board of Pharmacy, Dept. of Commerce, Medical Board—Medical Marijuana Rules).
- Ohio Admin. Code chs. 3780:1-1 to 3780:8-4 (Dept. of Commerce—Adult-Use Marijuana Rules).

## D. Cannabis and Health

### i. Psychosis and Schizophrenia

55. Perhaps the most alarming health risk associated with marijuana use is its causal relationship with mental health disorders, particularly grim afflictions such as schizophrenia and psychosis.[18] A relationship that has been verified by dozens of peer-reviewed studies, systematic

---

[16] New York law requires cannabis products to bear health warnings addressing potential impacts. N.Y. Cannabis Law § 81 (McKinney 2026). Required statements include: "This product contains cannabis and THC"; "KEEP OUT OF REACH OF CHILDREN AND PETS. For use only by persons 21 years of age and older"; "Warning: Do not use if pregnant or nursing"; and "Poison Center 1-800-222-1222." 9 N.Y.C.R.R. § 128.6 (2026). Products intended to be smoked or vaped must bear the warning: "Warning: Smoking or vaping is hazardous to health." *Id*. Oral cannabis products must include the warning: "Warning: Effects of this product may be delayed by 4 or more hours." *Id*. Topical cannabis products must be labeled: "Warning: For topical use only. Do not eat or smoke." *Id.*

[17] Ohio law requires cannabis product labels to include health and safety warnings. Ohio Rev. Code Ann. § 3796.25 (LexisNexis 2026). Required warnings include: "This product may cause impairment and may be habit-forming"; and "This product may be unlawful outside of the State of Ohio." Ohio Admin. Code § 3796:6-3-09 (2026). For edible and infused cannabis products, labels must include the additional warning: "Caution: When eaten or swallowed, the effects and impairment caused by this drug may be delayed." *Id.*

[18] According to Hill's Postulates, evidence supporting causality includes: (1) strength of association; (2) consistency; (3) specificity of the association; (4) temporality; (5) biological gradient (i.e. dose-response curve); (6) plausibility; (7) coherence; (8) experiment; and (9) analogy.

26

reviews, and meta-analyses. This association is so strong that the Canadian Government advised in 2018, "there is strong evidence that using cannabis may increase the risk of an individual developing psychosis and schizophrenia." In 2017, the National Academy of Sciences declared, "[t]here is substantial evidence of a statistical association between cannabis use and the development of schizophrenia or other psychoses, with the highest risk among the most frequent users." Other studies have also linked cannabis use to the development of psychiatric disorders.

56. There is an increasing amount of mental health impacts from cannabis products in states that legalized cannabis for medical and recreational purposes.

57. In Colorado, which legalized recreational cannabis in 2012, emergency room visits and hospitalizations with marijuana-related billing codes increased 116% between 2000 and 2015. The prevalence of mental illness in patients admitted to the hospital generally with a marijuana-related billing code was nine times higher when compared to patients admitted without said code.

58. A 2022 Colorado study found that as recreational dispensaries per 10,000 residents in Colorado increased, the rate of emergency room visits for cannabis-involved complications increased 24%.

59. A study published in the Canadian Journal of Psychiatry found a significant increase in the percentage of emergency room visits for first-episode psychosis in states post-legalization.

60. A 2025 study in Arizona found that cannabis-related visits to an emergency room were seven times more likely to involve psychotic disorder than cannabis-unrelated visits during the years 2016 through 2022.

61. The capacity of cannabis to induce short-term psychosis is recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM). A diagnosis of Cannabis-Induced Psychotic Disorder (CIPD) is given when one who has recently

27

ingested cannabis "presents with hallucinations and/or delusions causing clinically significant distress or impairment in social, occupational, or other important areas of functioning." CIPD can be differentiated from cannabis intoxication in that CIPD symptoms are "severe enough to warrant clinical attention/treatment, the hallucinations or delusions are experienced without insight, and the symptoms are not time-locked to exposure but rather can last for as long as a month."

62. CIPD is strongly associated with a subsequent diagnosis of long-term psychosis. A study of 18,478 Finnish patients hospitalized for substance induced psychosis found that nearly half of those admitted for CIPD had been diagnosed with schizophrenia eight years later compared with 5% of those who had been hospitalized for alcohol induced psychosis.

63. The bedrock study illuminating the profound impact cannabis use has on the development of long-term psychosis is the Swedish conscript study, published in 1987. In that study, researchers examined the effect of drug use on Swedish military conscripts who filled out extensive questionnaires regarding their upbringing, education, and drug use upon conscription in 1969-1970. To examine the effect of cannabis, researchers tracked the hospitalizations and psychiatric inpatient registries for these conscripts through 1983. Of the nearly 45,000 Swedish conscripts considered, researchers found that those who had used cannabis on fifty or more occasions in 1969-1970 had a six times greater risk of having developed schizophrenia by 1983. Importantly, researchers found that the relative risk of schizophrenia was dose dependent, increasing with increased cannabis consumption. Even when statistically controlling for other confounding factors such as prior psychiatric illness, social background, and prior family history

28

of mental illness, researchers found a persistent association with cannabis that more than doubled the risk of developing schizophrenia. [19]

64.   Perhaps the most comprehensive longitudinal study ever conducted, the Dunedin, New Zealand Multidisciplinary Health and Development Study (which is still ongoing), similarly found a conclusive link between cannabis use and subsequent psychosis.  The study has been following a group of approximately 1,000 people since their birth sometime in 1972 or 1973.  The children were assessed at ages 5, 7, 9, 11, 13, 15, 18, 21, and 26. [20]  Researchers found that cannabis use was associated with a threefold risk of developing schizophrenia or schizophreniform disorders even after controlling for psychotic symptoms prior to cannabis use.

65.   Another New Zealand study reached similar results.  A longitudinal 25-year study of 265 children found that, even after controlling for previous psychotic symptoms, daily cannabis users experienced psychotic symptoms at nearly twice the rate of non-users.  Regression models indicated that cannabis use had a "positive and significant" effect on psychotic symptoms suggesting that increasing cannabis use was associated with increased symptom levels.  Moreover, after controlling for several confounding factors, including anxiety disorder, deviant peer affiliations, exposure to childhood sexual or physical abuse, educational achievement, and, most

---

[19] A follow-up with of the same Swedish cohort in 2002 found that cannabis use remained associated with schizophrenia, the risk increasing with the frequency of cannabis exposure. Researchers found further that those who had consumed cannabis at least 50 times had a 6.7 times greater chance of developing schizophrenia 27 years later.  This risk held when the analysis was repeated on a subsample of men who used cannabis only, as opposed to using other drugs as well. The risk was reduced, but remained significant, after controlling for confounders such as disturbed behavior, low IQ, growing up in a city, cigarette smoking, and poor social integration.  The adjusted odds ratio for developing schizophrenia in years 0–5 after conscription in subjects who have ever used cannabis was 4.7.

[20] The assessment is a one-day process that consists of "almost all" aspects of the groups physical and mental health, including cardiovascular, dental, respiratory, sexual, and mental health, psychosocial well-being, and detailed interviews about relationships, behavior and family.

importantly, psychotic symptoms at a previous assessment, the association remained strong and significant.  The authors concluded:

> The findings are clearly consistent with the view that heavy cannabis use may make a causal contribution to the development of psychotic symptoms since they show that, independently of pre-existing psychotic symptoms and a wide range of social and contextual factors, young people who develop cannabis dependence show an elevated rate of psychotic symptoms.

66.  The devastating association goes beyond use during adolescence or young adulthood. A three-year, population-based study from 2022 of the incidence, course, and consequences of psychiatric disorders in over 4,000 randomly selected adult Danes reported that baseline history of cannabis use significantly increased the risk of a "follow-up psychosis outcome" three years later by a factor of nearly three.  This risk remained significant after statistical adjustments for a range of factors, including ethnic group, marital status, educational level, urbanicity, and discrimination. The authors found a dose-response relationship between schizophrenia and schizophreniform and cannabis use such that for the most frequent cannabis users the risk was nearly seven times higher. The authors concluded that "cannabis use is an independent risk factor for the emergence of psychosis in psychosis free persons and may be responsible for as much as half the serious psychosis in previously healthy adults."

67. Study after study has continued to corroborate with hard evidence the causative association between cannabis use and psychosis.

68. A 2007 systematic review and meta-analysis of population-based and longitudinal studies reported a 40% increased risk of any psychotic outcome in individuals who had ever used cannabis compared with non-users.  As with other studies, the more cannabis ingested, the greater the risk.

69.  An examination of a nationally representative U.S. sample of approximately 34,653 adults derived from a 2001-2002 epidemiologic survey and a 2004-2005 follow-up also found a dose-dependent relationship between the level of cannabis use and psychosis such that cannabis-dependent subjects had the highest risk, four-fold, of developing psychosis.

70.  A 2016 meta-analysis of cohort and cross-sectional studies assessing cannabis and psychosis also revealed a four-fold increase in the risk of developing psychosis for the heavier users and a two-fold increase in risk for the average cannabis user.

71.  The association persists even among sibling pairs raised in the same households or, in other words, even after controlling for genetics and environment.  A 2010 analysis of 228 sibling pairs in Australia, all born at the same hospital between 1981 and 1984 who were evaluated at ages 5, 14, and 21, focused on the difference between the age of first cannabis use and the Peters Delusion Inventory (PDI)[21] score.  Compared with their siblings, those with more years since first cannabis use were more likely to have higher PDI total scores with every additional year of divergence between the sibling pairs in terms of onset of cannabis use increasing the variance in PDI scores.

72.  It is not just the frequency or length of cannabis use that increases the risk of psychosis; it is also the potency or $\Delta 9$-THC concentration.  In a 2015 case-cohort study, daily cannabis use of high potency cannabis containing 16% $\Delta 9$-THC or higher was associated with a greater risk of developing psychosis when compared with lower potencies.  After controlling for use of other intoxicants, education, gender, and prior employment history, those who used high potency cannabis were three times more likely to develop psychosis when compared to non-users.

---

[21] The Peters Delusions Inventory is a 21-item questionnaire that measures delusional ideation and is one of the primary means by which psychosis is determined and measured.

31

73. A 2019 study published in *The Lancet* examined nearly 1,000 patients presenting with first episode psychosis at 11 sites across Europe and Brazil between 2010 and 2015. The study found that daily cannabis use was associated with 3.2 times increased odds of presenting with a psychotic disorder when compared with never users. For daily users of high potency cannabis, the risk increased to 4.8 times. The study found further that the population attributable fraction of high potency cannabis (in other words, the percentage of psychosis cases that could be prevented if high potency cannabis were no longer available) was 12.2% across the entire sample, rising to 50.3% in Amsterdam and 30.3% in London.

74. The peer-reviewed medical literature convincingly demonstrates that cannabis increases the risk of causing and/or exacerbating psychosis in those who are already vulnerable to such a diagnosis. A recent systematic review and meta-analysis, which included 24 studies and over 16,000 participants who had suffered at least one psychotic episode, showed that independent of the state of psychotic illness, continued cannabis use was associated with a greater increase in psychosis relapse when compared to patients who never used or who discontinued use. Continued use was also associated with longer hospital admissions.

75. A subsequent observational study of 256 patients, 18-65 years of age, with first episode psychosis showed that regular users of cannabis who stopped using after the onset of psychosis had the most favorable illness course with regards to psychotic relapse, whereas continued high-frequency use (i.e. daily use of high potency cannabis) was associated with the worst outcomes. High frequency, high potency users had an over three times greater chance of a subsequent relapse and more intense psychiatric care after the onset of psychosis as well as fewer months until a relapse occurred.

76. A 2025 study examined 1,000 participants aged 16-40 who had recently suffered a brief psychotic episode. A two year follow up revealed that those whose psychotic event had been cannabis-induced had the highest transition rate to schizophrenia – being 87% higher than the non-substance group.

77. A 2025 study further found that, among patients experiencing a first episode of psychosis, the risk of subsequent psychotic disorder declined progressively following cessation of cannabis use and, after approximately 37 weeks of sustained abstinence, receded to a level comparable to that of individuals who had never used cannabis.

78. The weight of the scientific literature also rejects the hypothesis that the higher association between psychosis and cannabis use can be explained by a user's attempt to self-medicate prodromal or full-fledged psychotic symptoms. A 2011 meta-analysis of studies examining the effect of cannabis use on the onset of psychotic illness found that the age of onset of psychosis for cannabis users was nearly three years earlier than for nonusers while alcohol use was not associated with a younger age at onset. The authors commented:

> Our findings do not support the view that people with a propensity to develop psychosis at a young age are simply more likely to use all substances…The result of this systematic review and meta-analysis represents strong scientific evidence for an association between substance use, particularly the use of cannabis, and an earlier age of onset of psychotic illnesses…The results of this study provide strong evidence that reducing cannabis use could delay or even prevent some cases of psychosis. Reducing the use of cannabis could be one of the few ways of altering the outcome of the illness because earlier onset of schizophrenia is associated with a worse prognosis and because other factors associated with age at onset, such as family history and sex, cannot be changed…The results of this confirm the need for a renewed public health warning about the potential for cannabis use to bring on psychotic illness.

79. Similarly, in 2018 the Cannabis Legalization and Regulation Branch of Health Canada synthesized dozens of clinical studies and found that cannabis users developed schizophrenia an average of 1.5 years earlier than non-users.

80. There is compelling evidence in at least two countries that accurately track psychosis related disorders that such diagnoses increase at a population level concomitant with population-wide increases in marijuana use.

81. A 2017 Finland study examining rates of schizophrenia or other psychosis in all children born in 1966 and 1986 in two provinces by age 27 found that prevalence went from 1.0% to 1.9%. In other words, between 1993 and 2013, schizophrenia rates in Finland nearly doubled. Surveys show that marijuana use similarly doubled among Finnish teens and young adults between 1992 and 2002 and remained at the higher levels through 2010. A subsequent Danish study found that the incidence of schizophrenia related disorders increased by 30% between 2002 and 2012. This increase corresponds with an increase in cannabis use in Denmark. Specifically between 1994 and 2010, the rate of cannabis use among 16- to 24-year-olds doubled.

82. A 2021 study examined the proportion of schizophrenia cases in Denmark that were attributable to cannabis use disorder. Researchers reviewed the nationwide mental health records from all people born in Denmark prior to 2001 who were alive and 16 years or older at some point from January 1, 1972, to December 31, 2016. Researchers found that having been diagnosed with cannabis use disorder increased the risk of developing psychosis by a factor of four. The researchers found further that the proportion of schizophrenia cases associated with cannabis use disorder increased from 2.0% prior to 1995 to 8.0% since 2010, a four-fold increase during the past two decades.

34

83. In another gravely unsettling population-based 2025 study including over 13 million Canadians, researchers found that nearly 9% of those with cannabis use disorder eventually went on to develop schizophrenia compared with 0.6% of those without said disorder. Researchers found further that the proportion of new schizophrenia cases attributed to cannabis use disorder nearly tripled since cannabis legalization in Canada, rising from 3.7% before cannabis legalization to 10.3% after legalization.

84. The United States has experienced a similar increase in the prevalence of self-reported psychosis when comparing nationally representative data from the National Epidemiologic Survey on Alcohol and Related Conditions from 2001-2002 with the data from 2012-2013. Researchers noted that those reporting cannabis use were significantly more likely to have self-reported psychosis.

85. A 2020 meta-analysis of 12 high-quality studies revealed a number of arresting conclusions, especially with respect to the biological gradient criteria of Bradford Hill's criteria for causation. Specifically, the meta-analysis found that cannabis use can alter the typical age and onset of schizophrenia symptoms, cannabis-induced psychosis can eventually convert to clinical schizophrenia, frequent use of cannabis at a young age can double the chances of developing schizophrenia, and daily use of high-potency THC may result in a five times greater chance of developing a psychotic illness.

86. A 2022 meta-analysis of studies analyzing the association of cannabis potency with mental health and addiction found that the use of high potency cannabis, relative to low potency cannabis, was associated with an increased risk of psychosis and cannabis use disorder.

87. In a groundbreaking 2023 study, researchers from the National Institute of Drug Abuse and the Mental Health Services of Denmark analyzed health records data for more than 6.9 million

Danes spanning five decades, an enormous data set. Researchers found strong evidence of an association between cannabis use disorder and schizophrenia among men and women, though the association was much stronger among young men. Using statistical models, researchers estimated that as many as 30% of the cases of schizophrenia among men aged 21 through 30 and 15% of cases among women 16 through 49 might have been prevented by avoiding cannabis use disorder. Researchers stated that "the study adds to our growing understanding that cannabis use is not harmless, and that the risks are not fixed at one point in time."

88. In a 2023 article for the National Institute of Health, Dr. D'Souza, M.D., professor of psychiatry at the Yale School of Medicine, stated, "the tight temporal relationship between exposure to cannabinoids and the emergence of psychotic states observed in experimental studies provides strong evidence to support a causal relationship." With respect to schizophrenia, Dr. D'Souza continued, "the relationship between cannabis and schizophrenia fulfills, to varying degrees, a number of the classic Hill criteria of causality, including the strength, consistency, specificity, temporal characteristics, direction, biological gradient, coherence, and plausibility of the association and supporting experimental evidence."

89. In 2024, Dr. Bertha Madras stated when discussing Sir Hill's criteria for the causal relationship between cannabis use and psychosis and schizophrenia:

> When you look at the causality of association, the strength of the association is pretty good. There is consistency across countries. The timing is almost invariably that marijuana precedes the symptoms. The dose-response is very robust; the more potent the drug and the more frequently it is used, the more likely schizophrenia will develop. The specificity is that of all the patients who took different drugs that brought them to the ED, it is marijuana that best predicts the conversion to psychosis. Not the other drugs to the same extent. The biological plausibility is that the symptoms of psychosis that THC produces can be antagonized by the same drug that is used to treat schizophrenia.

36

ii.        **Suicidal Ideation, Depression, PTSD, and Anxiety**

90.    Far from "stimulating or easing the mind," a waxing body of research has established that cannabis use increases the risk of developing mental health disorders such as depression, anxiety, bipolar disorder, and suicidal ideation.

91.    A 2015 systematic review of the scientific literature found that cannabis use worsens the course of bipolar disorder by increasing the likelihood, severity, and/or the duration of manic phases.  This finding persists even after controlling for baseline symptoms, suggesting that cannabis use is causative and not merely a symptom or attempt at self-medication.

92.    In a 2015 study of 1,922 bipolar disorder patients enrolled in a two-year prospective observational study, cannabis users were found to have lower rates of recovery and remission, higher rates of recurrence, and higher rates of work impairment when compared to never users.

93.    A 2023 meta-analysis of 25 studies involving 13,624 individuals examining "the repercussion of cannabis use on the onset of the first episode of bipolar disorder and the worsening of symptoms in pre-existing illness" found a large effect size of 2.63 after conducting a fixed-effects model.

94.    In the most comprehensive study to date examining the medical history of over six million Danes, researchers in 2023 found that individuals with cannabis use disorder have almost double the risk of developing depression, two to three times the risk of developing bipolar disorder, and four times the risk of developing bipolar disorder with psychotic symptoms.  The authors concluded that "[o]ur findings lend support to the notion that cannabis use may represent an independent factor associated with unipolar depression and bipolar disorder."

95.    One of the first studies demonstrating the anxiety-inducing effects of recent cannabis use was performed in 2004 and centered around a group of 22 healthy individuals.  In a three-day

double-blind, randomized procedure study, 22 volunteers were asked to score their feelings using a clinically verified anxiety test after ingesting cannabis. The results showed a statistically significant increase in VAS-A scores of "anxious," with the scores increasing in a dose-dependent manner.

96. A 2017 study of 302 adults between the ages of 18 and 50 over a 12-week period found, after controlling for demographics, treatment condition, and tobacco and alcohol use, that there was a "significant association" between cannabis use and worsening symptoms of anxiety, depression, and sleep quality.

97. A 2015 study of 332 female adults, ages 18-25, found that reductions in cannabis use were significantly associated with reductions in depression symptoms among those reporting at least mild depression symptoms.

98. A 2002 cohort study following students, ages 14-15, in 44 Australian schools over a period of seven years found that daily cannabis use in young women was associated with a more than five-fold increase in the odds of reporting a state of depression and anxiety and that weekly or more frequent cannabis use in teenagers predicted an approximately two-fold increase in the risk for later depression and anxiety after controlling for alcohol use, antisocial behavior, parental separation, parental education, and teenagers' depression and anxiety at 13-14 years old.

99. A New Zealand birth cohort was also used to assess cannabis use and its association with various quality of life metrics. Researchers in 2008 found that increased cannabis use at ages 14 through 21 was "significantly associated" with lower income at age of 25, higher levels of welfare dependence, higher unemployment, lower levels of relationship satisfaction, lower levels of life satisfaction that persisted even after controlling for confounding variables such as family

38

socio-economic background, family functioning, exposure to child abuse, early adolescent academic achievement, mental disorders, and substance abuse.

100.    A 2024 study of over 12 million Canadians without prior care for an anxiety disorder found that a visit to the emergency room for a cannabis related incident increased the risk of a future emergency room visit or outpatient treatment for an anxiety disorder by a factor of nearly four.

101.    A 2018 systematic review of prospective studies examined the longitudinal associations between cannabis use and symptomatic outcomes among individuals with anxiety or mood disorders at baseline.  After inclusion of 12 studies with a total of 11,959 individuals, the authors found that "recent" cannabis use was associated with higher symptomatic levels of posttraumatic stress disorder, panic disorder, bipolar disorder, and depressive disorder over time relative to comparison groups.  The review found further that cannabis was also associated with less symptomatic improvement from treatment.

102.    In a longitudinal U.S. study of a nationally representative sample of 34,000 adults aged 18 years or older researchers investigated the prospective associations of cannabis use in the past 12 months with anxiety disorders three years later. Researchers adjusted for sociodemographic characteristics, family history of substance use disorder, disturbed family environment, childhood parental loss, low self-esteem, social deviance, education, recent trauma, past and present psychiatric disorders, and respondent's history of divorce.  Using the same data set, a different group of authors found that those who had used cannabis in the last year had a nearly three-fold risk of reporting social anxiety disorder.  They also found that regular cannabis use increased the risk of developing panic disorder with agoraphobia and social phobia by nearly a factor of two.

39

103.    A 2023 Canadian Task Force's meta-analysis of 56 studies on cannabis use and bipolar disorder or major depressive disorder found that cannabis use was "associated with worsening course and symptoms of both mood disorders, …increased severity of depressive, manic, and psychotic symptoms in bipolar disorder and depressive symptoms in major depressive disorder."

104.    A 2025 longitudinal study involving participants ages 16 through 50 found that continued cannabis use following first-episode psychosis (FEP) found "persistently higher" depression and suicidality scores and slower recovery and higher relapse rates than non-cannabis users.

105.    A 2024 systematic review of 78 studies found that cannabis use is associated with increased depressive and manic symptoms in the general population in addition to an elevated likelihood of developing major depressive disorder and bipolar disorder and, far from "improv[ing] clinical or treatment outcomes," worsens symptoms of those already suffering from these disorders. Specifically, the authors stated:

> [W]e found compelling evidence indicating that cannabis use and cannabis use disorder are linked to more pronounced symptomatology and less favorable prognosis compared to patients who do not use cannabis. This includes greater levels of anhedonia, suicidality, reduced adherence and poorer cognition…Our systematic review also revealed a multitude of adverse consequences of cannabis use in people with bipolar disorder. This includes more severe symptom profiles, a greater number of manic and depressive episodes, more rapid cycling, and higher levels of suicidality.

106.    Like psychosis, these increased rates of mental health disorders associated with cannabis use are being observed at the population level.  A study in 2018 found that states with more permissive medical cannabis laws were "significantly associated with higher prevalence of [serious mental illnesses]."  The researchers found further that the increased past-year use of

cannabis by state residents was "significantly associated with higher prevalence of [serious mental illnesses]."

107.    With respect to PTSD specifically, the scientific evidence shows that it is not therapeutic, but rather makes symptoms worse and "nullif[ies] the benefits of specialized, intensive treatment." A 2015 longitudinal study involving over 2,000 veterans found that those who began using marijuana after PTSD treatment were significantly more likely to experience more severe symptoms, increased violent behavior, and higher alcohol use compared to those who abstained or ceased use. Moreover, the Veteran's Affairs/Department of Defense Guidelines "strongly" recommends against treating PTSD with cannabis or cannabis derivatives due to the lack of evidence for their efficacy, known adverse side effects, and associated risks.

108.    In 2019, the APA in a position statement opposing the use of cannabis for PTSD found that the extant medical literature contained no high-quality studies that cannabis or cannabinoids could provide benefit for patients suffering with PTSD. Based on its review of the literature, the APA concluded that, if anything, individuals with PTSD who use cannabis have more severe PTSD and possibly worse outcomes than individuals who did not use cannabis.

109.    Most alarming, a steadily condensing body of research has linked marijuana use and suicide. This association appears to be most pronounced for those whose marijuana use began during adolescence.

110.    In 2014, a Lancet-published study combined three longitudinal data sets involving six to nine assessments over a period of 15 years and found a 6.9-fold increase in the risk for subsequent suicide attempts in those using marijuana daily before age 17. A second longitudinal study with a follow-up time of 8 years found, after controlling for a number of variables including a history of any mood disorder, a 7-fold increase in the risk for a suicide attempt for those who

began using marijuana in their teen years. A subsequent meta-analysis of all longitudinal studies evaluating cannabis use prior to the age of 18 found a near 3.5 times increase in the risk of suicide attempts during young adulthood in those with no pre-existing suicidal behaviors, depression, or anxiety. A recent study involving a large and ethnically mixed population of U.S. high school students that effectively controlled for a variety of confounding factors found that those students who had smoked marijuana 20 or more days per month had an over 2.5 increased risk of suicide attempt.

111. The association is not limited to adolescent use. A 2016 meta-analysis of a mix of longitudinal and case-control studies worldwide found that heavy users of cannabis were over three times more likely to attempt suicide than non-users. A 2013 study of Danish individuals who were followed after having been discharged from treatment for cannabis use disorder revealed a 5.3-fold increase in completed suicide. A 2017 study of over 3,000 veterans found that cannabis use disorder was significantly associated with both current suicidal ideation and lifetime suicide attempts, even after accounting for the effects of sex, posttraumatic stress disorder, depression, alcohol use disorder, non-cannabis drug use disorder, childhood sexual abuse, and combat exposure.

112. The National Academy of Sciences in its definitive review of the association between cannabis use and major depression in 2017 found that there is "moderate evidence of a statistical association between cannabis use and increased incidence of suicidal ideation and suicide attempts, with higher incidence among heavier users."

113. A 2020 data summary of case reports of those admitted to the hospital over a four-month period with self-reported history of marijuana use revealed that nearly 10% professed having experienced suicidal ideation in the last 30 days. A 2019 study found that of cannabis using

teens, use of marijuana on a particular day is reported to be a "significant" predictor of a suicide attempt on that day.

114. A 2023 population-based study found that people with a cannabis-related emergency or hospital visit had a 5.4-fold higher adjusted risk of deliberate self-harm and a 9.2-fold higher adjusted risk of death by suicide within three years compared with the general population. These significantly increased risks remained even after adjusting for age, sex, other health conditions, and substance use, indicating a strong association between serious cannabis-related health contacts and subsequent self-harm and suicide outcome.

115. Most recently, a 2025 systematic review of over 50 studies examining the relationship between cannabis use and suicide risk in FEP demonstrated that daily use or high-potency use tripled the risk of suicide in FEP.

### iii.    Cannabis and Cardiovascular Health

116. Cannabis has other serious health effects, including adverse cardiovascular events. A 2025 "exhaustive" systematic review and meta-analysis of 24 studies found that, even after adjusting for age, smoking, and other risk factors, cannabis use doubled the risk of cardiovascular death and increased the risk of stroke by 20%.

117. A separate 2025 study analyzed electronic health records from over 4.6 million adults aged 18-50 with no prior history of cardiovascular disease, comparing the cardiovascular outcomes of those who self-identified as cannabis users to non-users. After adjusting for age, sex, race, tobacco use, and other comorbidities, the findings revealed that cannabis users had significantly elevated cardiovascular risks. Specifically, they faced more than six times higher odds of experiencing a heart attack, four times higher odds of ischemic stroke, double the risk of

developing heart failure, and triple the risk of experiencing any major adverse cardiovascular event.

118. The same team also conducted a 2025 meta-analysis examining the relationship between cannabis use and heart attack by systematically reviewing and pooling data from 12 observational studies encompassing more than 75 million individuals. Researchers found that cannabis users faced a 50% increased risk of experiencing a myocardial infarction compared to non-users.

119. The American College of Cardiology ("ACC") found these results so startling that it issued a press release setting forth the results. In the press release, the ACC quotes the primary author of the study, who advises that "[a]sking about cannabis use should be part of clinicians' workup to understand patients' overall cardiovascular risk, similar to asking about smoking cigarettes."

120. These recent studies build upon a meta-analysis conducted in 2024 examining 26 studies that included 72,551,926 patients that found that self-identified cannabis users had a 38% increased risk of suffering a heart attack and a 43% increased risk of suffering a stroke.

### iv.    Cannabis and Pain

121. From a scientific standpoint, credible evidence does not support the effectiveness of cannabis in treating pain, and pain's inherently subjective nature may be exploited by individuals whose motivations are more recreational than therapeutic.

122. In a 2022 systematic review and meta-analysis encompassing 20 randomized, double-blind, placebo-controlled cannabis-based trials with a total of 1,459 participants, researchers found that placebo treatments produced a moderate to large, statistically significant reduction in self-reported pain. Researchers found no statistically significant difference in pain

44

reduction between the active drug and placebo groups. Researchers discovered too that the size of the placebo effect reported was linked to the "low risk" of bias in the study. In other words, in those studies included as part of the systematic review where the researchers and their methodologies were biased in favor of cannabis, the reported placebo effect was lower. The authors also examined the media coverage of the included studies and found that they were being categorically misrepresented by the media. Specifically, researchers found that the overwhelming majority of news items reported that cannabis had a positive effect on pain regardless of what the study's outcomes actually were.

123. A 2023 systematic review reached nearly the identical result — as study quality improves and risk of bias decreases, it becomes increasingly evident that cannabis's apparent effect on pain is nearly entirely attributable to the placebo response. In a 2023 comprehensive review of 65 randomized, placebo-controlled trials involving 7,017 participants, cannabinoids fared no better than the placebo in improving acute pain, chronic pain, or cancer-related pain when the quality and bias of studies were controlled for.

124. As observed by Bertha Madras, the situation mirrors past opioid marketing because "[t]he benefits have been exaggerated, the risks have been minimized, and skeptics in the scientific community have been ignored."

125. As for the contention that cannabis can act as a substitute for opioids or results in reduced opioid consumption, this also is without a credible scientific basis. As of 2020, the definitive review of the current state of knowledge found that individuals using marijuana for pain relief do not exhibit a reduction or elimination of opioid use. More disturbing, the researchers found further that marijuana users were less likely to discontinue opioid use than non-users.

45

126.    A 2023 study spanning two decades reported that there is no evidence to support the claim that cannabis reduces opioid misuse.  The study, which is one of the longest studies of its kind, enlisted 615 heroin dependent subjects in 2001 and assessed cannabis and opioid use at various points in time over 20 years.  While finding that cannabis use was common among people with opioid use disorder, the researchers found further that there was no evidence to suggest that cannabis reduced the use of opioids.

127.    Neither the American Academy of Pain Medicine nor the International Association for the Study of Pain endorses the use of cannabis to treat pain.  As stated by the IASP in its position statement in 2021:

> Due to the lack of high-quality clinical evidence, the International Association for the Study of Pain does not currently endorse general use of cannabis and cannabinoids for pain relief...There are concerns about the potential for harms of cannabis and cannabinoids.

### v.    Glaucoma

128.    The use of marijuana to treat glaucoma relies on  the narrow fact that THC can transiently influence intraocular pressure while ignoring the broader reality that effective dosing is wholly impractical, sustained benefit is unsupported by credible evidence, and the risks of use far outweigh any conceivable therapeutic benefit.

129.    Glaucoma is a complex disease that is characterized by progressive damage to the optic nerve over time, constriction of peripheral visual fields, and irreversible blindness if left untreated.  One of the causes of glaucoma is intraocular pressure ("IOP"), which is a function of the production and drainage of aqueous humor within the ocular system.

130.    Effective treatment of glaucoma, including oral medication or topical eye drops, laser or other surgical interventions, exist and "clinically translate to sustained, continuous control of IOP."

131.    A 2019 meta-analysis of five studies featuring different routes of administration revealed varying and conflicting results in reducing intraocular pressure, leading researchers to conclude:

> Studies have indicated cannabis may have the potential to lower IOP, however the quality of available literature is poor. The studies that were reviewed were highly variable in their methods and patient population selected, and therefore no current evidence supports the use of any form of cannabis to replace existing Cannabis and glaucoma therapy for glaucoma.

132.    While marijuana can lower intraocular pressure, it does not do so at therapeutic levels with reasonable dosing.  To maintain a beneficial concentration of THC in the bloodstream for glaucoma treatment, one would need to smoke or otherwise consume cannabis approximately six to eight times a day.

133.    The American Glaucoma Society's current position statement on cannabis declares that there is no scientific basis for the use of cannabis in the treatment of glaucoma and expressly disavows the use of cannabis in any form as a primary or sole treatment for glaucoma.

134.    The American Academy of Ophthalmology has declared that no scientific evidence has been found that marijuana demonstrates increased benefit or diminished risk in the treatment of glaucoma compared with the wide variety of pharmaceutical agents now available.

### vi.    Hyperemesis

135.    Cannabis hyperemesis syndrome ("CHS") is a condition that is characterized by repeated bouts of relentless vomiting in the setting of chronic cannabis use.  Symptoms usually appear within 24 hours of cannabis use and can last for days.  These episodes are so brutal that ER staff have coined the terms "scromiting" – a chilling conflation of screaming and vomiting.

136.    Many patients are misdiagnosed or have delayed diagnosis, often after undergoing various expensive medical tests and workups.  In a 2016 observational study of CHS

patients over a two-year period, the median charge for emergency visits and hospital admissions for CHS was $95,023.   A 2019 study analyzed the cost for 17 patients diagnosed with CHS.  The total cost for combined emergency department visits and radiological studies averaged over $76,000 per patient.

137.    A research team at the University of Colorado led a large study analyzing emergency visits related to cannabis use between January 2012 (the year of legalization) and December 2016.  Researchers found a dramatic increase in the emergency department visits attributable to CHS or CHS-like symptoms.

### vii.    Cannabis Use Disorder

138.    Despite Defendants' repeated efforts to downplay or deny it, cannabis is highly addictive.  Historically it was believed that about 9% of cannabis users became addicted.  The National Institute on Drug Abuse and Centers for Disease Control and Prevention recently released data challenging this figure as inadequate and suggesting that 30% of those who use cannabis may have some degree of cannabis use disorder. [22]  By comparison 15% of alcohol users, 32% of nicotine users, and 26% of opioid users become addicted.

---

[22] Cannabis Use Disorder (CUD) is defined in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5) as a problematic pattern of cannabis use leading to clinically significant impairment or distress. Diagnosis requires at least two of the following 11 criteria occurring within a 12-month period:
1. Cannabis is often taken in larger amounts or over a longer period than intended.
2. Persistent desire or unsuccessful efforts to cut down or control cannabis use.
3. A great deal of time is spent obtaining, using, or recovering from cannabis.
4. Craving or a strong desire to use cannabis.
5. Recurrent cannabis use resulting in failure to fulfill major obligations at work, school, or home.
6. Continued use despite persistent or recurrent social or interpersonal problems caused or exacerbated by cannabis.
7. Important social, occupational, or recreational activities are given up or reduced because of cannabis use.
8. Recurrent cannabis use in situations where it is physically hazardous.

48

139.    Daily cannabis users, such as those who use it regularly as a type of "medication," are at the highest risk for developing cannabis dependence, with 25% to 50% of these users becoming addicted.

### viii.    Prenatal Cannabis Exposure Risks to Fetuses and Children

140.    A 2016 meta-analysis assessing the effects of prenatal exposure to cannabis found that infants exposed to cannabis in utero had a 77% increased odds of low birthweight, which is associated with increased morbidity and mortality, and were more likely to need placement in the neonatal intensive care unit compared with infants whose mothers abstained.  The researchers concluded, "pregnant women could benefit from health education on the potential adverse effects of use of cannabis during pregnancy."

141.    Results from the largest long-term U.S. study of brain development and child health, the Adolescent Brain Cognitive Development ("ABCD" study), revealed that prenatal cannabis exposure affects children well beyond infancy.  In children averaging about ten-years-old, prenatal cannabis exposure before and after maternal knowledge of pregnancy was associated with greater offspring psychopathology characteristics (e.g. psychotic-like experiences and attention, thought, and social problems), sleep problems, and lower cognition and gray matter volume.  The ABCD study also corroborated prior studies finding that cannabis exposure was

---

9. Continued use despite knowledge of having a persistent or recurrent physical or psychological problem likely caused or worsened by cannabis.
10. Tolerance, as defined by either:
    o  A need for markedly increased amounts to achieve intoxication or desired effect.
    o  A markedly diminished effect with continued use of the same amount.
11. Withdrawal, as manifested by either:
    o  The characteristic withdrawal syndrome for cannabis.
    o  Cannabis (or a closely related substance) is taken to relieve or avoid withdrawal symptoms.

associated with lower birth weight.  Researchers concluded, "[s]imilar to the effective messaging surrounding the adverse consequences of alcohol and tobacco exposure during pregnancy, education regarding the potential harms associated with prenatal cannabis use is necessary."

142.    Leveraging longitudinal ABCD study data, a 2022 study linked prenatal cannabis exposure to persistent psychopathology from childhood to early adolescence.  Exposed children showed significantly higher levels of psychotic-like experiences, social problems, ADHD, depression, anxiety, and other conduct problems than unexposed peers even after adjusting for confounders.

143.    A 2024-2025 systematic review found that cannabis use during pregnancy significantly increased the risk of miscarriage, stillbirth, pre-term birth, and low birth weight.  That same year, a separate group of researchers conducting a longitudinal assessment of prenatal cannabis use on neonatal outcomes found that maternal cannabis use increased the adjusted risk of fetal death (miscarriage/stillbirth) by more than a factor of six.

144.    Most recently, a 2025 systematic review of 51 studies involving over 21 million pregnancies found that cannabis use was associated with preterm birth and lower birth weight.

### E.    Defendants' Unlawful and Deceptive Marketing Practices

145.    Defendants, based in part on the large body of scientific research set forth above, knew, or at least should have known, that cannabis is not suited for medical applications as Defendants claim or for mental health disorders such as depression, PTSD, bipolar disorder, and anxiety and other health disorders, such as pain and glaucoma, as the Defendants represent. Defendants also knew or should have known that cannabis use is a causal factor in the development and/or exacerbation of schizophrenia, psychosis, bipolar disorder, depression, suicidal ideation, and anxiety, and other health disorders, such as adverse cardiovascular events, and that it poses

50

significant risks to fetuses and children from prenatal exposure, CHS, and cannabis use disorder, as has been repeatedly, coherently, and specifically established by years of high-quality medical research.

146.    To mask the adverse effects of cannabis and maximize profits, Curaleaf's defining market strategy – in which it has engaged with its related entities and its fellow participants in the cannabis industry – over the relevant statute of limitations period has been to market cannabis as "medicine" or "health-supportive."  In furtherance of that goal, Curaleaf has made countless unscientific, false, fraudulent, illegal, deceptive, disingenuous, and/or dangerous affirmative claims regarding the medical and therapeutic benefits of cannabis.

147.    The cannabis industry, like Big Tobacco, adopted a strategy of promoting cannabis through less than reputable "cannabis research" that touts cannabis-related health benefits through free-floating concepts imbued with high consumer confidence such as "health," "medicine," and "science."  As explained by University of Pennsylvania Professor Theodore Caputi:

> Essentially, marketers realize that social media sites and the 24-hour new cycle effectively deliver health information to consumers and that consumers are less-discerning auditors of scientific rigor than are federal regulators. Therefore, rather than invest in the multitude of expensive, large-scale clinical trials required to make regulator-endorsed health claims, marijuana companies sponsor and publicize the results of less-robust studies.

148.    In a 2022 study, Professor Caputi analyzed how six major medical cannabis companies used their public websites to promote partnerships with major academic institutions and health-related research claims.  Through web scraping and content analysis, it was determined that these companies made 908 research-related health claims referencing serious conditions like mental health disorders (412 claims), pain (326 claims), inflammation (163 claims), cancer (154 claims), and gastrointestinal issues (133 claims) without rigorous clinical proof.

51

149.    Defendants similarly promote the health benefits of cannabis without rigorous scientific proofs and analysis by promoting their cannabis products based upon very low-quality cannabis "research" that commends to consumers cannabis as a "potential" or "promising" therapy.

150.    Cannabis industry funding of "research" and "studies" make it more likely that the results will skew in favor of industry.  Scientists have long recognized a "funding effect," wherein industry sponsorship is statistically and positively associated with research outcomes and conclusions favorable to the sponsor.  This effect is believed to be produced by researchers suppressing unfavorable results and/or making methodological choices around research or experimental design that produce more favorable outcomes.

151.    Take as an example the 2011 review of literature regarding cannabis terpenes published in the British Journal of Pharmacology. One "finding" was that terpenes in cannabis "may" contribute to the therapeutic effects of cannabis. The author concluded that terpene "synergy, if proven, increases the likelihood that an extensive pipeline for new therapeutic products is possible from this venerable plant."

152.    Moreover, in the "conflict of interest" section the author admitted that he works as a "Senior Medical Advisor to GW Pharmaceuticals," a "leader in cannabinoid science" that "passionately believe[s] in the therapeutic and breakthrough potential of cannabinoid medicines to revolutionize how patients deal with their often-overlooked diseases and redefine what living with their disease means."

153.    Though the literature review "proved," scientifically speaking, nothing, Curaleaf states in a blog post that terpenes "may also affect and interact with the cannabinoids to activate what is known as 'the entourage effect,' which enhances the psychological effects of cannabis."

52

In the same blog post, Curaleaf adds a list of specific terpenes and their wide-ranging purported health benefits including that certain terpenes: address inflammation, inhibit the growth of bacteria and fungi, treat anxiety and stress, boost users' mood, regulate users' nervous system, act as a muscle relaxant, act as a bronchodilator—widening the bronchi as a topical antiseptic, a way to relieve discomfort, inflammation, promote alertness, increase focus, and improve memory— act as a sleep aid, improve blood flow, increase focus, and act as a decongestant.

154. The ongoing refusal of cannabis researchers to adopt gold-standard methodologies instead of relying on research of limited rigor and credibility was set forth convincingly by a 2021 study conducted by the Consortium for Medical Marijuana Clinical Outcomes Research. In its examination of randomized-controlled studies evaluating medical cannabis and cannabinoid-based treatments, researchers found that only 4 out of 79 trials (5%) reviewed met the criteria for "low risk of bias," indicating widespread methodological concerns. Key sources of bias were identified across multiple domains, including inadequate random sequence generation, poor allocation concealment, insufficient blinding of participants and personnel, incomplete outcome data, and selective reporting, many of which were either poorly executed or inadequately documented. Researchers concluded that these shortcomings significantly undermined the reliability and applicability of these studies.

155. Curaleaf stands out in the industry for the degree to which it has embraced this strategy. Curaleaf established the U.K. Medical Cannabis Registry (the "Registry") which uses industry data from European cannabis companies to publish studies touting the benefits of cannabis. In Exhibit 99.2 to Curaleaf's March 4, 2025, Form 40-F filed with the SEC, Curaleaf claims that the Registry has published five such papers and that Curaleaf itself has published seventeen more based on the data created from the Registry.

156.    In that filing, Curaleaf touted the value of the Registry to its business, finding that Curaleaf's studies "demonstrate the value patients place in the Company's own research performed using the U.K. Registry and provide commentary from subject matter experts on the use of medical cannabis for the treatment of neurological disorders, inflammatory bowel disease, depression and ADHD."

157.    Additionally, thirty additional research publications from other sources "have arisen from the U.K. Registry, covering chronic pain, anxiety, insomnia, fibromyalgia, autism spectrum disorder, ADHD, PTSD, depression, inflammatory bowel disease, headache disorders, multiple sclerosis, arthritis and childhood epilepsy."

158.    This body of Curaleaf curated "research" is considered by Curaleaf to "be strategically important in the future education of patients, public and healthcare professionals."

159.    Repeatedly these studies, even those authored by purportedly "independent" researchers suffer from bias. For example, many studies using the Registry as a source of data cite authorship by researchers employed by the Imperial College of London and its Medical Cannabis Research Group.

160.    These studies broadly find positive health outcomes for people using cannabis to treat a number of different medical conditions. However, the leader of the Medical Cannabis Research Group, Dr. Mikael Sodergren, is also the Chief Medical Officer for Curaleaf International, an entity in which Curaleaf holds a controlling interest.

161.    In a particularly alarming example of this strategy, one study listing Dr. Sodergren as a co-author, relied on data from the Curaleaf created Registry to find that individuals with substance use disorder had an improved quality of life when using cannabis. Predictably, the results were based on self-reported answers to questionnaires by patients high on cannabis. Not

54

only that, but the study relied on data from only thirty-four individuals, of which twenty-nine had used cannabis prior to participation in the study. Yet, from that limited, biased, data, the authors concluded that cannabis "is associated with short- to medium-term improvements in anxiety, sleep quality, and [health-related quality of life], in those suffering from [substance use disorder], while also reducing the daily dose of prescribed opioids. Finally, it reiterates the safety profile of [cannabis] with no severe or life-threatening adverse events reported."

162. Moreover, Curaleaf's websites are shrewdly and deceptively curated to resemble health care companies' and project the authority of science and medicine. For instance, Curaleaf International's website has an entire section dedicated to touting the very research discussed above, claiming that Curaleaf conducts "Pioneering medical cannabis research" and that "Scientific research isn't just what we do – it's at the root of who we are."



163. Among other things, Curaleaf further claims on its Curaleaf International website that its research will "lay[] the foundations for cannabis to take its place in modern medicine." It further represents its goal as "to make sure cannabis-based treatments are backed with the same rigorous science as other pharmaceuticals so that the right patients can benefit."



164. Curaleaf also posts links to (and the covers of) the various publications it has developed on its website to further provide the impression that its promotional statements are backed by valid scientific research.



165.    These websites falsely create the overall impression that cannabis and, nearly all its constituent properties, have certain scientifically-approved medical applications.

166.    Much of the work is also done on "blogs" or "education" pages stocked with various false and deceptive posts relating to cannabis. These articles are meant to "teach" novice consumers how to ingest cannabis, which for most is still a novelty; demystify for new consumers those ritualized and elaborate aspects of cannabis use and lore they might otherwise find intimidating; and "inform" consumers of "potential," "possible," "anticipated," "suggested," and "promising" health and therapeutic benefits of cannabis.

167.    On one blog post advertising its "pre-rolls," Curaleaf touts their cannabis products as "plant-based medicine." The post also encourages its customers to discuss their purchasing decision with a Curaleaf employee and makes other claims about the benefits of using Curaleaf's pre-roll cannabis products:



168.    In another blog post regarding Curaleaf's edible cannabis products, among other scientific and medical claims, Curaleaf purports to provide "the short of the science" claiming that "Cannabis is chock full of therapeutic compounds, aka, cannabinoids." And further describing the amount of a cannabis edibles that a person consumes using the medical term "dose."

# Cannabis edibles, 101

Author          Date Published
Curaleaf        04/22/2019

If you've smoked cannabis, and also eaten foods **infused with** cannabis, you know that each consumption method makes for a very, very different experience from the other!

Smoking it results in an almost instant effect. An edible, however, doesn't make an impact on the body until it's been metabolized; a process which takes a little more time, yet produces intensified, longer lasting results. For this reason, cannabis edibles have become an extremely popular delivery method for reveling in the benefits of everyone's favorite medicinal plant.

But- before you go munching on a fresh flower, know this:

**The short of the science**

Cannabis is chock full of therapeutic compounds, aka, cannabinoids. Newly harvested buds are quite high in one cannabinoid called THCA, which, when heated, converts to THC; a process called decarboxylation. While THCA has its own benefits to boast, THC is the particular cannabinoid you're after if you're looking for that classic, intoxicating effect. Through smoking or vaping, THCA will "decarb" just fine by way of those burning hot temps. If you prefer to eat your cannabis, applying heat is a must. That is, if you want to maximize -or even notice- the evidence of THC.

**A cannabis carrier**

Cooking with cannabis: It's a blend of cuisine and chemistry that just may be a tad intimidating. But even if you're not an elite CannaChef, you can still create edibles that range from easy to elegant. The secret? Cooking with an infused butter or oil; a carrier for your cannabis! As long as you decarboxylate your bud, the "carrier method" brings total versatility to your table. These infusions require little more than your stove, and a watchful eye. Decarbing in the oven has long been a standard method, yet the sous vide craze is catching on hot when it comes to cannabis. The slow, controlled, hot water bath makes for ideal conditions to activate those THC compounds.

**Easy dose it**

As for dosing, it's impossible to provide an exact formula you should follow, because there are just too many variables! From the plant used, to the density of the food -or beverage- you're infusing, to its even (or not-so-even) distribution throughout your executed recipe, to your own metabolic function, to how empty or full your stomach is... there are many factors are at play. That said, it's really easy to over-do it, which defeats the purpose of enjoying cannabis in its edible form. The best advice we've found is to personalize your infusion with a pre-test.

169.    In these blogs, the medical lexicon and medical imagery are deceptively appropriated. One no longer takes a "hit" or does a "bong rip," but rather receives a specific "dose" or "micro-dose" measured out to the milligram by a pharmacist.  Cannabis is no longer distributed as an "eighth" or in "blunt" form, but rather as "capsules," tinctures," "extract," "topicals," or "therapies."

170.    For example, Curaleaf, when describing its tinctures and distillates emphasizes the precision of is supposed process, emphasizing both the medicine-like qualities of these products and their "up to 99% pure cannabinoid" content.



Learn    Wellness    Curaleaf Rewards    Rooted in Good    About Us

Seasoned cannabis connoisseurs might be surprised to hear that many people think distillates and tinctures are the same thing. Yet if you're new to the scene, they sure do look a lot alike! So, here's a flash course in how these two popular cannabis options contrast. (Spoiler alert, they're practically opposites.)

**Distillates!**

By definition, to "distill" means: "to extract the most important aspect of." In a nutshell, that's what **any** cannabis concentrate is—an extraction of only the most valuable compounds found in the plant. The cannabinoids, terpenes and flavonoids are preserved, while everything else is eliminated through the application of specific temperatures and pressures. True **distillates** , however, are extra special because they're even more pure and potent than some of their concentrated, oily cousins. Distillates go through **extra refinement processes** to remove additional compounds via boiling-point separation. Why? Because the goal is to isolate **very specific** plant pigment and bi-product. Once these cannabinoids have been distilled, they are recondensed into a precise ratio for a precise effect (a 6:1 ratio of THC:CBD, for example). When done well, the finished product can be up to 99% pure cannabinoid. Potent!

The other major benefit to distillates is versatility. Because you're dealing with the purest of pure cannabis oil in its activated form, there's no limit to how you can enjoy it. Distillates are often vaporized, but you can also take them under the tongue, dab them, smoke them, ingest them in a capsule, or infuse them into an edible. Creating a distillate is a very laborious process, so yes, they're expensive! But the result is top-tier, and hard to beat.

**Tinctures!**

Side-by-side—to the untrained eye—a cannabis tincture and a cannabis distillate look quite alike. Sure, they're both in liquid form... but the similarities end there. While a distillate is the most intensive extract there is, a tincture isn't an extract at all. Instead, it's an **infusion** .

A tincture is made by soaking decarboxylated (activated) cannabis in a solvent. Traditionally, the solvent was always alcohol. Today, you'll see all kinds of bases, like MCT (medium-chain triglyceride) oil, which is usually derived from coconuts. MCT is currently a popular solvent choice, both for its health reasons, and because cannabinoids are readily soluble within it. The plant matter is eventually removed from the solvent, yet the cannabinoids—and terpenes, and flavonoids—remain.

As you learned above, distillates don't use a solvent. With a tincture, the solvent IS what remains as the finished product! Tinctures are generally taken sublingually (under the tongue) or added to a food or drink. This process highlights the natural tastes and aromas of the cannabis strain used, so they're especially fun to pair with specific food flavors. Just as distillation is an involved and complicated process, making a tincture is relatively easy.

The recap

Distillates and tinctures may look similar, but looks can be deceiving! Distillates are pure, highly potent, concentrated extractions that can be taken in a variety of ways. Tinctures are flavorful, solvent-based infusions that are popularly consumed in edibles.

**And now you know.**

171.    When describing edible products, Curaleaf is quick to characterize its portions as a "dose", claiming to its customers that it is important that they find the right dose of each product.

172.    Additionally, Curaleaf characterizes its edible products on a spectrum of "doses" ranging from "Low" and "Micro" dose edibles up to "high dose edibles." Curaleaf emphasizes the "psychoactive effects" of its high dose edibles including "intense euphoria" "profound relaxation, significant discomfort relief, and appetite stimulation," while touting its low dose edible's ability to "offer mild relaxation, stress relief, heightened senses, and mood elevation."

59

# Unlock Edibles

| Author | Date Published |
|---|---|
| Curaleaf Inc. | 04/22/2024 |

Edible cannabis has come a long way since the days of Brownie Mary. Consider bells and whistles like rapid onsets, ratios and precise dosing, coupled with an endless array of formats and flavors—edibles are having a moment. And we're here for it.

This piece looks at the options out there, the basics of dosing, and how to best enjoy the experience based on the vibe you're looking to create, whether you're new to edibles or already an aficionado.

New to edibles? All good—there are tons of formats for you to choose from when embarking on your journey, each with their own unique convenience, taste, and dose levels to safely fit a feel you're after.

**Common Types of Cannabis Edibles**
- Gummies
- Hard Candies
- Chocolates
- Baked goods
- Beverages
- Cooking ingredients
- Mints and tablets
- Tinctures and oils
- Frozen treats and much more

**New to Edibles? Start here.**

To find the right dose, be sure to consider your current cannabis experience and tolerance, as well as factors specific to your body like metabolism and weight. A dose that one person may consider reasonable might make you feel uncomfortable, so we highly recommend taking a conservative approach, learning as you go, letting yourself try new doses and


curaleaf

Learn    Wellness    Curaleaf Rewards    Rooted in Good    About Us

than one whole serving. On that note, make sure you understand the product's specific serving size - for example, a cannabis brownie or cookie may be sold individually, but depending on the THC content in it, may contain multiple servings.

With edibles, patience is key. That's the "go slow" part. Edibles often take longer to kick in compared to smoking or vaping, with typical onset times from 30 minutes up to 2 hours for you to feel the full effects. Avoid the temptation to take more during this time. If you don't feel the desired effects after waiting a couple of hours, you can try increasing your dosage slightly in future sessions. Or, if you felt a little too much of an effect, you can try lowering your dose next time and seeing how you feel then. If you'd like to document your journey, we recommend keeping a journal to track your experiences and how certain doses affect you personally, and whether or not you'd like to increase your dose next time.

**Common Edibles Dosing Breakdown and What to Expect**

**A quick word of warning:** Depending on experience and metabolism, edible doses at any mg level have the potential to alter reality perception and impair coordination. Please exercise caution and remember to start low and go slow.

**Low dose edibles (1-5mg THC per serving)** are best for beginners and those with low tolerance, and can offer mild relaxation, stress relief, heightened senses, and mood elevation. Depending on your experience, low dose edibles may increase sociability and creativity, offering minimal psychoactive effects.

**Micro dose edibles (2.5-5mg THC per serving)** are ideal for daytime use without impairing cognitive function, and can offer subtle relaxation, reduction of anxious feelings, enhanced focus and productivity, helping enhance mood without feeling intoxicated.

**Moderate dose edibles (5-10mg THC per serving)** are suitable for those with some tolerance, seeking a balanced experience without excessive intoxication, offering noticeable relaxation and euphoria, improved muscle tension and enhanced sensory perception. Moderate dose edibles can also increase appetite and potential deeper relaxation.

**Standard dose edibles (10-20mg THC per serving)** are suitable for experienced users or those seeking potent effects for therapeutic purposes, offering strong euphoria and sedation, deep relaxation and stress relief, heightened sensory experiences, and potential for intensified emotions. Like moderate dose edibles, a standard dose may also help to increase appetite, as well as sleep quality. Standard doses are ideal for users looking to relieve significant discomfort.

**High dose edibles (20mg+ THC per serving)** are recommended only for those with extensive cannabis experience and high tolerance levels, and can offer intense euphoria and psychoactive effects, as well as profound relaxation, significant discomfort relief, and appetite stimulation. High dose edibles can alter reality perception and impair coordination.

**CBD dominant edibles:** While CBD dominant edibles contain low doses of THC, the effects of high CBD concentration provide therapeutic benefits like anxiety reduction, stress relief, and management of discomfort without the psychoactive effects of THC.

It's truly exciting times for edibles—and it feels like we're just scratching the surface of how they can enhance our everyday. If you have more questions, or want to explore our extensive edible lineup, stop by a Curaleaf dispensary. We'd be more than happy to help grow your know.

173.    Curaleaf's blogs discussing marijuana and health make deceptive statements about "treatment," "wellness," or "therapeutic" qualities of cannabis products. Often, some medical condition is referenced followed by deceptive statements about cannabis being "researched" as

having the "potential" to treat said condition.  Some blog posts state unequivocally that cannabis does in fact treat mental health disorders and offers medical advice on the best "dose" or "optimal" treatment for such disorders.

174.    In a blog post targeted specifically at college students, among other claims, Curaleaf claims that their cannabis products can help them avoid depression, and help aid their insomnia, stating "At Curaleaf, we believe cannabis can help college students and anyone struggling with sleepless nights[.]"



When lack of sleep drives you to the point where you forget details and important deadlines, your grades will suffer.

**Depression**

Once the consequences of your insomnia show up on your transcript, depression is inevitable. While good grades are not the end-all for success, failing to meet your expectations is a horrendous feeling.

**HOW CAN BUSY COLLEGE STUDENTS GET A GOOD NIGHT'S SLEEP?**

We coach the staff at every Curaleaf dispensary to offer thoughtful suggestions for how anxious people can calm their overactive minds, decompress, and sleep through the night. That's especially true in the beautiful state of Maine where hundreds of thousands of people worldwide flock to "Vacationland" every summer to relax.

When it comes to helping people get the rest they need to return home rejuvenated, Assistant Manager Doug Bolte and his crew at Curaleaf Wells are world-class. Doug was kind enough to share his thoughts on how cannabis can be a natural part of a stressed-out college student's wellness routine. Age 21 and over college students, of course.

"The best way I can describe the benefits of cannabis is it can help you circumvent discomfort." Doug explained. "Here in the Wells dispensary, we have a wide range of products at different dosage levels that enable us to help everyone from people who have never tried cannabis to long-time users looking to shake up their routines."

When we asked Doug to choose one product for a college student struggling with insomnia, he didn't hesitate: "I've always believed that mental and physical health starts with a good night's sleep, so I'm a big fan of our Select Snooze Bites with a 1:1 ratio of THC and CBN. In my experience, this product delivers a nice relaxed head feel that's perfect at bedtime before the CBN does its thing so you can sleep throughout the night. With 5mg of THC and CBN in each piece, college students can start low, take another piece if necessary, and find a dosage that works for them so they wake up feeling refreshed and ready to go instead of tense and anxious."

Besides food, water, and oxygen, sleep is one of the most critical things a human can have to be healthy and happy. Sleeping well makes us better prepared to deal with adversity and more receptive to other healthier choices. It's a lot easier to exercise regularly, eat healthier, and implement more effective time management strategies when your mind's not racing, you're not constantly behind in your work, and you stop seeking temporary relief from your anxiety with fast food, sugary treats, or alcohol.

To be 100% clear, we're not saying that cannabis is the cure for insomnia. Being able to fall asleep quickly and stay asleep throughout the night is all about finding balance. At Curaleaf, we believe cannabis can help college students and anyone struggling with sleepless nights to put their needs first, set boundaries, make time for self-care, and Live Life Well.

Marijuana products are not available in every state. Where available, they may be sold only to adults, 21 years and above. Please consume responsibly.

175.    In another blog post on its Curaleaf Clinic website, Curaleaf touts the ability of their cannabis products to treat anxiety and chronic pain, citing its paid scientists to claim that "For anxiety, cannabis may offer an alternative for people who haven't responded well to other treatments" further claiming that cannabis is proven to treat "anxiety, PTSD, and depression that have proven difficult to treat." Additionally, the post touts cannabis' purported ability to treat

61

chronic pain as well, claiming "cannabis is gaining attention in individuals with anxiety and chronic pain, particularly for those who haven't found relief with traditional treatments."



176.    Curaleaf went so far with its deceptive representations regarding its products that in 2019, the FDA issued Curaleaf a public warning regarding its unsubstantiated claims regarding purported health benefits. Curaleaf's representations that incurred that warning included, that their cannabis products could treat "chronic pain", "anxiety", "ADHD", "Parkinson's disease", "Alzheimer's disease", "depression", "opioid-related withdrawal", "counteract the growth of spread of cancer", "kill[] human breast cancer cells", and deter "[h]eart disease." All representations that Curaleaf continues to make to the present day.

177.    Curaleaf deceptively distinguishes and categorizes their cannabis products using pseudo-scientific language drawn from botany, chemistry, engineering, and medicine. First, cannabis is classified by strain, whether indica, sativa, or hybrid.  According to Defendants, the

difference between these two "strains" are so pronounced that they produce opposite effects—indica causes "a mellower, more physical experience" with a "deeply relaxing nature . . . for evening or nighttime consumption" whereas sativa tends "to produce a more cerebral, mentally stimulating effect" leading to a "reputation for mental alertness and stimulation" that give them the "potential to enhance focus and maintain mental clarity."



178. Curaleaf emphasizes that no matter the strain, other aspects of its products may determine an individual's experience. Focusing on three aspects of their cannabis products as determining a user's experience and purported benefits: its cannabinoid content, its Δ9-THC to CBD ratio, and terpenes.

179. Products are then sub-categorized by their "cannabinoid profile." According to Defendants, there are a large number of cannabinoids that could influence a user's experience, however, Curaleaf emphasizes what it calls the "big six" which it claims are "prominent in medical research." Curaleaf claims further that the endocannabinoid system is responsible for regulating nearly every major biological system and maintaining "homeostasis" or "stability and ability to function healthily in your environment." Curaleaf falsely and deceptively claims that it is precisely the supposed pharmacological interactions between the cannabinoids making up a specific strain's profile and our body's endocannabinoid receptors that cause a strain to have a specific effect and induce unique "medical benefits."

**Cannabinoids**

The other chemical compound present in cannabis is cannabinoids, like THC and CBD, which are formed in the same trichomes as terpenes, and may affect the body and mind through their own unique interaction with the same endocannabinoid receptors. They're largely responsible for a lot of the reported benefits of cannabis.

Patients have reported using cannabis for a wide range of concerns—but the plant's benefits all come down to the unique DNA of each strain. Here we've broken down some of the most prevalent terpenes and cannabinoids and their reported therapeutic effects.

**Cannabinoids:**

THC (tetrahydrocannabinol)

Probably the most recognizable of all the cannabinoids, patients report using THC to relieve discomfort, stress and anxiety, nausea, and to stimulate appetite, and as an antimicrobial agent, inhibiting the growth of bacteria, and fungi.

CBD (cannabidiol)

Meet THC's more chill sister CBD. Patients report using CBD to treat things like anxiety, mood issues, physical discomfort, nausea, and to stimulate bone growth, reduce blood-sugar levels, inhibit bacterial growth, and act as a neuroprotectant.

CBN (cannabinol)

Insomnia's worst enemy, CBN is most famous for its reported effects on sleep. Patients not only report using CBN as a sleep aid, but to treat anxiety, relieve physical discomfort and inflammation, stimulate bone growth, and inhibit growth of bacteria and viruses.

THCV (tetrahydrocannabivarin)

Similar in molecular structure to THC and utilized to treat a variety of ailments, patients report using THCV as an appetite suppressant, memory aid, immune-system booster, and antibacterial agent.

CBG (cannabigerol)

Because it's usually present in very low levels (less than 1%), CBG is considered a "minor cannabinoid," but that doesn't mean it can't have an array of therapeutic effects. Patients report using CBG to relieve discomfort, inflammation, poor digestion, as a sleep aid, muscle relaxant, antibacterial agent, to stimulate bone growth, and encourage healthy cell growth.

CBC (cannabichromene)

CBC has similar origins as THC and CBD and is considered one of the "big six" cannabinoids prominent in medical research. Patients report using CBC to relieve discomfort, inflammation, anxiety, mood issues to stimulate bone and cell growth, combat bacteria and fungi.

180. Terpenes are the aromatic compounds in cannabis that create its distinctive aroma. Almost invariably, terpenes are physiologically inert and have no known medical applications. Curaleaf falsely and deceptively contends that terpenes have their own therapeutic properties or support other cannabinoids by amplifying their effect.

65

**Terpenes**

What makes Cherry Diesel taste different from Cookies N' Chem? A key ingredient: terpenes. Each individual strain possesses its own unique organic compounds called terpenes, which determine the aroma and flavor of the cannabis plant. Terpenes bind to receptors throughout the brain and body.

When terpenes trigger the body's endocannabinoid receptors, patients report feelings of relaxation and calm—like what you might experience with strains classified as indica—or of focus and alertness—like what you might find with strains classified as sativa. Different terpene profiles may also affect and interact with the cannabinoids to activate what is known as "the entourage effect," which enhances the psychological effects of cannabis.

**Terpenes:**

Humulene

Humulene is found in black pepper, cloves, and cinnamon. Patients report using humulene to address inflammation, as an appetite suppressant, and to inhibit the growth of bacteria and , fungi.

Linalool

Linalool is found in lavender, birch trees, cinnamon, and parsley. Patients report using linalool to treat anxiety and stress, boost their mood, regulate their nervous system, and as a muscle relaxant.

Pinene (alpha & beta)

Alpha-pinene and beta-pinene terpenes are generally found in equal measure, balancing each other out and working together. Alpha- and beta-pinene are found in pine trees, rosemary, pine nuts, and basil.

Patients report using a-pinene and b-pinene as a bronchodilator—widening the bronchi as a topical antiseptic, a way to relieve discomfort, inflammation, promote alertness, increase focus, and improve memory.

Caryophyllene

Caryophyllene is found in black pepper, hops, cloves, and cinnamon. Patients report using caryophyllene to relieve stress, inflammation, to help aid in sleep, to improve blood flow, and as an antifungal and antibacterial agent.

181.    Curaleaf falsely and deceptively promotes many of its products as "good for", "great for", "aiding," "helping with," "treating" "alleviating," and "relieving" various mental health disorders. The promotions and product descriptions provide no citation or basis substantiating these claims nor any explanation as to how it is that the specific product being

66

promoted uniquely or more effectively treats the referenced medical disorder when compared to other products.

182.    Social media is also an integral forum for dispensaries to market cannabis as therapeutic or having health benefits. One 2020 study found that social media was the number one source of advertising for adolescents and adults in Canada and the United States.

183.    Curaleaf uses its social media accounts to parrot its own health claims, and cite news reports regarding its own, or others' pro-cannabis studies. In one X (formerly Twitter) post, Curaleaf posted a link to an article regarding one such study, including the quote that "Medical cannabis users reported significantly better quality of life, greater health satisfaction, improved sleep, & a lower average pain severity than non-users. They were also significantly less depressed & anxious than the control group."



184.    If Curaleaf's own advertisements didn't clearly show this fact, numerous studies have also substantiated the fact that the cannabis industry, routinely and systematically advertises its products as healthy, medicinal, and therapeutic to reduce harm perceptions and drive initiation and continued use.  One 2024 study found that nearly 62.8% of Las Vegas dispensaries surveyed posted some unsubstantiated health claim, most often indicating physical or mental health benefits.

185.    Another study in 2019 investigating the marketing tactics being used on cannabis dispensary websites in Arizona, California, Colorado, Illinois, Michigan, Montana, Nevada, New

Mexico, Oregon, and Washington found that 67% made health claims pertaining to medical conditions that could be treated by their cannabis products.

186.    The false and deceptive marketing is not confined to product descriptions, websites, blog posts, and social media.  Rather, Curaleaf and its employees and agents engage in rampant, systematic and daily misrepresentations about the medical and therapeutic benefits of their cannabis products through direct, personal interactions with customers at dispensaries they own and operate across the State of Illinois.  These misrepresentations occur regularly in the form of in-store conversations with "budtenders," online chat features on Defendants' websites, and telephone consultations.  Class members are routinely and repeatedly recommended to use Defendants' products to treat or relieve serious medical and health disorders, including PTSD, depression, anxiety, glaucoma, and pain.

187.    An Illinois specific study surveying the Facebook and X posts of every recreational cannabis dispensary in Illinois found that nearly 11% of all posts contained a health claim.

188.    One study involving mystery shoppers posing as new users at dispensaries in Las Vegas found that nearly all retailers endorsed use of cannabis to treat anxiety, insomnia, and/or pain.

### F.   Summary of Defendants' Untrue, False, and Misleading Statements

189.    Defendants, together with their subsidiaries and other participants in the cannabis industry, created and implemented a scheme to create and increase the market for cannabis and substantially increase sales of cannabis products through a pervasive pattern of false and misleading statements and omissions in all states in which it operates.  At all times relevant to this Complaint, Defendants, made and disseminated untrue, false, and misleading statements that are not supported by credible scientific or medical evidence to consumers to promote the sale and use

of cannabis in all states in which it operates. The many, material and untrue, false, and/or misleading statements were made through an array of marketing channels, including, but not limited to: in-person and other forms of detailing, point of sale displays and in-store promotions, search engine marketing, mobile app advertisements, public relations and press releases, sponsorship and event marketing, product demonstrations and free trials, brochures, advertisements, influencer endorsements and testimonials, email marketing campaigns, television and radio commercials, customer reviews and ratings, chatbots and automated messaging, product packaging and labeling, websites, and social media. These many untrue, false, and/or misleading statements permeated the cannabis market in all states in which Defendants operated. Defendants' omissions and misrepresentations alleged in this complaint occurred during time periods relevant to this complaint. These untrue, false, and/or misleading statements include, but were not limited to:

    a. Defendants falsely claiming or implying that cannabis, any constituent part of cannabis, or Defendants' cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

    b. Defendants falsely claiming or implying that certain cannabis products can more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain health and mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders,

69

including, but not limited to, pain and glaucoma, when compared to other cannabis products.

c.  Defendants falsely claiming or implying that there is credible medical or scientific evidence or scholarship that supports that cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

d.  Defendants falsely claiming or implying that there is credible medical or scientific evidence or scholarship that supports that certain cannabis products can more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain health and mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma, when compared to other cannabis products.

e.  Defendants falsely claiming or implying that cannabis products are healthy or health-promoting, not dangerous or hazardous to consumers' health, not addictive, or do not cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or do not cause or contribute to adverse cardiovascular events and/or CHS.

f.  Defendants falsely claiming or implying that there is credible scientific or medical evidence or scholarship establishing that cannabis products are healthy or health-

70

promoting, not dangerous or hazardous to consumers' health, not addictive, and/or do not cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or do not cause or contribute to adverse cardiovascular events and/or CHS.

## V.    INTERSTATE AND INSTRASTATE COMMERCE

190.    Defendants' conduct as alleged herein has had a substantial effect on both interstate and intrastate commerce. At all material times, Defendants participated in the manufacture, marketing, promotion, distribution, and sale of substantial amounts of cannabis products in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States. Defendants' conduct also had significant intrastate effects, as cannabis products were advertised and sold in each identified state impacting at least thousands of individuals in every jurisdiction. As a direct result of Defendants' fraudulent, deceptive, and unfair conduct, Plaintiffs and class members in each identified state purchased cannabis products that they otherwise would not have purchased or paid more for such products than they would have, absent such unlawful conduct.

## VI.   CLASS ALLEGATIONS

191.    Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and/or (c)(4), as representatives of classes defined as follows:

### A.    Multi-State Class

192.    All natural persons who purchased in Connecticut, Arizona, Illinois, Massachusetts, Maryland, Maine, Missouri, Nevada, New Jersey, New York, and Ohio within the applicable limitations period one or more cannabis products manufactured, distributed, sold, or

71

offered for sale by Defendants from a recreational or adult-use dispensary, market, shop, store, online, or other retail platform.  On behalf of the Multi-State Class, Plaintiffs assert a claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq., for which federal law governs, and state-law claims for which Connecticut law governs because Connecticut has the most significant relationship to the claims and the parties, the conduct giving rise to the claims occurred in Connecticut, and Defendants' principal place of business is in Connecticut.

## B.  State Subclasses

193.    As an alternative or in addition to the Multi-State Class, Plaintiffs allege a separate class for each State set forth below upon the applicable laws set forth in the alternate state law counts.  Each class is defined as follows for the claims asserted under a particular jurisdiction's law:

a.  Arizona Subclass is defined as:

All natural persons who purchased in Arizona within the applicable limitations period one or more cannabis products manufactured, transported, distributed, sold, or offered for sale by Defendants from a recreational or adult-use dispensary, market, shop, store, online, or other retail platform.

b.  Connecticut Subclass is defined as:

All natural persons who purchased in Connecticut within the applicable limitations period one or more cannabis products manufactured, transported, distributed, sold, or offered for sale by Defendants from a recreational or adult-use dispensary, market, shop, store, online, or other retail platform.

c.  Illinois Subclass is defined as:

All natural persons who purchased in Illinois within the applicable limitations period one or more cannabis products manufactured, transported, distributed, sold, or offered for sale by Defendants from a recreational or adult-use dispensary, market, shop, store, online, or other retail platform.

d.  Maryland Subclass is defined as:

All natural persons who purchased in Maryland within the applicable limitations period one or more cannabis products manufactured, transported, distributed, sold, or offered for sale by Defendants from a recreational or adult-use dispensary, market, shop, store, online, or other retail platform.

e.  Massachusetts Subclass is defined as:

All natural persons who purchased in Massachusetts within the applicable limitations period one or more cannabis products manufactured, transported, distributed, sold, or offered for sale by Defendants from a recreational or adult-use dispensary, market, shop, store, online, or other retail platform.

f.  Nevada Subclass is defined as:

All natural persons who purchased in Nevada within the applicable limitations period one or more cannabis products manufactured, transported, distributed, sold, or offered for sale by Defendants from a recreational or adult-use dispensary, market, shop, store, online, or other retail platform.

g.  New Jersey Subclass is defined as:

All natural persons who purchased in New Jersey within the applicable limitations period one or more cannabis products manufactured, transported, distributed, sold,

73

or offered for sale by Defendants from a recreational or adult-use dispensary, market, shop, store, online, or other retail platform.

h.  New York Subclass is defined as:

All natural persons who purchased in New York within the applicable limitations period one or more cannabis products manufactured, transported, distributed, sold, or offered for sale by Defendants from a recreational or adult-use dispensary, market, shop, store, online, or other retail platform.

i.  Ohio Subclass is defined as:

All natural persons who purchased in Ohio within the applicable limitations period one or more cannabis products manufactured, transported, distributed, sold, or offered for sale by Defendants from a recreational or adult-use dispensary, market, shop, store, online, or other retail platform.

### C.  Class Exclusions

194.  The following persons and entities are excluded from the proposed classes: Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and any persons who filed claims against Defendants for personal injuries as a result of Defendants' conduct, including physical injury, illness, or death.

## VII.    RULE 23 PREREQUISITES

195.  Each member of the proposed class meets the requirements of Federal Rules of Civil Procedure 232(a), (b)(2), and/or (c)(4).

196.    The members of each class are so numerous that joinder is impracticable. Each class includes at least thousands of members. Members of the classes are widely dispersed throughout the country and/or each respective state.

197.    Plaintiffs' claims are typical of the claims of all class members. Plaintiffs' claims arise out of the same common course of conduct that gives rise to the claims of the other class members. Plaintiffs and all class members were and will continue to be damaged by the same wrongful conduct.

198.    Certifying class members would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated without sacrificing procedural fairness.  Class certification would also allow Plaintiffs to overcome the impediment of otherwise small individual recoveries that would substantially disincentivize bringing this suit on their own.

199.    Plaintiffs will fairly and adequately protect and represent the interests of the classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the classes.

200.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise with consumer class actions.

201.    Questions of law and fact common to members of each class will predominate over any questions that may affect only individual class members because Defendants have acted on grounds generally applicable to members of the classes.

202.    Class treatment is a superior method for fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual

actions would engender.  The benefits of proceeding through the class mechanism substantially outweigh any difficulties that may arise in the management of this class action.

203.    Class treatment is also manageable, and Plaintiffs know of no management difficulties that would preclude class certification in this case.

204.    All of Defendants' cannabis products are materially identical for purposes of the injuries alleged. Every product manufactured, distributed, sold, or offered for sale by Defendants regardless of brand or form (flower, pre-rolls, vapes, edibles, topicals, concentrates), or potency is derived from the cannabis plant and contains the same psychoactive compound ($\Delta$9-THC).

205.    The core misrepresentations and omissions at issue in this case, that these products are safe, non-addictive, therapeutic, and capable of treating or relieving PTSD, depression, anxiety, glaucoma, pain, and other conditions, apply uniformly to Defendants' entire product line. While the concentration of $\Delta$9-THC may vary across products and may pose a greater or lesser degree of risk depending on potency, all of Defendants' products nevertheless pose the same fundamental category and type of risk arising from the presence of $\Delta$9-THC. The health risks (schizophrenia, psychosis, exacerbation of mental illness, cardiovascular events, cannabis use disorder, etc.) likewise flow directly from the presence of $\Delta$9-THC and are not unique to any particular brand, strain, formulation, or concentration level.

206.    Because the deceptive marketing scheme, the omissions of material safety information, and the resulting economic and health injuries are identical across all of Defendants' cannabis products, the named Plaintiffs' injuries are fairly traceable to Defendants' uniform conduct and are substantially similar in all material respects to the injuries suffered by purchasers of any other of Defendants' products.

207. Plaintiffs reserve the right to seek to certify common questions related to Defendants' knowledge, conduct, products, and duties.

## VIII.    CAUSES OF ACTION MULTI-STATE CLASS

208. Except as otherwise noted, Plaintiffs bring each of the claims in this Section on behalf of the Multi-State Class.

### COUNT I
### RICO Violation

209. Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

210. This is a civil action for damages and other relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, arising from Curaleaf's operation of, participation in, and conspiracy to operate and participate in an enterprise and association-in-fact enterprise engaged in a pattern of racketeering activity along with Cresco Labs Inc., Green Thumb Industries Inc., Verano Holdings Corp., the U.K. Medical Cannabis Registry, and the Medical Cannabis Research Group of the Imperial College London, together with their respective subsidiaries and affiliated entities, officers, employees, agents, and other persons and entities known and unknown ("Enterprise Members"). Enterprise Members' racketeering activity includes, among other things, dealing in controlled substances prohibited by federal law; fraudulent marketing schemes; misrepresentations; and systematic deception of consumers concerning the safety, addictiveness, and purported medical utility of cannabis products.  Such actions were done in part to increase the market price and increase or otherwise ensure the sales of Defendants' cannabis products and the cannabis products sold by the other Enterprise Members in the business of selling cannabis.

211.    At all times relevant to this Complaint, the enterprise described below was engaged in, and its activities affected, interstate and foreign commerce, including through the manufacturing, marketing, distribution, and sale of cannabis products to consumers across multiple states, and through interstate communications used to promote those products.

212.    The Enterprise Members associated together for the common purpose of manufacturing, marketing, distributing, and selling cannabis products throughout the United States while systematically concealing and misrepresenting the known health risks of those products and while falsely promoting cannabis products as safe, medicinal, and therapeutic (the "Enterprise") as described herein.

213.    The Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4). The Enterprise is an ongoing organization whose members function as a continuing unit with relationships among those associated with the Enterprise and with a shared purpose and course of conduct directed at expanding cannabis sales, market price, and industry profits by promoting a false public narrative that cannabis products are safe, non-addictive, therapeutic, and medicinal, while suppressing or minimizing material health-risk information known to the Enterprise Members, including Defendants.

214.    Upon information and belief, the Enterprise's coordinated conduct includes, among other things, Enterprise Members' participation in common trade associations and industry groups, through which the Enterprise Members advance shared goals of expanding cannabis markets, resisting health warnings, and coordinating industry-wide marketing and messaging strategies, coordinating to increase or otherwise ensure sales, and coordinating to increase the market price of the Enterprise Members' products.

215. Upon information and belief, the Enterprise's coordinated conduct further includes their deployment of materially similar marketing strategies across their platforms, including the shared use of pseudo-scientific terminology; the false categorization of products by "strain" (including "indica," "sativa," and "hybrid"); and the practice of marketing cannabis as a treatment for mental health disorders including PTSD, depression, and anxiety, in each instance to cultivate consumer demand while minimizing or omitting material health-risk information.

216. Upon information and belief, Enterprise Members also sponsor, create, promote, and rely upon a shared body of methodologically flawed and industry-funded research to support health and therapeutic claims about cannabis, including using data created by the U.K. Medical Cannabis Registry and research papers published by the Medical Cannabis Research Group of the Imperial College London, while suppressing, omitting, and failing to disclose well-established scientific evidence of serious adverse health effects of cannabis. Those concealed or minimized risks include, among other things, addiction, psychosis, schizophrenia, bipolar disorder, suicidal ideation, depression, anxiety, adverse cardiovascular events, cannabis hyperemesis syndrome, cannabis use disorder, and prenatal harm.

217. Upon information and belief, the Enterprise Members further disseminate materially similar health-related messages through substantially similar marketing channels, including websites, social media platforms, email campaigns, and influencer endorsements, and coordinate efforts to expand market access for cannabis products, to the detriment of consumers, including Plaintiffs and class members.

218. The Enterprise has an ascertainable structure separate and apart from the individual acts constituting the pattern of racketeering activity. The Enterprise Members' association with one another within the Enterprise is evidenced by, among other things, their overlapping state-

79

market participation, their agreements to stock and sell each others' cannabis products, their common membership and active participation in certain cannabis industry organizations through which they coordinate messaging and share promotional plans, and the longevity of the Enterprise, which has existed for a period sufficient for Enterprise Members to pursue and accomplish the Enterprise's purpose.

219.    Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3). Defendants are each distinct from the Enterprise, and Defendants have conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

220.    Defendants' and Enterprise Members' pattern of racketeering activity consists of multiple related predicate acts committed over an extended period of time, which are related to each other and amount to or pose a threat of continued criminal activity, all directed at Plaintiffs and class members and undertaken to profit from the marketing, increased market price, promotion, distribution, and sale of cannabis products through deception regarding legality, safety, addictiveness, and purported medical utility and as otherwise described herein.

221.    Defendants' and Enterprise Members' predicate acts constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) and include, among other things, (a) dealing in a controlled substance punishable under federal law, including the manufacture, distribution, dispensing, and sale of cannabis products, which Defendants knew or should have known were illegal under federal law; (b) mail fraud, in violation of 18 U.S.C. § 1341, through the use of the United States mail to facilitate the marketing and sale of cannabis products and to disseminate false or misleading statements and omissions concerning the legality, safety, addictiveness, and therapeutic value of cannabis products; (c) wire fraud, in violation of 18 U.S.C. § 1343, through

the use of interstate wire communications, including email, digital advertising, marketing campaigns, and public statements, to disseminate false or misleading statements and omissions concerning the legality, safety, addictiveness, and therapeutic value of cannabis products; and (d) monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957, including, upon information and belief, engaging in monetary transactions of $10,000 or more using property derived from specified unlawful activity, including the unlawful dealing in cannabis and the foregoing fraud-based conduct.

222.    As part of and in furtherance of Enterprise Members' racketeering activity, Defendants misrepresented and omitted material facts through marketing and advertising to convey that their cannabis products were safe and legal for consumers; misrepresented that their cannabis products complied with federal laws and regulations; and failed to disclose material facts regarding known or foreseeable risks, including risks of addiction, psychosis, bipolar disorder, depression, suicidal ideation, and anxiety, while affirmatively marketing products to "patients," including those with mental health vulnerabilities.

223.    Defendants' predicate acts were not isolated, sporadic, or accidental. They were repeated, related, and coordinated acts undertaken pursuant to the Enterprise's common purpose of maximizing cannabis sales and profits by expanding consumer demand through deception and by reducing the likelihood that consumers would refrain from purchase or pay less due to concerns about legality, safety, addictiveness, and health risks.

224.    By reason of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs and class members were injured in their business or property. As a direct and proximate result of Defendants' racketeering activity, Plaintiffs and class members suffered economic injury, including losses from the purchase of Defendants' unlawfully marketed and illegal cannabis products. But for

81

Defendants' racketeering activity, Plaintiffs and class members would not have purchased cannabis products from Defendants, or would have paid substantially less for such products.

225.    Plaintiffs and class members are therefore entitled to recover treble damages and attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c), together with such other relief as the Court deems proper.

226.    In violation of 18 U.S.C. § 1962(d), Defendants further conspired and agreed with the other Enterprise Members and with other persons and entities, both known and unknown, to violate 18 U.S.C. § 1962(c). Defendants knew of, and agreed to, the overall objective of the conspiracy, including the commission of at least two predicate acts constituting a pattern of racketeering activity. The existence of the conspiracy is demonstrated by, among other things, the parallel and coordinated nature of the Enterprise Members' conduct; their common membership in trade and public relations organizations through which they developed, refined, and propagated their shared marketing strategy and promotional plans; their agreements to stock and sell each other's products; their materially similar public messaging and suppression of health warnings; and their shared financial interest in expanding the cannabis market through deceptive means.

227.    Each Enterprise Member, including Defendants, committed overt acts in furtherance of the conspiracy, including, among other things, the predicate acts of mail fraud, wire fraud, and dealing in controlled substances as described herein, as well as the use and reinvestment of proceeds derived from those unlawful activities to continue the Enterprise's operations and expand the reach of the challenged marketing, promotion, and sales practices.

228.    As a direct and proximate result of Defendants' racketeering and conspiracy described herein, Plaintiffs and class members suffered injury in their business or property,

including economic losses from the purchase of Defendants' unlawfully marketed, priced, and illegal cannabis products.

229. WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) for threefold damages in an amount to be determined at trial, together with interest pursuant to 18 U.S.C. § 1964(c); (c) prohibiting Defendants from making any further misrepresentations or omissions regarding the medicinal, health, or therapeutic benefits of cannabis or cannabis products; (d) requiring Defendants to adequately warn consumers in Illinois of their cannabis products' dangers, especially the dangers to users' mental and physical health; (e) requiring Defendants to disgorge their ill-gotten profits; (f) requiring Defendants to pay the costs of the suit, including attorneys' fees as provided by 18 U.S.C. § 1964(c); (g) certification of this action as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiffs as class representatives and their counsel as class counsel; and (h) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT II
**Violation of the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §42-110a-110q)**

230. Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

231. Pursuant to Conn. Gen. State §42-110b(a), "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

232. Pursuant to Conn. Gen. Stat. §42-110b(b), "[i]t is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be

83

guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1 of the Federal Trade Commission Act (15 USC 45(a)(1)), as from time to time amended."

233. Under the Federal Trade Commission Act, a person engages in an "unfair or deceptive act" by making "misrepresentations or deceptive omissions of material facts," 15 U.S.C. § 45(a)(1),  in connection with the "advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." *See also* Conn. Gen. Stat. §442-110a(4).

234. Defendants' marketing, advertising, and labeling of their cannabis products, purchased by Plaintiffs and class members, constituted unfair and deceptive acts or practices in the conduct of trade or commerce within the meaning of Conn. Gen. Stat. § 42-110b. Defendants misrepresented, concealed and failed to disclose or adequately warn of the material facts that their cannabis products are not therapeutic or medicinal as Defendants claim, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

235. These actions and omissions were misleading, unfair, and deceptive standing alone and were particularly deceptive and willful considering Defendants' advertising of their products as medicinal and therapeutic.

236. In purchasing Defendants' products for personal, family, or household purposes, Plaintiffs and class members relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

237. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, intended for consumers to rely on such misrepresentations and omissions, and that Plaintiffs and class members were ignorant of the facts that cannabis products are not therapeutic or medicinal, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

238. Defendants' conduct proximately caused ascertainable losses to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Connecticut Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

239. WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) for punitive damages as permitted under Conn. Gen. Stat. § 42-110g(a); (c) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (d)

85

requiring Defendants to disgorge their ill-gotten profits; (e) prohibiting Defendants from making any further misrepresentations or omissions regarding the medicinal, health, or therapeutic benefits of cannabis or cannabis products; (f) requiring Defendants to adequately warn consumers of their cannabis products' dangers, especially the dangers to users' mental and physical health; (g) requiring Defendants to pay the costs of the suit, including attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g(d); (h) for prejudgment interest; and (i) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT III
### Unfair and Deceptive Trade Practices: Unlawful Advertising in Violation of Conn. Gen. Stat. § 21a-421bb(b)(5) and (f), and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b

240.    Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

241.    Pursuant to Conn. Gen. Stat. § 21a-421bb(b)(5), no cannabis establishment shall "advertise cannabis or cannabis products in a manner claiming or implying, or permit any employee of the cannabis establishment to claim or imply, that such products have curative or therapeutic effects, or that any other medical claim is true, or allow any employee to promote cannabis for a wellness purpose unless such claims are substantiated as set forth in regulations adopted under chapter 420f."

242.    Pursuant to Conn. Gen. Stat. § 21a-421bb(f), a violation of subsection (b)(5) "shall constitute an unfair or deceptive trade practice under section 42-110b."

243.    Defendants created and implemented a scheme to expand the market for cannabis products through a pervasive pattern of false, misleading, and deceptive advertising and omissions.

86

At all relevant times, Defendants made statements, directly or by implication, claiming or suggesting that their cannabis products were healthy, therapeutic, or medicinal.

244.    These statements were made through an array of marketing channels, including, but not limited to: in-person and other forms of detailing, point of sale displays and in-store promotions, search engine marketing, mobile app advertisements, public relations and press releases, sponsorship and event marketing, product demonstrations and free trials, brochures, advertisements, influencer endorsements and testimonials, email marketing campaigns, television and radio commercials, customer reviews and ratings, chatbots and automated messaging, product packaging and labeling, websites, and social media. These statements included, but were not limited to: Defendants claiming or implying that cannabis, any constituent part of cannabis, or Defendants' cannabis  products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

245.    Plaintiffs and class members are consumers for whose protection Conn. Gen. Stat. §§ 21a-421bb and 42-110b were enacted.

246.    Defendants' conduct, as alleged herein, constitutes unlawful advertising in violation of Conn. Gen. Stat. § 21a-421bb(b)(5), and thereby constitutes an unfair or deceptive trade practice under Conn. Gen. Stat. § 42-110b, as expressly provided by § 21a-421bb(f).

247.    As a direct and proximate result of Defendants' unlawful advertising, Plaintiffs and class members suffered ascertainable losses, including monetary loss, injury to their health and wellbeing, and other damages.

87

248.   WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) for punitive damages pursuant to Conn. Gen. Stat. § 42-110g; (c) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (d) requiring Defendants to disgorge their ill-gotten profits; (e) prohibiting Defendants from making any further misrepresentations or omissions regarding the medicinal, health, or therapeutic benefits of cannabis or cannabis products; (f) requiring Defendants to adequately warn consumers of their cannabis products' dangers, especially the dangers to users' mental and physical health; (g) requiring Defendants to pay the costs of the suit, including attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g; (h) for prejudgment interest; and (i) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT IV
### Connecticut Negligent Misrepresentation

249.   Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

250.   Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of the fact that their cannabis products are not therapeutic or medicinal as the Defendants describe, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or cause or contribute to adverse cardiovascular events, CHS, and/or cause cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

88

251. These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

252. Defendants were careless or negligent in determining the truth of the above statements and/or omissions. Defendants, in the course of their business of manufacturing, marketing, and selling cannabis products, failed to exercise reasonable care or competence in obtaining or communicating the information supplied to consumers.

253. At all relevant times, Defendants made these statements and/or omissions with the intent of inducing reliance on them by Plaintiffs and class members and with the intent to cause Plaintiffs and class members to purchase their cannabis products.

254. Plaintiffs and class members reasonably and justifiably relied on these statements and/or omissions when purchasing cannabis products.

255. Defendants' unlawful representations described herein are continuing in nature and are widespread practices.

256. Defendants' conduct proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

257. WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring

89

Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (c) requiring Defendants to disgorge their ill-gotten profits; (d) requiring Defendants to pay the costs of the suit, including attorneys' fees; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

**<u>COUNT V</u>**
**Connecticut Breach of Express Warranty (Conn. Gen. Stat. §§ 42a-2-313)**

258. Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

259. Defendants made affirmations of fact and promises to Plaintiffs and class members including but not limited to:

    a. Warranties that cannabis, any constituent part of cannabis, or Defendants' cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

    b. Warranties that certain cannabis products can more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain health and mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma, when compared to other cannabis products.

    c. Warranties that there is credible medical or scientific evidence or scholarship that supports that cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute

90

medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

d. Warranties that there is credible medical or scientific evidence or scholarship that supports that certain cannabis products can more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain health and mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma, when compared to other cannabis products.

e. Warranties that cannabis products are healthy or health-promoting, not dangerous or hazardous to consumers' health, not addictive, or do not cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or do not cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS.

f. Warranties that there is credible scientific or medical evidence establishing that cannabis products are healthy or health-promoting, not dangerous or hazardous to consumers' health, not addictive, and/or do not cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or do not cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS.

260. Plaintiffs and class members complied with the terms of the express warranty, and demanded Defendants fulfill its terms.

261.    As a proximate result of the breach of warranties by Defendants, Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted.

262.    Defendants' motive of increasing profits at the expense of the mental health of consumers was intentional, willful, morally wrong and the acts showed gross recklessness.

263.    Defendants breached their express warranties because their products were not therapeutic or safe and did not conform to the affirmations and promises made.

264.    Plaintiffs and class members provided notice of breach within a reasonable time after discovery.

265.    As a direct and proximate result of Defendants' breach, Plaintiffs and class members suffered damages including overpayment for the products, loss of the benefit of their bargain, and incidental and consequential damages pursuant to Conn. Gen. Stat. §§ 42a-2-313, 42a-2-714, and 42a-2-715.

266.    WHEREFORE, Plaintiffs and class members seek judgment against all Defendants : (a) for compensatory damages, including overpayment for the products, loss of the benefit of the bargain; (b) for incidental and consequential damages pursuant to Conn. Gen. Stat. §§ 42a-2-714 and 42a-2-715; (c) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (d) requiring Defendants to disgorge their ill-gotten profits; (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) for

92

prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT VI
### Connecticut Breach of Implied Warranty of Merchantability
### (Conn. Gen. Stat. §§ 42a-2-314)

267.    Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

268.    Defendants' cannabis products came with an implied warranty that they were merchantable under Conn. Gen. Stat. § 42a-2-314, warranting that such goods were fit for the ordinary purpose for which they would be used.

269.    Defendants breached their implied warranty of merchantability because their products were not in merchantable condition when sold; posed significant health risks; and did not conform to marketing promises, including but not limited to, dangers of psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or cardiovascular disease, CHS, and/or cannabis use disorder, and/or significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits; lacked adequate warnings or instructions regarding these risks, rendering Defendants' products unreasonably dangerous and unfit for consumption in their ordinary manner; and/or did not conform to the promises and affirmations of fact made during Defendants' marketing scheme that their cannabis products had medicinal, therapeutic, or health benefits, including, but not limited to, cannabis products being capable of treating, easing, alleviating, being good for, aiding, or relieving or otherwise being medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical conditions, including, but not limited to, pain and glaucoma.

93

270. Defendants breached the warranty implied at the time of sale in that Plaintiffs and class members did not receive products with the purported benefits and, thus, the goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, advertised, or sold.

271. Defendants also breached the warranty implied at the time of sale in that Plaintiffs and class members did not receive products that were adequately contained, packaged, and labeled as required by the contract of sale.

272. Defendants' products were not fit for ordinary use because they posed significant health risks, were defectively marketed without adequate warnings, and did not conform to the promises and affirmations made.

273. Plaintiffs and class members have had sufficient direct dealings with Defendants to establish privity of contract between Defendants, on the one hand, and Plaintiffs and class members, on the other hand.

274. Plaintiffs and class members were third-party beneficiaries of Defendants' agreements with their distributors, dealers, and sellers for the distribution, dealing, and sale of Defendants' products to consumers. Specifically, Plaintiffs and class members are the intended beneficiaries of Defendants' implied warranties. Defendants' products are manufactured with the express purpose and intent of being sold to consumers.

275. Plaintiffs and class members provided notice of breach within a reasonable time after discovery.

276. As a direct and proximate result of Defendants' breach, Plaintiffs and class members suffered damages recoverable under Conn. Gen. Stat. §§ 42a-2-314, 42a-2-714, and 42a-

2-715., including overpayment, loss of the benefit of their bargain, and incidental and consequential damages.

277.    WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for compensatory damages, including overpayment for the products, loss of the benefit of the bargain; (b) for incidental and consequential damages pursuant to Conn. Gen. Stat. §§ 42a-2-714 and 42a-2-715; (c) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (d) requiring Defendants to disgorge their ill-gotten profits; (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT VII
### Connecticut Common Law Fraud

278.    Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

279.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose the facts and/or adequately warn Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal as the Defendants describe, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits. These omitted facts were material to reasonable consumers in deciding whether to purchase Defendants' cannabis products.

95

280. Defendants owed Plaintiffs and class members a duty to adequately disclose or warn of these facts because Defendants possesses and has always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to Plaintiffs and class members, concerning the manufacture, distribution, nature, and properties of their cannabis products and has at all relevant times been in a position to know, identify, and confirm the threats posed by their cannabis products; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' cannabis products posed an unreasonable risk of substantial injury; and/or because Defendants made partial representations concerning the same subject matter as the omitted facts.

281. Defendants knew, or recklessly disregarded the truth, and acted willfully and intentionally to deceive as to whether their misrepresentations and/or omissions were false and misleading and intended for consumers to rely on such misrepresentations and omissions and act upon them. Defendants made these misrepresentations and omissions with the specific intent to induce Plaintiffs and class members to purchase cannabis products and thereby increase Defendants' profits.

282. Plaintiffs and class members reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to rely on the misrepresentations and/or omissions under the circumstances and Plaintiffs' and class members' reliance on these misrepresentations and omissions was foreseeable, direct, and a substantial factor in causing their purchases.

283.    Defendants' motive of increasing profits at the expense of the mental health of consumers was morally wrong and the acts showed a reckless disregard of the rights of Plaintiffs and class members.

284.    Defendants' conduct was the direct and proximate cause of Plaintiffs' and class members' damages.  Absent Defendants' fraudulent conduct, Plaintiffs and class members would not have purchased Defendants' cannabis products or would have paid less for them. As a result, Plaintiffs and class members suffered actual damages, including but not limited to, the purchase price paid, the diminished value of the products, and consequential losses.

285.    WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' fraudulent conduct; (c) requiring Defendants to disgorge their ill-gotten profits; (d) requiring Defendants to pay the costs of the suit, including attorneys' fees; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT VIII
### Connecticut Unjust Enrichment

286.    Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

287.    Defendants created and implemented a scheme to create a market for cannabis and substantially increase sales of cannabis products through a pervasive pattern of false and/or misleading statements and/or omissions.  At all times relevant to this Complaint, Defendants made and disseminated untrue, false, and misleading statements that are not supported by credible scientific or medical evidence to consumers to promote the sale and use of cannabis.

97

288. Defendants' marketing, advertising, and labeling of their cannabis products concealed and failed to disclose the facts and/or adequately warn Plaintiffs and class members that the products are addictive, not therapeutic or medicinal as Defendants describe, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or contribute to adverse cardiovascular events, CHS, and cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

289. Plaintiffs and class members purchased Defendants' cannabis products directly from Defendants and/or from Defendants' authorized retailers, conferring a direct and substantial benefit on Defendants.

290. Defendants were unjustly enriched by receiving payments from Plaintiffs and class members for cannabis products sold through deception, fraud, and unlawful conduct.

291. Defendants' retention of these benefits is unjust and inequitable because it was obtained through false statements, material omissions, and the sale of unreasonably dangerous products, and equity and good conscience require restitution.

292. Plaintiffs and class members plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate remedy.

293. WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (c) requiring Defendants to disgorge their ill-gotten profits; (d) prohibiting

98

Defendants from making any further misrepresentations or omissions regarding the medicinal, health, or therapeutic benefits of cannabis or cannabis products; (e) requiring Defendants to adequately warn consumers of their cannabis products' dangers, especially the dangers to users' mental and physical health; (f) requiring Defendants to pay the costs of the suit, including attorneys' fees; (g) for prejudgment interest; and (h) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## IX.    CAUSES OF ACTION STATE SUB-CLASSES

### A.    Violations of Arizona Law Brought on Behalf of Arizona Subclass.

294.    Plaintiffs Brent Duke, Cheryl Oliver, and Joseph Parkhurst(collectively, "Arizona Plaintiffs") bring each of the following claims on behalf of themselves and the Arizona Subclass under Arizona law.

**COUNT I**
**Arizona Consumer Fraud Act Violation**

295.    Arizona Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

296.    Pursuant to A.R.S. § 44-1522: "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."

297.    Defendants have engaged in unlawful and deceptive business practices in violation of the Arizona Consumer Fraud Act ("ACFA"), A.R.S. § 44-1521 et seq., as set forth above.

298.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of the fact that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

299.    These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

300.    Defendants' conduct was fraudulent and deceptive for all of the reasons stated herein.  The misrepresentations and omissions at issue were likely to, and in fact did, cause confusion or misunderstanding to reasonable consumers including Arizona Plaintiffs and class members. Reasonable consumers, including Arizona Plaintiffs and class members, would have found it material to their purchasing decisions that: a) Defendants' cannabis products were not therapeutic or medicinal and could not treat, ease, alleviate, be good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to pain and glaucoma; b) there is no credible medical or scientific evidence or scholarship that supports that Defendants' cannabis  products have the medicinal or therapeutic properties described by the Defendants and/or can treat, ease, alleviate, be good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression,

and/or anxiety and/or other medical disorders, including, but not limited to pain and glaucoma; c) certain of Defendants' cannabis  products do not uniquely or more effectively treat, ease, alleviate, be good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and anxiety when compared to other cannabis products and/or other medical disorders, including, but not limited to, pain and glaucoma and d) Defendants' cannabis products cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and anxiety; adverse cardiovascular events, CHS, and/or cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

301.    Knowledge of these facts would have been a substantial factor in Arizona Plaintiffs' and class members' decisions to purchase cannabis products.

302.    Defendants owed Arizona Plaintiffs and class members a duty to adequately disclose or warn of these facts because Defendants possess and has always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to Arizona Plaintiffs and class members, concerning the manufacture, distribution, nature, and properties of their cannabis products and has at all relevant times been in a position to know, identify, and confirm the threats posed by their cannabis products; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' cannabis products posed an unreasonable risk of substantial injury; and/or because Defendants made partial representations concerning the same subject matter as the omitted facts.

303.     Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading and intended for consumers, including Arizona Plaintiffs and class members, to rely on such misrepresentations and omissions.

304.     Defendants' conduct proximately caused actual damages to Arizona Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Arizona Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Arizona Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

305.     WHEREFORE, Arizona Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (c) requiring Defendants to disgorge their ill-gotten profits; (d) prohibiting Defendants from making any further misrepresentations or omissions regarding the medicinal, health, or therapeutic benefits of cannabis or cannabis products; (e) requiring Defendants to adequately warn consumers of their cannabis products' dangers, especially the dangers to users' mental and physical health; (f) requiring Defendants to pay the costs of the suit, including attorneys' fees; (g) for prejudgment interest; and (h) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT II
### Arizona Breach of Express Warranty

306.     Arizona Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

307.    Pursuant to A.R.S. § 47-2313:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to goods and becomes part of the basis of the bargain creates and express warranty that the good shall conform to the affirmation or promise;

(b) Any description of the good which is made part of the basis of the bargain creates an express warranty that the good shall conform to the description

….

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant" or guarantee" or that he have specific intention to make a warrant, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

308.    Defendants provided Arizona Plaintiffs and class members with written and unwritten express warranties, including but not limited to, warranties that cannabis, any constituent part of cannabis, or their cannabis products can treat, ease, alleviate, are good for, aid, or relieve or otherwise are a medicine therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

309.    Defendants provided Arizona Plaintiffs and class members with written and unwritten express warranties, including but not limited to, warranties that certain Defendants' products uniquely or more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

103

310.    Defendants provided Arizona Plaintiffs and class members with written and unwritten express warranties, including but not limited to, warranties that that there is credible medical or scientific evidence or scholarship that supports that cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma

311.    Defendants provided Arizona Plaintiffs and class members with written and unwritten express warranties, including but not limited to, warranties that there is credible medical or scientific evidence or scholarship that supports that cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

312.    Defendants breached these warranties resulting in damages to Arizona Plaintiffs and class members who purchased Defendants' products, which did not have the purported benefits.

313.    Arizona Plaintiffs and class members complied with the terms of the express warranty, and demanded Defendants fulfill its terms, and provided notice to Defendants within a reasonable time upon discovering their breach of this express warranty.

314.    As a proximate result of the breach of warranties by Defendants, Arizona Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that did not conform to what was promised and

promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value as compared to what was warranted.

315. Defendants' motive of increasing profits at the expense of the mental health disorders of Arizona consumers was immoral and the acts showed a reckless disregard of the rights of Arizona Plaintiffs and class members.

316. WHEREFORE, Arizona Plaintiffs and class members seek judgment against all Defendants: (a) for actual, compensatory, incidental, and consequential damages to Arizona Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (c) requiring Defendants to disgorge their ill-gotten profits; (d) requiring Defendants to pay the costs of the suit, including attorneys' fees; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

**COUNT III**
**Arizona Breach of Implied Warranty of Merchantability**

317. Arizona Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

318. Pursuant to A.R.S. § 47-2314:

> (1) Unless excluded or modified (Section 47-2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this Section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
>
> (2) Goods to be merchantable must be at least such as:
> (a) pass without objection in the trade under the contract description; and

105

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (Section 47-2316) other implied warranties may arise from course of dealing or usage of trade.

319.    Defendants' cannabis products came with an implied warranty that they were merchantable and fit for the ordinary purpose for which they would be used.  Defendants breached their implied warranty of merchantability because their products were not in merchantable condition when sold; were defective when sold; posed significant health risks, including but not limited to, dangers of psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or cardiovascular disease and/or cannabis use disorder, and/or significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits; lacked adequate warnings or instructions regarding these risks, rendering Defendants' products unreasonably dangerous and unfit for consumption in their ordinary manner; and/or did not conform to the promises and affirmations of fact made during Defendants' marketing scheme that their cannabis products had medicinal, therapeutic, or health benefits, including, but not limited to, cannabis products being capable of treating, easing, alleviating, being good for, aiding, or relieving or otherwise being medicine or therapy for certain

106

mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical conditions, including, but not limited to, pain and glaucoma.

320. Defendants breached the warranty implied at the time of sale in that Arizona Plaintiffs and class members did not receive products with the purported benefits and, thus, the goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, and advertised, or sold.

321. Defendants also breached the warranty implied at the time of sale in that Arizona Plaintiffs and class members did not receive products that were adequately contained, packaged, and labeled as required by the contract of sale.

322. Arizona Plaintiffs and class members have had sufficient direct dealings with Defendants to establish privity of contract between Defendants, on the one hand, and Arizona Plaintiffs and class members, on the other hand.

323. Arizona Plaintiffs and class members provided Defendants with notice of the breach of implied warranty within a reasonable time after discovering, or when they should have discovered, the above-mentioned breaches.

324. As a proximate result of the breach of warranties by Defendants, Arizona Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that were not fit for the ordinary purposes for which therapeutic or medicinal products are used and did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted or purchased products that they would not otherwise have purchased.

107

325.    Defendants' motive of increasing profits at the expense of the mental health of Arizona consumers was morally wrong and the acts showed a reckless disregard of the rights of Arizona Plaintiffs and class members.

326.    WHEREFORE, Arizona Plaintiffs and class members seek judgment against all Defendants: (a) for actual, compensatory, incidental, and consequential damages to Arizona Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (c) requiring Defendants to disgorge their ill-gotten profits; (d) requiring Defendants to pay the costs of the suit, including attorneys' fees; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## <u>COUNT IV</u>
### Arizona Common Law Fraud

327.    Arizona Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

328.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose the facts and/or adequately warn Arizona Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, and/or CHS; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

329. Defendants owed Arizona Plaintiffs and class members a duty to adequately disclose or warn of these facts because Defendants possess and has always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to Arizona Plaintiffs and class members, concerning the manufacture, distribution, nature, and properties of their cannabis products and has at all relevant times been in a position to know, identify, and confirm the threats posed by their cannabis products; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' cannabis products posed an unreasonable risk of substantial injury; and/or because Defendants made partial representations concerning the same subject matter as the omitted facts.

330. Defendants knew that their misrepresentations and/or omissions were false and misleading or were ignorant of their truth and intended for consumers to rely on such misrepresentations and omissions and act upon them.

331. Arizona Plaintiffs and class members reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to rely on the misrepresentations and/or omissions under the circumstances.

332. Defendants' motive of increasing profits at the expense of the mental health of Arizona consumers was morally wrong and the acts showed a reckless disregard of the rights of Arizona Plaintiffs and class members.

333. Defendants' conduct directly caused actual damages to Arizona Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Arizona Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Arizona

109

Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

334.    WHEREFORE, Arizona Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Arizona Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' fraudulent conduct; (c) requiring Defendants to disgorge their ill-gotten profits; (d) prohibiting Defendants from making any further misrepresentations or omissions regarding the medicinal, health, or therapeutic benefits of cannabis or cannabis products; (e) requiring Defendants to adequately warn consumers of their cannabis products' dangers, especially the dangers to users' mental and physical health; (f) requiring Defendants to pay the costs of the suit, including attorneys' fees; (g) for prejudgment interest; and (h) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT V
### Arizona Unjust Enrichment

335.    Arizona Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

336.    Defendants were also enriched by their marketing and advertisements for and/or labeling of their cannabis products that concealed and/or failed to disclose the facts and/or adequately warn Arizona Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety;  cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS;

110

and/or poses significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

337. Defendants' conduct was unfair and unconscionable in that: a) it included the manufacture, sale, and marketing of products that are illegal under federal law and cause and/or exacerbate serious and debilitating mental health conditions, and b) it included misrepresentations and omissions of material facts concerning the medicinal and therapeutic characteristics and safety of their cannabis products that are illegal under Arizona law; offends public policy; was immoral, unethical, oppressive, and unscrupulous; was part of a pattern of sales conduct that would outrage and offend the public conscience; and caused substantial harm that greatly outweighs any benefits associated with the conduct.

338. As a result of Defendants' deceptive, false, and misleading statements and illegal claims as to the health, medicinal, or therapeutic qualities of their products and actions and many violations of the law, Defendants were enriched at the expense of consumers, Arizona Plaintiffs and class members, who were impoverished through the payment of the purchase price for Defendants' products.

339. Defendants requested and received a measurable benefit at the expense of Arizona Plaintiffs and class members in the form of payment for Defendants' cannabis products.

340. There is no justification for Defendants' retention of this benefit.

341. Defendants' retention of the benefit of these ill-gotten gains on the back of human misery and suffering caused by mental health disorders violates fundamental principles of justice, equity, and good conscience.

111

342.    Thus, it would be unjust for Defendants to retain the ill-gotten benefits that they received from Arizona Plaintiffs and class members without restitution to Arizona Plaintiffs and class members.

343.    Arizona Plaintiffs and class members plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

344.    WHEREFORE, Arizona Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' consumer misrepresentations or omissions; (c) requiring Defendants to disgorge their ill-gotten profits; (d) requiring Defendants to pay the costs of the suit, including attorneys' fees; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

### B.    Violations of Connecticut Law Brought on Behalf of Connecticut Subclass

345.    Plaintiffs Jacyn Green and Donna Taylor (together, "Connecticut Plaintiffs") bring each of the following claims on behalf of themselves and the Connecticut Subclass under Connecticut law.

### COUNT I
### Violation of the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §42-110a-110q)

346.    Connecticut Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

347.    Pursuant to Conn. Gen. State §42-110b(a), "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

112

348.    Pursuant to Conn. Gen. Stat. §42-110b(b), "[i]t is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1 of the Federal Trade Commission Act (15 USC 45(a)(1)), as from time to time amended."

349.    Under the Federal Trade Commission Act, a person engages in an "unfair or deceptive act" by making "misrepresentations or deceptive omissions of material facts," 15 U.S.C. § 45(a)(1),  in connection with the "advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." See also Conn. Gen. Stat. §442-110a(4).

350.    Defendants' marketing, advertising, and labeling of their cannabis products, purchased by Connecticut Plaintiffs and class members, constituted unfair and deceptive acts or practices in the conduct of trade or commerce within the meaning of Conn. Gen. Stat. § 42-110b. Defendants misrepresented, concealed and failed to disclose or adequately warn of the material facts that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

351.    These actions were misleading, unfair, and deceptive standing alone and were particularly deceptive and willful considering Defendants' advertising of their products as medicinal and therapeutic.

352.    In purchasing Defendants' products for personal, family, or household purposes, Connecticut Plaintiffs and class members relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

353.    Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, intended for consumers to rely on such misrepresentations and omissions, and that Connecticut Plaintiffs and class members were ignorant of the facts that cannabis products are not therapeutic or medicinal, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

354.    Defendants' conduct proximately caused ascertainable losses to Connecticut Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Connecticut Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Connecticut Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

355.    WHEREFORE, Connecticut Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Connecticut Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not

have done so; (b) for  punitive damages as permitted under Conn. Gen. Stat. § 42-110g(a); (c) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions;  (d) requiring Defendants to disgorge their ill-gotten profits; (e) prohibiting Defendants from making any further misrepresentations or omissions regarding the medicinal, health, or therapeutic benefits of cannabis or cannabis products; (f) requiring Defendants to adequately warn consumers of their cannabis products' dangers, especially the dangers to users' mental and physical health; (g) requiring Defendants to pay the costs of the suit, including attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g(d); (h) for prejudgment interest; and (i) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT II
### Unfair and Deceptive Trade Practices: Unlawful Advertising in Violation of Conn. Gen. Stat. § 21a-421bb(b)(5) and (f), and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b

356.    Connecticut Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

357.    Pursuant to Conn. Gen. Stat. § 21a-421bb(b)(5), no cannabis establishment shall "advertise cannabis or cannabis products in a manner claiming or implying, or permit any employee of the cannabis establishment to claim or imply, that such products have curative or therapeutic effects, or that any other medical claim is true, or allow any employee to promote cannabis for a wellness purpose unless such claims are substantiated as set forth in regulations adopted under chapter 420f."

358.    Pursuant to Conn. Gen. Stat. § 21a-421bb(f), a violation of subsection (b)(5) "shall constitute an unfair or deceptive trade practice under section 42-110b."

115

359. Defendants created and implemented a scheme to expand the market for cannabis products through a pervasive pattern of false, misleading, and deceptive advertising and omissions. At all relevant times, Defendants made statements, directly or by implication, claiming or suggesting that their cannabis products were healthy, therapeutic, or medicinal.

360. These statements were made through an array of marketing channels, including, but not limited to: in-person and other forms of detailing, point of sale displays and in-store promotions, search engine marketing, mobile app advertisements, public relations and press releases, sponsorship and event marketing, product demonstrations and free trials, brochures, advertisements, influencer endorsements and testimonials, email marketing campaigns, television and radio commercials, customer reviews and ratings, chatbots and automated messaging, product packaging and labeling, websites, and social media. These statements included, but were not limited to: Defendants claiming or implying that cannabis, any constituent part of cannabis, or Defendants' cannabis  products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

361. Connecticut Plaintiffs and class members are consumers for whose protection Conn. Gen. Stat. §§ 21a-421bb and 42-110b were enacted.

362. Defendants' conduct, as alleged herein, constitutes unlawful advertising in violation of Conn. Gen. Stat. § 21a-421bb(b)(5), and thereby constitutes an unfair or deceptive trade practice under Conn. Gen. Stat. § 42-110b, as expressly provided by § 21a-421bb(f).

363.    As a direct and proximate result of Defendants' unlawful advertising, Connecticut Plaintiffs and class members suffered ascertainable losses, including monetary loss, injury to their health and wellbeing, and other damages.

364.    WHEREFORE, Connecticut Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Connecticut Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) for punitive damages pursuant to Conn. Gen. Stat. § 42-110g; (c) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (d) requiring Defendants to disgorge their ill-gotten profits; (e) prohibiting Defendants from making any further misrepresentations or omissions regarding the medicinal, health, or therapeutic benefits of cannabis or cannabis products; (f) requiring Defendants to adequately warn consumers of their cannabis products' dangers, especially the dangers to users' mental and physical health; (g) requiring Defendants to pay the costs of the suit, including attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g; (h) for prejudgment interest; and (i) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT III
### Connecticut Negligent Misrepresentation

365.    Connecticut Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

366.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of the fact that their cannabis products are not therapeutic or medicinal, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or cause or contribute to adverse cardiovascular events, CHS,

117

and/or cause cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

367. These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

368. Defendants were careless or negligent in determining the truth of the above statements and/or omissions. Defendants, in the course of their business of manufacturing, marketing, and selling cannabis products, failed to exercise reasonable care or competence in obtaining or communicating the information supplied to consumers.

369. At all relevant times, Defendants made these statements and/or omissions with the intent of inducing reliance on them by Connecticut Plaintiffs and class members and with the intent to cause Connecticut Plaintiffs and class members to purchase their cannabis products.

370. Connecticut Plaintiffs and class members reasonably and justifiably relied on these statements and/or omissions when purchasing cannabis products.

371. Defendants' unlawful representations described herein are continuing in nature and are widespread practices.

372. Defendants' conduct proximately caused actual damages to Connecticut Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Connecticut Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Connecticut Plaintiffs and class members to purchase Defendants' cannabis products they

118

would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

373.    WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (c) requiring Defendants to disgorge their ill-gotten profits; (d) requiring Defendants to pay the costs of the suit, including attorneys' fees; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT IV
### Connecticut Breach of Express Warranty (Conn. Gen. Stat. §§ 42a-2-313)

374.    Connecticut Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

375.    Defendants made affirmations of fact and promises to Connecticut Plaintiffs and class members including but not limited to:

a.    Warranties that cannabis, any constituent part of cannabis, or Defendants' cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

b.    Warranties that certain cannabis products can more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain health and mental health disorders such as bipolar disorder, PTSD, depression,

119

and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma, when compared to other cannabis products.

c. Warranties that there is credible medical or scientific evidence or scholarship that supports that cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

d. Warranties that there is credible medical or scientific evidence or scholarship that supports that certain cannabis products can more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain health and mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma, when compared to other cannabis products.

e. Warranties that cannabis products are healthy or health-promoting, not dangerous or hazardous to consumers' health, not addictive, or do not cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or do not cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS.

f. Warranties that there is credible scientific or medical evidence establishing that cannabis products are healthy or health-promoting, not dangerous or hazardous to consumers' health, not addictive, and/or do not cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar

120

disorder, suicidal ideation, depression, and/or anxiety and/or do not cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS.

376. Connecticut Plaintiffs and class members complied with the terms of the express warranty, and demanded Defendants fulfill its terms.

377. As a proximate result of the breach of warranties by Defendants, Connecticut Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted.

378. Defendants' motive of increasing profits at the expense of the mental health of Connecticut consumers was intentional, willful, morally wrong and the acts showed gross recklessness.

379. Defendants breached their express warranties because their products were not therapeutic or safe and did not conform to the affirmations and promises made.

380. Connecticut Plaintiffs and class members provided notice of breach within a reasonable time after discovery.

381. As a direct and proximate result of Defendants' breach, Connecticut Plaintiffs and class members suffered damages including overpayment for the products, loss of the benefit of their bargain, and incidental and consequential damages pursuant to Conn. Gen. Stat. §§ 42a-2-313, 42a-2-714, and 42a-2-715.

382. WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for compensatory damages, including overpayment for the products, loss of the benefit of the

121

bargain; (b) for incidental and consequential damages pursuant to Conn. Gen. Stat. §§ 42a-2-714 and 42a-2-715; (c) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (d) requiring Defendants to disgorge their ill-gotten profits; (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

**COUNT V**
**Connecticut Breach of Implied Warranty of Merchantability**
**(Conn. Gen. Stat. §§ 42a-2-314)**

383.    Connecticut Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

384.    Defendants' cannabis products came with an implied warranty that they were merchantable under Conn. Gen. Stat. § 42a-2-314, warranting that such goods were fit for the ordinary purpose for which they would be used.

385.    Defendants breached their implied warranty of merchantability because their products were not in merchantable condition when sold; posed significant health risks; and did not conform to marketing promises, including but not limited to, dangers of psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or cardiovascular disease, CHS, and/or cannabis use disorder, and/or significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits; lacked adequate warnings or instructions regarding these risks, rendering Defendants' products unreasonably dangerous and unfit for consumption in their ordinary manner; and/or did not conform to the promises and affirmations of fact made during Defendants' marketing scheme that their cannabis products had certain medicinal, therapeutic, or health

122

benefits, including, but not limited to, cannabis products being capable of treating, easing, alleviating, being good for, aiding, or relieving or otherwise being medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical conditions, including, but not limited to, pain and glaucoma.

386. Defendants breached the warranty implied at the time of sale in that Connecticut Plaintiffs and class members did not receive products with the purported benefits and, thus, the goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, advertised, or sold.

387. Defendants also breached the warranty implied at the time of sale in that Connecticut Plaintiffs and class members did not receive products that were adequately contained, packaged, and labeled as required by the contract of sale.

388. Defendants' products were not fit for ordinary use because they posed significant health risks, were defectively marketed without adequate warnings, and did not conform to the promises and affirmations made.

389. Connecticut Plaintiffs and class members have had sufficient direct dealings with Defendants to establish privity of contract between Defendants, on the one hand, and Connecticut Plaintiffs and class members, on the other hand.

390. Connecticut Plaintiffs and class members were third-party beneficiaries of Defendants' agreements with their distributors, dealers, and sellers for the distribution, dealing, and sale of Defendants' products to consumers. Specifically, Connecticut Plaintiffs and class members are the intended beneficiaries of Defendants' implied warranties. Defendants' products are manufactured with the express purpose and intent of being sold to consumers.

391.   Connecticut Plaintiffs and class members provided notice of breach within a reasonable time after discovery.

392.   As a direct and proximate result of Defendants' breach, Connecticut Plaintiffs and class members suffered damages recoverable under Conn. Gen. Stat. §§ 42a-2-314, 42a-2-714, and 42a-2-715., including overpayment, loss of the benefit of their bargain, and incidental and consequential damages.

393.   WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for compensatory damages, including overpayment for the products, loss of the benefit of the bargain; (b) for incidental and consequential damages pursuant to Conn. Gen. Stat. §§ 42a-2-714 and 42a-2-715; (c) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (d) requiring Defendants to disgorge their ill-gotten profits; (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT VI
### Connecticut Common Law Fraud

394.   Connecticut Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

395.   Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose the facts and/or adequately warn Connecticut Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or

124

CHS; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits. These omitted facts were material to reasonable consumers in deciding whether to purchase Defendants' cannabis products.

396. Defendants owed Connecticut Plaintiffs and class members a duty to adequately disclose or warn of these facts because Defendants possess and has always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to Connecticut Plaintiffs and class members, concerning the manufacture, distribution, nature, and properties of their cannabis products and has at all relevant times been in a position to know, identify, and confirm the threats posed by their cannabis products; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' cannabis products posed an unreasonable risk of substantial injury; and/or because Defendants made partial representations concerning the same subject matter as the omitted facts.

397. Defendants knew, or recklessly disregarded the truth, and acted willfully and intentionally to deceive as to whether their misrepresentations and/or omissions were false and misleading and intended for consumers to rely on such misrepresentations and omissions and act upon them. Defendants made these misrepresentations and omissions with the specific intent to induce Connecticut Plaintiffs and class members to purchase cannabis products and thereby increase Defendants' profits.

398. Connecticut Plaintiffs and class members reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to rely on the misrepresentations and/or omissions under the circumstances and Connecticut Plaintiffs' and

125

class members' reliance on these misrepresentations and omissions was foreseeable, direct, and a substantial factor in causing their purchases.

399.    Defendants' motive of increasing profits at the expense of the mental health of Connecticut consumers was morally wrong and the acts showed a reckless disregard of the rights of Plaintiffs and class members.

400.    Defendants' conduct was the direct and proximate cause of Connecticut Plaintiffs' and class members' damages.  Absent Defendants' fraudulent conduct, Connecticut Plaintiffs and class members would not have purchased Defendants' cannabis products or would have paid less for them. As a result, Connecticut Plaintiffs and class members suffered actual damages, including but not limited to, the purchase price paid, the diminished value of the products, and consequential losses.

401.    WHEREFORE, Connecticut Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Connecticut Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' fraudulent conduct; (c) requiring Defendants to disgorge their ill-gotten profits; (d) requiring Defendants to pay the costs of the suit, including attorneys' fees; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT VII
### Connecticut Unjust Enrichment

402.    Connecticut Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

403. Defendants created and implemented a scheme to create a market for cannabis and substantially increase sales of cannabis products through a pervasive pattern of false and/or misleading statements and/or omissions. At all times relevant to this Complaint, Defendants made and disseminated untrue, false, and misleading statements that are not supported by credible scientific or medical evidence to consumers to promote the sale and use of cannabis.

404. Defendants' marketing, advertising, and labeling of their cannabis products concealed and failed to disclose the facts and/or adequately warn Connecticut Plaintiffs and class members that the products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or contribute to adverse cardiovascular events, CHS, and cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

405. Connecticut Plaintiffs and class members purchased Defendants' cannabis products directly from Defendants and/or from Defendants' authorized retailers, conferring a direct and substantial benefit on Defendants.

406. Defendants were unjustly enriched by receiving payments from Connecticut Plaintiffs and class members for cannabis products sold through deception, fraud, and unlawful conduct.

407. Defendants' retention of these benefits is unjust and inequitable because it was obtained through false statements, material omissions, and the sale of unreasonably dangerous products, and equity and good conscience require restitution.

408.    Plaintiffs and class members plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate remedy.

409.    WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (c) requiring Defendants to disgorge their ill-gotten profits; (d) prohibiting Defendants from making any further misrepresentations or omissions regarding the medicinal, health, or therapeutic benefits of cannabis or cannabis products; (e) requiring Defendants to adequately warn consumers of their cannabis products' dangers, especially the dangers to users' mental and physical health; (f) requiring Defendants to pay the costs of the suit, including attorneys' fees; (g) for prejudgment interest; and (h) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

**C.    Violations of Illinois Law Brought on Behalf of Illinois Subclass.**

410.    Plaintiffs Byron Hill and Patricia Pye (collectively, "Illinois Plaintiffs") bring each of the following claims on behalf of themselves and the Illinois Subclass under Illinois law.

<u>COUNT I</u>
**Illinois Consumer Fraud and Deceptive Business Practices Act Violation**

411.    Illinois Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

412.    Pursuant to 815 ILCS 505/2:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or

128

omission of such material fact …are hereby declared unlawful whether any person has in fact been misled, or damaged thereby.

413.    Defendants have engaged in unlawful and deceptive business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").

414.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of the fact that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

415.    These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

416.    Defendants' conduct was unfair and unconscionable in that it included: a) the manufacture, sale, and marketing of products that are illegal under federal law and cause and/or exacerbate serious and debilitating mental health conditions, and b) misrepresentations and omissions of material facts concerning the medicinal and therapeutic characteristics and safety of their cannabis products that are illegal under the Illinois Cannabis Regulation and Tax Act ("CRTA"); offends public policy; was immoral, unethical, oppressive, and unscrupulous; was part of a pattern of sales conduct that would outrage and offend the public conscience; and caused substantial harm that greatly outweighs any benefits associated with the conduct.

417.    Defendants' conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, cause confusion or misunderstanding to reasonable consumers including Illinois Plaintiffs and class members. Reasonable consumers, including Illinois Plaintiffs and class members, would have found it material to their purchasing decisions that: a) Defendants' cannabis products were not therapeutic or medicinal as represented by Defendants and could not treat, ease, alleviate, be good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to pain and glaucoma; b) there is no credible medical or scientific evidence or scholarship that supports that Defendants' cannabis  products are medicinal or therapeutic in the manner represented by Defendants and/or can treat, ease, alleviate, be good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma; c) certain of Defendants' cannabis  products do not uniquely or more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety when compared to other cannabis products and/or other medical disorders, including, but not limited to, pain and glaucoma; and d) Defendants' cannabis products cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; adverse cardiovascular events, CHS, and/or cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

418.    Knowledge of these facts would have been a substantial factor in Illinois Plaintiffs' and class members' decisions to purchase cannabis products.

419.    Defendants owed Illinois Plaintiffs and class members a duty to disclose or adequately warn of these facts because Defendants possess and has always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to Plaintiffs and class members, concerning the manufacture, distribution, nature, and properties of their cannabis products and has at all relevant times been in a position to know, identify, and confirm the threats posed by their cannabis products; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' cannabis products posed an unreasonable risk of substantial injury; and/or because Defendants made partial representations concerning the same subject matter as the omitted facts.

420.    Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading and intended for consumers, including Plaintiffs and class members, to rely on such misrepresentations and omissions.

421.    Defendants' conduct proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Illinois Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Illinois Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered and/or to pay more for Defendants' cannabis products than they otherwise would have paid.

131

422.    WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to disgorge their ill-gotten profits; (d) prohibiting Defendants from making any further misrepresentations or omissions regarding the medicinal, health, or therapeutic benefits of cannabis or cannabis products; (e) requiring Defendants to adequately warn consumers of their cannabis products' dangers, especially the dangers to users' mental and physical health; (f) requiring Defendants to pay the costs of the suit, including attorneys' fees; (g) prejudgment interest; and (h) for such other and further relief as this Honorable Court may deem just,  proper, and equitable.

## COUNT II
### Negligence - Unlawful Advertising in Violation of the Illinois Cannabis Tax and Regulation Act, 410 ILCS 705/55-20

423.    Illinois Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

424.    Pursuant to 410 ILCS 705/55-20, "[n]o cannabis business establishment nor any other person or entity shall engage in advertising that contains any statement or illustration that…makes any health medicinal, or therapeutic claims about cannabis or cannabis-infused products."

425.    Pursuant to 410 ILCS 705/1-10, "advertise" means to "engage in promotional activities including, but not limited to: newspaper, radio, Internet and electronic media, and television advertising; the distribution of fliers and circulars; billboard advertising; and the display of window and interior signs."

132

426.    Defendants created and implemented a scheme to create and increase the market for cannabis and substantially increase sales of their cannabis products through a pervasive pattern of false and misleading statements and omissions.  At all times relevant to this Complaint, Defendants made numerous statements regarding the health, medicinal, and therapeutic benefits of cannabis.

427.    These statements were made through an array of marketing channels, including, but not limited to: in-person and other forms of detailing, point of sale displays and in-store promotions, search engine marketing, mobile app advertisements, public relations and press releases, sponsorship and event marketing, product demonstrations and free trials, brochures, advertisements, influencer endorsements and testimonials, email marketing campaigns, television and radio commercials, customer reviews and ratings, chatbots and automated messaging, product packaging and labeling, websites, and social media.  These statements included, but were not limited to: Defendants claiming or implying that cannabis, any constituent part of cannabis, or Defendants' cannabis  products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

428.     Plaintiff and class members are members of the class for whose benefit section 705/55-20 was passed.

429.    A private right of action is consistent with the purposes of the CRTA.

430.    Plaintiff's injury is one the CRTA was designed to prevent and enforcing this section through a private right of action is necessary to provide an adequate remedy for Defendants' violations.

431. Plaintiffs and class members allege that Defendants committed intentional fraudulent misrepresentation by knowingly making false health, medicinal, and therapeutic claims about their cannabis products. These material misrepresentations caused Plaintiffs and class members to justifiably rely and suffer economic losses allowing tort recovery under the intentional misrepresentation exception to Illinois' economic loss rule.

432. WHEREFORE, Illinois Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Illinois Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to pay the Illinois Plaintiffs and class members punitive damages; (d) requiring Defendants to pay the costs of the suit, including attorneys' fees; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT III
### Illinois Negligent Misrepresentation

433. Illinois Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

434. Defendants created and implemented a scheme to create and increase the market for cannabis and substantially increase sales of their cannabis products through a pervasive pattern of false and misleading statements and omissions. At all times relevant to this Complaint, Defendants made and disseminated untrue, false, and misleading statements that are not supported by credible scientific or medical evidence to Illinois consumers to promote the sale and use of cannabis. The many, material and untrue, false, and/or misleading statements were made through an array of marketing channels, including, but not limited to: in-person and other forms of

134

detailing, point of sale displays and in-store promotions, search engine marketing, mobile app advertisements, public relations and press releases, sponsorship and event marketing, product demonstrations and free trials, brochures, advertisements, influencer endorsements and testimonials, email marketing campaigns, television and radio commercials, customer reviews and ratings, chatbots and automated messaging, product packaging and labeling, websites, and social media. These untrue, false, and/or misleading statements include, but were not limited to:

a. Defendants falsely claiming or implying that cannabis, any constituent part of cannabis, or Defendants' cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

b. Defendants falsely claiming or implying that certain cannabis products can more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain health and mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma, than other cannabis products.

c. Defendants falsely claiming or implying that there is credible medical or scientific evidence or scholarship that supports that cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

135

d. Defendants falsely claiming or implying that there is credible medical or scientific evidence or scholarship that supports that certain cannabis products can more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain health and mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma, than other cannabis products.

e. Defendants falsely claiming or implying that cannabis products are healthy or health-promoting, not dangerous or hazardous to consumers' health, not addictive, or do not cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or do not cause or contribute to adverse cardiovascular events and/or CHS.

f. Defendants falsely claiming or implying that there is credible scientific or medical evidence establishing that cannabis products are healthy or health-promoting, not dangerous or hazardous to consumers' health, not addictive, and/or do not cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or do not cause or contribute to adverse cardiovascular events and/or CHS.

435. Defendants' marketing and advertisements for and labeling and packing of their cannabis products concealed and failed to adequately disclose or warn of the facts their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and anxiety and/or cause or contribute to adverse

136

cardiovascular events, CHS, and/or cause cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

436.    These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

437.    Defendants were careless or negligent in determining the truth of the above statements and/or omissions.

438.    At all relevant times, Defendants made these statements and/or omissions with the intent of inducing reliance on them by Illinois Plaintiffs and class members and with the intent to cause Illinois Plaintiffs and class members to purchase their cannabis products.

439.    Illinois Plaintiffs and class members did rely on these statements and/or omissions when purchasing cannabis products.

440.    Defendants' unlawful representations described herein are continuing in nature and are widespread practices.

441.    Defendants' motive of increasing profits at the expense of the mental health of Illinois consumers was morally wrong and the acts showed a reckless disregard for the rights of Illinois Plaintiffs and class members.

442.    Defendants' conduct actually and proximately caused actual damages to Illinois Plaintiffs and class members.  Absent Defendants' unfair and fraudulent conduct, Illinois Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them.  Defendants' misrepresentations and omissions induced Illinois Plaintiffs and class members to purchase Defendants' cannabis products

137

they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

443.    Illinois Plaintiffs and class members allege that Defendants committed intentional fraudulent misrepresentation by knowingly making false health, medicinal, and therapeutic claims about their cannabis products.  These material misrepresentations caused Illinois Plaintiffs and class members to justifiably rely and suffer economic losses allowing tort recovery under the intentional misrepresentation exception to Illinois' economic loss rule.

444.    WHEREFORE, Illinois Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Illinois Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to pay the Illinois Plaintiffs and class members punitive damages; and (d) for such other and further relief as this Honorable Court may deem just,  proper, and equitable.

## COUNT IV
### Illinois Strict Liability

445.    Illinois Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

446.    At all relevant times, Defendants sold to Illinois Plaintiffs and class members cannabis products in a defective condition that were unreasonably dangerous to Illinois Plaintiffs and class members as consumers.  Defendants' cannabis products had and have a "marketing defect" in that they failed to adequately warn Illinois Plaintiffs and class members as consumers that their products can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, depression, and anxiety and cause and/or contribute to

138

adverse cardiovascular events, CHS, and cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

447.    The danger was not obvious or generally appreciated by Illinois Plaintiffs and class members, and the magnitude of the danger outweighs the utility of the products as designed.

448.    The lack of an adequate warning existed at the time Defendants' cannabis products left Defendants' control and were purchased by Illinois Plaintiffs and class members.

449.    Defendants knew or should have known that their cannabis products caused, contributed to, or exacerbated mental health disorders such as schizophrenia, psychosis, bipolar disorder, depression, and anxiety and/or caused or contributed to adverse cardiovascular events, CHS, and/or cannabis use disorder and/or posed significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

450.    Instead of adequately warning Illinois Plaintiffs and class members, Defendants knowingly misrepresented cannabis products as safe, therapeutic, or medicinal.

451.    As a proximate result of Defendants' failure to adequately warn of the mental health dangers of their products, Illinois Plaintiffs and class members have suffered damages in an amount to be determined at trial, in that, among other things, they purchased and paid for products that they otherwise would not have purchased or overpaid for Defendants' cannabis products.

452.    Defendants motive of increasing profits at the expense of the mental health disorders of Illinois Plaintiffs and the class members was morally wrong and the acts showed a reckless disregard of the rights of Illinois Plaintiffs and class members.

139

453.    Illinois Plaintiffs' and class members' claims are not barred by the economic loss rule because Defendants fraudulently misrepresented and concealed material health risks associated with their cannabis products—an established exception under Illinois law.

454.    WHEREFORE, Illinois Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Illinois Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to pay the Illinois Plaintiffs and class members punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; and (e) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT V
### Illinois Negligence

455.    Illinois Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

456.    Defendants had a non-delegable duty of care to Illinois Plaintiffs and class members to cultivate, manufacture, transport, and sell reasonably safe products and/or adequately warn consumers of a product's dangerous propensity of which the average consumer would not be aware.

457.    At all relevant times, Defendants sold to Illinois Plaintiffs and class members cannabis products that were unreasonably dangerous to Illinois Plaintiffs and class members as their products cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, depression, and anxiety, and cause and/or contribute to adverse cardiovascular events, CHS, and cannabis use disorder, and/or pose significant risks to

140

fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

458. Defendants breached their duty to Illinois Plaintiffs and class members by failing to adequately warn Illinois Plaintiffs and class members of these dangers.

459. Defendants knew or should have known that their cannabis products caused, contributed to, and/or exacerbated mental health disorders such as schizophrenia, psychosis, bipolar disorder, depression, and anxiety, and caused and/or contributed to adverse cardiovascular events, CHS, and cannabis use disorder, and/or posed significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

460. Instead of adequately warning Illinois Plaintiffs and class members, Defendants knowingly misrepresented cannabis products as safe, therapeutic, or medicinal.

461. As a proximate result of Defendants' failure to adequately warn of the mental health dangers of their product, Illinois Plaintiffs and class members have suffered damages in an amount to be determined at trial, in that, among other things, they purchased and paid for products that they would not have purchased if they had known of the mental health dangers or overpaid for Defendant's cannabis products.

462. Defendants' motive for increasing profits at the expense of the mental health of Illinois Plaintiffs and the class members was morally wrong and the acts showed a reckless disregard of the rights of Illinois Plaintiffs and class members.

463. Illinois Plaintiffs' and class members' claims are not barred by the economic loss rule because Defendants fraudulently misrepresented and concealed material health risks associated with their cannabis products—an established exception under Illinois law.

141

464. WHEREFORE, Illinois Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Illinois Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to pay the Illinois Plaintiffs and class members punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; and (e) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT VI
### Illinois Breach of Express Warranty

465. Illinois Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

466. Pursuant to 810 ILCS 5/2-313:

1. Express warranties by the seller are created as follows:

    (a) Any affirmation of fact or promise made by the seller to the buyer which relates to goods and becomes part of the basis of the bargain creates an express warranty that the good shall conform to the affirmation or promise.

    (b) Any description of the good which is made part of the basis of the bargain creates an express warranty that the good shall conform to the description….

2. It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that the seller have specific intention to make a warrant.

142

467. Defendants provided Illinois Plaintiffs and class members with written and unwritten express warranties, including but not limited to warranties that cannabis, any constituent part of cannabis, or their cannabis products can treat, ease, alleviate, is good for, aid, or relieve or otherwise is a medicine or therapy for certain mental health disorders such as bipolar disorder, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

468. Defendants provided Illinois Plaintiffs and class members with written and unwritten express warranties, including but not limited to, warranties that certain Defendants' cannabis products uniquely or more effectively treat, ease, alleviate, is good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

469. Defendants provided Illinois Plaintiffs and class members with written and unwritten express warranties, including but not limited to warranties that there is credible medical or scientific evidence or scholarship that supports that cannabis products are medicinal or therapeutic and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

470. Defendants provided Illinois Plaintiffs and class members with written and unwritten express warranties, including but not limited to, warranties that there is credible medical or scientific evidence or scholarship that supports that cannabis products are medicinal or therapeutic and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute

medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

471. Defendants breached these warranties resulting in damages to Illinois Plaintiffs and class members who purchased Defendants' products, which did not have the purported benefits.

472. Illinois Plaintiffs complied with the terms of the express warranty, and demanded Defendants fulfill its terms, and provided notice to Defendants within a reasonable time upon discovering their breach of this express warranty.

473. As a proximate result of the breach of warranties by Defendants, Illinois Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted, or on products that they would not otherwise have purchased.

474. Defendants' motive of increasing profits at the expense of the mental health disorders of Illinois consumers was morally wrong and the acts showed a reckless disregard of the rights of Illinois Plaintiffs and class members.

475. WHEREFORE, Illinois Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Illinois Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to pay the Illinois Plaintiffs and class members punitive damages; (d) requiring Defendants to

disgorge their ill-gotten profits; and (e) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT VII
### Illinois Breach of Implied Warranty of Merchantability

476.    Illinois Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

477.    Pursuant to 810 ILCS 5/2-314:

> (1) Unless excluded or modified (Section 2-316 [810 ILCS 5/2-316]), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this Section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
> (2) Goods to be merchantable must be at least such as
>> (a) pass without objection in the trade under the contract description; and
>> (b) in the case of fungible goods, are of fair average quality within the description; and
>> (c) are fit for the ordinary purposes for which such goods are used; and
>> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
>> (e) are adequately contained, packaged, and labeled as the agreement may require; and
>> (f) conform to the promises or affirmations of fact made on the container or label if any.
> (3) Unless excluded or modified (Section 2-316 [810 ILCS 5/2-316]) other implied warranties may arise from course of dealing or usage of trade.

478.    Defendants' cannabis products came with an implied warranty that they were merchantable and fit for the ordinary purpose for which they would be used.  Defendants breached their implied warranty of merchantability because their products were not in merchantable condition when sold; were defective when sold; posed significant health risks, including but not limited to dangers of psychosis, bipolar disorder, suicidal ideation, depression, and anxiety and/or

an adverse cardiovascular event, CHS, and/or cannabis use disorder, and/or significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits; lacked adequate warnings or instructions regarding these risks, rendering Defendants' products unreasonably dangerous and unfit for consumption in their ordinary manner; and did not conform to the promises and affirmations of fact made during Defendants' marketing scheme that their cannabis products had certain medicinal, therapeutic, or health benefits, including, but not limited to, cannabis products being capable of treating, easing, alleviating, being good for, aiding, or relieving or otherwise being medicine or therapy for certain mental health disorders such as bipolar disorder, depression, and anxiety and or other medical conditions, including, but not limited to pain and glaucoma.

479. Defendants breached the warranty implied at the time of sale in that Illinois Plaintiffs and class members did not receive products with the purported benefits and, thus, the goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, and advertised, or sold.

480. Defendants also breached the warranty implied at the time of sale in that Illinois Plaintiffs and class members did not receive products that were adequately contained, packaged, and labeled as required by the contract of sale.

481. Illinois Plaintiffs and class members have had sufficient direct dealings with Defendants to establish privity of contract between Defendants, on the one hand, and Illinois Plaintiffs and class members, on the other hand.

482. Illinois Plaintiffs and class members provided Defendants with notice of the breach of implied warranty within a reasonable time after discovering, or when they should have discovered, the above-mentioned breaches.

146

483.    As a proximate result of the breach of warranties by Defendants, Illinois Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted or products that they would not otherwise have purchased.

484.    Defendants' motive of increasing profits at the expense of the mental health of Illinois consumers was morally wrong and the acts showed a reckless disregard of the rights of Illinois Plaintiffs and class members.

485.    WHEREFORE, Illinois Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Illinois Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to pay the Plaintiffs and class members punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; and (e) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT VIII
### Illinois Common Law Fraud

486.    Illinois Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

487.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose the facts and/or adequately warn Illinois Plaintiffs and

147

class members that their cannabis products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events and/or CHS; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

488. Defendants' conduct was unfair and unconscionable in that it included: a) the manufacture, sale, and marketing of products that are illegal under federal law and cause and exacerbate serious and debilitating mental health and other physical conditions, and b) misrepresentations and omissions of material facts concerning the medicinal and therapeutic characteristics and safety of their cannabis products that offend public policy; were immoral, unethical, oppressive, and unscrupulous; were part of a pattern of sales conduct that would outrage and offend the public conscience; and caused substantial harm that greatly outweighs any benefits associated with the conduct.

489. Defendants owed Illinois Plaintiffs and class members a duty to adequately disclose and/or warn of these facts because Defendants possess and has always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to Illinois Plaintiffs and class members, concerning the manufacture, distribution, nature, and properties of their cannabis products and has at all relevant times been in a position to know, identify, and confirm the threats posed by their cannabis products; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' cannabis products posed

148

an unreasonable risk of substantial injury; and/or because Defendants made partial representations concerning the same subject matter as the omitted facts.

490. Defendants knew that their misrepresentations and/or omissions were false and misleading, or had a reckless disregard for their truth, and intended for consumers to rely on such misrepresentations and omissions and act upon them.

491. Illinois Plaintiffs and class members reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to rely on the misrepresentations and/or omissions under the circumstances.

492. Defendants' motive of increasing profits at the expense of the mental health of Illinois consumers was morally wrong and the acts showed a reckless disregard of the rights of Illinois Plaintiffs and class members.

493. Defendants' conduct directly caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Illinois Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them.

494. WHEREFORE, Illinois Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Illinois Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' fraudulent conduct; (c) requiring Defendants to pay the Illinois Plaintiffs and class members punitive damages; and (d) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT IX
### Illinois Unjust Enrichment

495.    Illinois Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

496.    Defendants created and implemented a scheme to create a market for cannabis and substantially increase sales of their cannabis products through a pervasive pattern of false and/or misleading statements and/or omissions.  At all times relevant to this Complaint, Defendants, violated the ICFA by making and disseminating untrue, false, and misleading statements that are not supported by credible scientific or medical evidence to Illinois consumers to promote the sale and use of cannabis.  The many material and untrue, false, and/or misleading statements were made through an array of marketing channels, including, but not limited to: in-person and other forms of detailing, point of sale displays and in-store promotions, search engine marketing, mobile app advertisements, public relations and press releases, sponsorship and event marketing, product demonstrations and free trials, brochures, advertisements, influencer endorsements and testimonials, email marketing campaigns, television and radio commercials, customer reviews and ratings, chatbots and automated messaging, product packaging and labeling, websites, and social media.  These untrue, false, and/or misleading statements include, but were not limited to:

   a.  Defendants falsely claiming or implying that cannabis, any constituent part of cannabis, or Defendants' cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

150

b. Defendants falsely claiming or implying that certain cannabis products can more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain health and mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma, than other cannabis products.

c. Defendants falsely claiming or implying that there is credible medical or scientific evidence or scholarship that supports that cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

d. Defendants falsely claiming or implying that there is credible medical or scientific evidence or scholarship that supports that certain cannabis products can more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain health and mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma, than other cannabis products.

e. Defendants falsely claiming or implying that cannabis products are healthy or health-promoting, not dangerous or hazardous to consumers' health, not addictive, or do not cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or do not cause or contribute to adverse cardiovascular events and/or CHS.

f.  Defendants falsely claiming or implying that there is credible scientific or medical evidence establishing that cannabis products are healthy or health-promoting, not dangerous or hazardous to consumers' health, not addictive, and/or do not cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or do not cause or contribute to adverse cardiovascular events and/or CHS.

497.    Defendants' marketing and advertisements for and labeling and packaging of their cannabis products concealed and failed to adequately disclose the facts and/or warn Illinois Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and anxiety and/or cause or contribute to adverse cardiovascular events, cannabis use disorder and CHS, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

498.    Defendants' conduct was unfair and unconscionable in that it included: 1) the manufacture, distribution, possession, sale, and marketing of products that are illegal under federal law and that cause and exacerbate serious and debilitating mental health and other physical conditions, and 2) the misrepresentations and omissions of material facts concerning the medicinal and therapeutic characteristics and safety of their cannabis products are illegal under the CRTA; offends public policy; was immoral, unethical, oppressive, and unscrupulous; was part of a pattern of sales conduct that would outrage and offend the public conscience; and caused substantial harm that greatly outweighs any benefits associated with the conduct.

499.   As a result of Defendants' deceptive, false, and misleading statements and illegal claims and omissions as to the health, medicinal, or therapeutic qualities of its products and actions and many violations of the ICFA, the CRTA, and the federal Controlled Substances Act, Defendants were enriched at the expense of Illinois Plaintiffs, and class members through the payment of the purchase price for Defendants' products.

500.   Defendants requested and received a measurable benefit at the expense of Illinois Plaintiffs and class members in the form of payment for Defendants' cannabis products.

501.   There is no justification for Defendants' retention of this benefit.

502.   Defendants' retention of the benefit of these ill-gotten gains on the back of human misery and suffering caused by mental health disorders violates fundamental principles of justice, equity, and good conscience.

503.   Thus, it would be unjust for Defendants to retain the ill-gotten benefits that they received from Illinois Plaintiffs and class members without restitution to Plaintiffs and class members.

504.   Illinois Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

505.   WHEREFORE, Illinois Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Illinois Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to pay the Illinois Plaintiffs and class members punitive damages; (d) requiring Defendants to

153

disgorge their ill-gotten profits; and (e) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

### D.  Violations of Maryland Law Brought on Behalf of Maryland Subclass.

506.    Plaintiffs Wayne Butts and Ronald Shelton (the "Maryland Plaintiffs") bring each of the following claims on behalf of the Maryland Subclass under Maryland law.

<u>COUNT I</u>
### Violations of the Maryland Consumer Protection Act

507.    Maryland Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

508.    Pursuant to Md. Code Ann., Com. Law § 13-303, a person may not engage in any unfair, abusive, or deceptive trade practice, as defined in § 13-303 or as further defined by the Division of Consumer Protection, in:  "(1) The sale … of any consumer goods; or (2) The offer for sale … of consumer goods."

509.    Unfair, abusive, or deceptive trade practices include any:

> (1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;
> (2) Representation that:
>> (i) Consumer goods … have a … characteristic, ingredient, use, benefit, or quantity which they do not have;
> …
> (3) Failure to state a material fact if the failure deceives or tends to deceive;
> …
> (9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:
> (i) The promotion or sale of any consumer goods, consumer realty, or consumer service….

154

510.    Defendants have engaged in unfair, abusive, or deceptive trade practices in violation of the Maryland Consumer Protection Act, independent of any contract, warranty, or commercial agreement.

511.    Defendants created and implemented a scheme to create and increase the market for cannabis and substantially increase sales of cannabis products through a pervasive pattern of false and misleading statements and omissions.

512.    As described above and below, Defendants made false or misleading oral or written statements, false visual depictions, and other false representations about the benefits of cannabis products which had the capacity, tendency, and/or effect of deceiving or misleading consumers. Further, Defendants failed to state material facts about the negative effects of cannabis products in a manner that deceived or tended to deceive consumers. Finally, Defendants used deception, fraud, false pretenses, false premises, misrepresentations and/or knowingly concealed, suppressed, or omitted material facts with the intent that a consumer rely on the same in connection with the promotion or sale of cannabis products.

513.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of the fact that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

514. These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

515. Defendants' conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, cause confusion or misunderstanding to reasonable consumers including Maryland Plaintiffs and class members. Reasonable consumers, including Maryland Plaintiffs and class members, would have found it material to their purchasing decisions that: i) Defendants' cannabis products were not therapeutic or medicinal as represented by Defendants and could not treat, ease, alleviate, be good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma; ii) there is no credible medical or scientific evidence or scholarship that supports that Defendants' cannabis products are medicinal or therapeutic in the manner represented by Defendants and/or can treat, ease, alleviate, be good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma; iii) certain of Defendants' cannabis products do not uniquely or more effectively treat, ease, alleviate, be good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety when compared to other cannabis products and/or other medical disorders, including, but not limited to, pain and glaucoma; and iv) Defendants' cannabis products cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; adverse cardiovascular events, CHS, and/or cannabis use disorder, and/or pose

significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

516. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase cannabis products.

517. Defendants owed Maryland Plaintiffs and class members a duty to adequately disclose or warn of these facts because Defendants possess and has always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to Maryland Plaintiffs and class members, concerning the manufacture, distribution, nature, and properties of their cannabis products and has at all relevant times been in a position to know, identify, and confirm the threats posed by their cannabis products ; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' cannabis products posed an unreasonable risk of substantial injury; and/or because Defendants made partial representations concerning the same subject matter as the omitted facts.

518. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading and intended for consumers, including Maryland Plaintiffs and class members, to rely on such misrepresentations and omissions. Defendants' conduct actually and proximately caused damages to Maryland Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Maryland Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Maryland Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

519.    WHEREFORE, Maryland Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Maryland Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' consumer fraud and deceptive practices; (c) requiring Defendants to pay the costs of the suit, including attorneys' fees; (d) for statutory, multiplied, or other penalties in the maximum amount authorized by law; (e) for injunctive relief prohibiting the Defendants from making any further misrepresentations or omissions regarding the medicinal, health, or therapeutic benefits of cannabis or cannabis products; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT II
### Maryland Negligent Misrepresentation

520.    Maryland Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

521.    Defendants owed Maryland Plaintiffs and class members a duty independent of contract arising from their knowledge, control over product safety information, and affirmative representations made to consumers, as detailed below.

522.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of the fact that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or cause or contribute to adverse cardiovascular events, CHS, cause cannabis use disorder, and/or pose significant risks to fetuses

158

and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

523. These omissions were misleading, material, and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

524. Defendants failed to exercise reasonable care or competence in obtaining or communicating the truth of the above statements and/or omissions.

525. At all relevant times, Defendants made these statements and/or omissions with the intent of inducing reliance on them by Maryland Plaintiffs and class members and with the intent to cause Maryland Plaintiffs and class members to purchase their cannabis products.

526. Maryland Plaintiffs and class members did rely on these statements and/or omissions when purchasing cannabis products.

527. Defendants' unlawful representations described herein are continuing in nature and are widespread practices.

528. Defendants' motive of increasing profits at the expense of the mental health of Maryland consumers constituted actual malice. At a minimum, Plaintiffs intended to deceive class members and failed to exercise reasonable care in communicating material information to consumers.

529. Defendants' conduct proximately caused actual damages to Maryland Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Maryland Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Maryland Plaintiffs and class members were also harmed by exposure to undisclosed and unreasonable health risks, and by the loss of informed

159

choice regarding products marketed as therapeutic or health-promoting. Defendants' misrepresentations and omissions induced Maryland Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

530.    WHEREFORE, Maryland Plaintiffs and class members seek damages against Defendants: (a) for damages to Maryland Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) for punitive damages; (c) requiring Defendants to pay the costs of the suit, including attorneys' fees; (d) for prejudgment interest; and (e) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT III
### Maryland Breach of Express Warranty

531.    Maryland Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

532.    Pursuant to Md. Code Ann., Com. Law § 2-313:

> (1) Express warranties by the seller are created as follows:
>     (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>     (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
> …
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be

160

merely the seller's opinion or commendation of the goods does not create a warranty.

533. Defendants provided Maryland Plaintiffs and class members with written and unwritten express warranties consisting of specific and verifiable affirmations of fact that did not constitute mere opinion or puffery, including but not limited to, warranties that cannabis or any constituent part of cannabis can treat, ease, alleviate, are good for, aid, or relieve or otherwise are a medicine therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

534. Defendants provided Maryland Plaintiffs and class members with written and unwritten express warranties consisting of specific and verifiable affirmations of fact that did not constitute mere opinion or puffery, including but not limited to, warranties that certain Defendants' products uniquely or more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

535. Defendants provided Maryland Plaintiffs and class members with written and unwritten express warranties consisting of specific and verifiable affirmations of fact that did not constitute mere opinion or puffery, including but not limited to, warranties that that there is credible medical or scientific evidence or scholarship that supports that cannabis products are medicinal or therapeutic in the manner represented by Defendants and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma

161

536. Defendants breached these warranties resulting in damages to Maryland Plaintiffs and class members who purchased Defendants' products, which did not have the purported benefits.

537. Maryland Plaintiffs and class members complied with the terms of the express warranty, and demanded Defendants fulfill its terms, and provided notice to Defendants within a reasonable time upon discovering their breach of this express warranty.

538. As a proximate result of the breach of warranties by Defendants, Maryland Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted.

539. Defendants' motive of increasing profits at the expense of the mental health of Maryland consumers was intentional, willful, morally wrong and their acts showed gross recklessness.

540. WHEREFORE, Maryland Plaintiffs and class members seek judgment against Defendants: (a) for damages to Maryland Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so including incidental and consequential damages; (b) requiring Defendants to pay the costs of the suit, including attorneys' fees; (c) for prejudgment interest; and (d) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT IV
### Maryland Breach of Implied Warranty of Merchantability

541.    Maryland Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

542.    Pursuant to Md. Code Ann., Com. Law § 2-314:

> (1) Unless excluded or modified (§ 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. … Notwithstanding any other provisions of this title
>> (a) In §§ 2-314 through 2-318 of this title, "seller" includes the manufacturer, distributor, dealer, wholesaler or other middleman or the retailer; and
>> (b) Any previous requirement of privity is abolished as between the buyer and the seller in any action brought by the buyer.
> (2) Goods to be merchantable must be at least such as
>> (a) Pass without objection in the trade under the contract description; and
>> (b) In the case of fungible goods, are of fair average quality within the description; and
>> (c) Are fit for the ordinary purposes for which such goods are used; and
>> (d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
>> (e) Are adequately contained, packaged, and labeled as the agreement may require; and
>> (f) Conform to the promises or affirmations of fact made on the container or label if any.
> (3) Unless excluded or modified (§ 2-316) other implied warranties may arise from course of dealing or usage of trade.

543.    Defendants' cannabis products came with an implied warranty that they were merchantable and fit for the ordinary purpose for which they would be used. Defendants breached the implied warranty of merchantability because their products were not in merchantable condition when sold; were defective when sold; posed significant undisclosed health and safety risks, including but not limited to, dangers of psychosis, bipolar disorder, suicidal ideation, depression,

and/or anxiety and/or cardiovascular disease, CHS, and/or cannabis use disorder, and/or significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits; lacked adequate warnings or instructions regarding these risks, rendering Defendants' products unreasonably dangerous and unfit for consumption in an ordinary manner as marketed and labeled; and did not conform to the promises and affirmations of fact made during Defendants' marketing scheme that their cannabis products had certain medicinal, therapeutic, or health benefits, including, but not limited to, cannabis products being capable of treating, easing, alleviating, being good for, aiding, or relieving or otherwise being medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical conditions, including, but not limited to, pain and glaucoma.

544.    Maryland Plaintiffs and class members complied with the terms of the warranty, and demanded Defendants fulfill its terms, and provided notice to Defendants within a reasonable time upon discovering their breach of the warranty.

545.    Defendants breached the warranty implied at the time of sale in that Maryland Plaintiffs and class members did not receive products with the purported benefits and, thus, the goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, and advertised, or sold.

546.    Although not necessary, Maryland Plaintiffs and class members have had sufficient direct dealings with Defendants to establish privity of contract between Defendants, on the one hand, and Maryland Plaintiffs and class members, on the other hand.

547.    As a proximate result of the breach of warranties by Defendants, Maryland Plaintiffs and class members have suffered damages in an amount to be determined at trial in that,

164

among other things, they purchased and paid for products that did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted or purchased products that they would not otherwise have purchased.

548. Defendants' motive of increasing profits at the expense of the mental health of Maryland consumers was morally wrong and the acts showed a reckless disregard of the rights of Maryland Plaintiffs and class members.

549. WHEREFORE, Maryland Plaintiffs and class members seek judgment against Defendants: (a) for damages to Maryland Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so including incidental and consequential damages; (b) requiring Defendants to pay the costs of the suit, including attorneys' fees; (c) for prejudgment interest; and (d) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT V
### Maryland Common Law Fraud

550. Maryland Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

551. Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose the facts and/or adequately warn Maryland Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS;

165

and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

552.    Defendants participated in, approved, controlled, or disseminated the challenged marketing and labeling advertisements.

553.    Defendants owed Maryland Plaintiffs and class members a duty to adequately disclose or warn of these facts because Defendants possess and has always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to Maryland Plaintiffs and class members, concerning the manufacture, distribution, nature, and properties of their cannabis products and has at all relevant times been in a position to know, identify, and confirm the threats posed by their cannabis products; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' cannabis products posed an unreasonable risk of substantial injury; and/or because Defendants made partial representations concerning the same subject matter as the omitted facts.

554.    Defendants knew that their misrepresentations and/or omissions were false and misleading, or had a reckless disregard for their truth, and intended for consumers to rely on such misrepresentations and omissions and act upon them.

555.    Maryland Plaintiffs and class members reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to rely on the misrepresentations and/or omissions under the circumstances.

556.    Defendants' motive of increasing profits at the expense of the mental health of Maryland consumers constituted actual malice and evidenced an intent to deceive.

166

557.    Defendants' conduct directly caused actual damages to Maryland Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Maryland Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Maryland Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

558.    WHEREFORE, Maryland Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Maryland Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' fraudulent conduct; (c) for punitive damages; (d) requiring Defendants to pay the costs of the suit, including attorneys' fees; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT VI
### Maryland Unjust Enrichment

559.    Maryland Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

560.    Defendants were also enriched by their marketing and advertisements for and/or labeling of their cannabis products that concealed and failed to disclose the facts and/or adequately warn Maryland Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety;  cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS; and/or pose significant risks to fetuses and children from

167

prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

561. Defendants' conduct was unfair and unconscionable and demonstrated actual malice in that: 1) it included the manufacture, distribution, possession, sale, and marketing of products that are illegal under federal law; 2) it causes and exacerbates serious and debilitating mental health and other physical conditions; and 3) the misrepresentations and omissions of material facts concerning the medicinal and therapeutic characteristics and safety of their cannabis products are unlawful under Maryland law; offend public policy; are immoral, unethical, oppressive, and unscrupulous; are part of a pattern of sales conduct that would outrage and offend the public conscience; and caused substantial harm that greatly outweighs any benefits associated with the conduct.

562. As a result of Defendants' deceptive, false, and misleading statements and illegal claims as to the health, medicinal, or therapeutic qualities of their products and actions and many violations of the law, Defendants were enriched at the expense of consumers, Maryland Plaintiffs and class members, who were impoverished through the payment of the purchase price for Defendants' products.

563. Defendants requested and received a measurable benefit at the expense of Maryland Plaintiffs and class members in the form of payment for Defendants' cannabis products.

564. There is no justification for Defendants' retention of this benefit.

565. Defendants' retention of the benefit of these ill-gotten gains on the back of human misery and suffering caused by mental health disorders violates fundamental principles of justice, equity, and good conscience.

168

566. Thus, it would be unjust for Defendants to retain the ill-gotten benefits that it received from Maryland Plaintiffs and class members without restitution to Maryland Plaintiffs and class members.

567. Maryland Plaintiffs and class members plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

568. WHEREFORE, Maryland Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Maryland Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring restitution and disgorgement by Defendants of any money acquired as a result of Defendants' misrepresentations or omissions; (c) for punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

**E.  Violations of Massachusetts Law Brought on Behalf of Massachusetts Subclass.**

569. Plaintiffs Justin Dunne and Ashby Moncure (collectively, "Massachusetts Plaintiffs") bring each of the following claims on behalf of themselves and the Massachusetts Subclass under Massachusetts law.

**<u>COUNT I:</u>**
**Violations of the Massachusetts Consumer Protection Act**

570. Massachusetts Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

169

571.    Pursuant to Mass. Gen. Laws Ann. ch. 93A, § 2: "(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

572.    Pursuant to Mass. Gen. Laws Ann. ch. 93A, § 9:

> (1) Any person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder or any person whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy-six D may bring an action in the superior court, or in the housing court as provided in section three of chapter one hundred and eighty-five C whether by way of original complaint, counterclaim, cross-claim or third party action, for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.

> (2) Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons…

573.    Defendants have engaged in unfair or deceptive acts and practices in violation of the Massachusetts Consumer Protection Act.

574.    Defendants created and implemented a scheme to create and increase the market for cannabis and substantially increase sales of cannabis products through a pervasive pattern of false and misleading statements and omissions.

575.    As described above and below, Defendants made false or misleading oral or written and unwritten statements, false visual depictions, and other false representations about the benefits of cannabis products which had the capacity, tendency, and/or effect of deceiving or misleading consumers. Further, Defendants failed to state material facts about the negative effects of cannabis products in a manner that deceived or tended to deceive consumers. Finally, Defendants used

170

deception, fraud, false pretenses, false premises, misrepresentations and/or knowingly concealed, suppressed, or omitted material facts with the intent that a consumer rely on the same in connection with the promotion or sale of cannabis products.

576. Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of the fact that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

577. These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

578. Defendants' conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, cause confusion or misunderstanding to reasonable consumers including Massachusetts Plaintiffs and class members. Reasonable consumers, including Massachusetts Plaintiffs and class members, would have found it material to their purchasing decisions that: a) Defendants' cannabis products were not therapeutic or medicinal in the manner represented by Defendants and could not treat, ease, alleviate, be good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma; b) there is no credible medical or scientific

171

evidence or scholarship that supports that Defendants' cannabis products are medicinal or therapeutic in the manner represented by Defendants and/or can treat, ease, alleviate, be good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma; c) certain of Defendants' cannabis products do not uniquely or more effectively treat, ease, alleviate, be good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety when compared to other cannabis products and/or other medical disorders, including, but not limited to, pain and glaucoma and d) Defendants' cannabis products cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; adverse cardiovascular events, CHS, and/or cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

579. Knowledge of these facts would have been a substantial factor in Massachusetts Plaintiffs' and class members' decisions to purchase cannabis products.

580. Defendants owed Massachusetts Plaintiffs and class members a duty to disclose or adequately warn of these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than Massachusetts Plaintiffs and class members), who had exclusive and/or superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' cannabis products posed an unreasonable risk of substantial injury; and/or

172

because Defendants made partial representations concerning the same subject matter as the omitted facts.

581. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading and intended for consumers, including Massachusetts Plaintiffs and class members, to rely on such misrepresentations and omissions.

582. Defendants' conduct actually and proximately caused damages to Massachusetts Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Massachusetts Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Massachusetts Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

583. Massachusetts Plaintiffs delivered to Defendants more than thirty days ago written demands for relief, identifying the claimants and reasonably describing the unfair or deceptive acts or practices relied upon and the injuries suffered.

584. WHEREFORE Massachusetts Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Massachusetts Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay the costs of the suit, including attorneys' fees; (c) for statutory, multiplied, or other penalties in the maximum amount authorized by law; (d) injunctive relief requiring Defendants to following the Massachusetts Consumer Protection Act and precluding Defendants from making any further medicinal, health, or therapeutic claims

173

regarding cannabis; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT II
### Massachusetts Negligent Misrepresentation

585.    Massachusetts Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

586.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of the fact that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

587.    These omissions were misleading, material, and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

588.    Defendants failed to exercise reasonable care or competence in obtaining or communicating the truth of the above statements and/or omissions.

589.    At all relevant times, Defendants made these statements and/or omissions with the intent of inducing reliance on them by Massachusetts Plaintiffs and class members and with the intent to cause Massachusetts Plaintiffs and class members to purchase their cannabis products.

590.    Massachusetts Plaintiffs and class members did rely on these statements and/or omissions when purchasing cannabis products.

591. Defendants' unlawful representations described herein are continuing in nature and are widespread practices.

592. Defendants' motive of increasing profits at the expense of the mental health of Massachusetts consumers was morally wrong and the acts showed a reckless disregard of the rights of Massachusetts Plaintiffs and class members.

593. Defendants' conduct proximately caused actual damages to Massachusetts Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Massachusetts Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Massachusetts Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

594. Massachusetts Plaintiffs' and class members' claims are not barred by the economic loss doctrine because Defendants fraudulently misrepresented and concealed material health risks associated with their cannabis products—an established exception under state law.

595. WHEREFORE, Massachusetts Plaintiffs and class members seek judgment against Defendants: (a) for damages to Massachusetts Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) for punitive damages; (c) requiring Defendants to pay the costs of the suit, including attorneys' fees; (d) for prejudgment interest; and (e) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT III
## Massachusetts Negligence

596.    Massachusetts Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

597.    Defendants had a non-delegable duty of care to Massachusetts Plaintiffs and class members to cultivate, manufacture, transport, and sell reasonably safe products and/or adequately warn consumers of a product's dangerous propensity of which the average consumer would not be aware.

598.    It was reasonably foreseeable that Massachusetts Plaintiffs would rely on the representations of Defendants with respect to the purchase and use of Defendants' cannabis products.

599.    At all relevant times, Defendants sold to Massachusetts Plaintiffs and class members such products that were unreasonably dangerous to Massachusetts Plaintiffs and class members as their products are addictive, cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation depression, and/or anxiety and cause and/or contribute to adverse cardiovascular events, CHS, and cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

600.    Defendants breached their duty to Massachusetts Plaintiffs and class members by failing to adequately warn Massachusetts Plaintiffs and class members of these dangers.

601.    Defendants knew or should have known that their cannabis products were addictive, caused, contributed to, and/or exacerbated mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and caused

176

and/or contributed to adverse cardiovascular events, CHS, and cannabis use disorder, and/or posed significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

602.    The actions or inactions of Defendants as described herein created a substantial and unreasonable risk of personal injury.

603.    As a proximate result of Defendants' failure to adequately warn of the mental health and other health dangers of their product, Massachusetts Plaintiffs and class members have suffered damages in an amount to be determined at trial, in that, among other things, they purchased and paid for products that they would not have purchased if they had known of the mental health and other health dangers.

604.    Defendants' motive of increasing profits at the expense of the mental health and other health dangers of Massachusetts consumers was morally wrong and the acts showed a reckless disregard of the rights of Massachusetts Plaintiffs and class members.

605.    As further evidence of the Defendants' negligence, Defendants have violated the rules of the Massachusetts Cannabis Control Commission.

606.    Specifically, Cannabis Control Commission rules state:

> 935 CMR:    Cannabis Control Commission
> 935 CMR 500.000:
>
> …
>
> (b) Prohibited Practices. The following Advertising activities are prohibited:
>
> 1. Advertising in such a manner that is deemed to be is deceptive, misleading, false or fraudulent, or that tends to deceive or create a misleading impression, whether directly or by omission or ambiguity;
>
> …

177

7. Advertising by a Licensee that asserts that its products are safe, or represent that its products have curative or therapeutic effects, other than labeling required pursuant to M.G.L. c. 94G, § 4(a½)(xxvi), unless supported by substantial evidence or substantial clinical data with reasonable scientific rigor as determined by the Commission;….

607. As described herein, Defendants have engaged in advertisement by publishing, disseminating, and circulating through multiple media auditory, visual, digital, oral, and written and unwritten statements that make therapeutic and medical claims about cannabis or cannabis products.

608. Defendants have not supported these claims with reliable, scientific evidence.

609. Defendants have also failed to include information on the most serious and most common side effects or risks associated with the use of cannabis in these advertisements.

610. Notwithstanding Massachusetts' economic loss rule, Defendants owed and breached an independent common-law and statutory duty to disclose known material health risks of cannabis use, including risks of psychosis, schizophrenia, bipolar disorder, suicidal ideation, depression, and/or anxiety, cardiovascular events, CHS, and/or cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits such that Massachusetts Plaintiffs' and class members' negligence claim may proceed to the extent it is predicated on this affirmative duty separate from any contractual expectation.

611. Massachusetts Plaintiffs' and class members' claims are not barred by the economic loss rule because Defendants fraudulently misrepresented and concealed material health risks associated with their cannabis products—an established exception under state law.

612. WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Plaintiffs and class members who overpaid for Defendants' cannabis products

or purchased Defendants' products when they otherwise would not have done so; (b) requiring

Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations

or omissions; (c) for punitive damages; (d) requiring Defendants to pay the costs of the suit,

including attorneys' fees; (e) for prejudgment interest; and (f) for such other and further relief as

this Honorable Court may deem just, proper, and equitable.

**COUNT IV**
**Massachusetts Breach of Express Warranty**

613.    Massachusetts Plaintiffs and class members re-allege and incorporate by reference

all foregoing paragraphs of this Complaint as if they were fully stated herein.

614.    Pursuant to Mass. Gen. Laws Ann. ch. 106, § 2-313:

§ 2-313. Express Warranties by Affirmation, Promise, Description, Sample

(1) Express warranties by the seller are created as follows:
(a) Any affirmation of fact or promise made by the seller to the
buyer which relates to the goods and becomes part of the basis of
the bargain creates an express warranty that the goods shall
conform to the affirmation or promise.
(b) Any description of the goods which is made part of the basis of
the bargain creates an express warranty that the goods shall
conform to the description.
(c) Any sample or model which is made part of the basis of the
bargain creates an express warranty that the goods shall conform to
the sample or model.
(2) It is not necessary to the creation of an express warranty that
the seller use formal words such as "warrant" or "guarantee" or
that he have a specific intention to make a warranty, but an
affirmation merely of the value of the goods or a statement
purporting to be merely the seller's opinion or commendation of
the goods does not create a warranty.

615.    Defendants provided Massachusetts Plaintiffs and class members with express

warranties, including but not limited to, warranties that cannabis, any constituent part of cannabis,

or their cannabis products can treat, ease, alleviate, are good for, aid, or relieve or otherwise are a

179

medicine therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

616.    Defendants provided Massachusetts Plaintiffs and class members with express warranties, including but not limited to, warranties that certain Defendants' products uniquely or more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

617.    Defendants provided Massachusetts Plaintiffs and class members with express warranties, including but not limited to, warranties that that there is credible medical or scientific evidence or scholarship that supports that cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma

618.    Defendants breached these warranties resulting in damages to Massachusetts Plaintiffs and class members who purchased Defendants' products, which did not have the purported benefits.

619.    As a proximate result of the breach of warranties by Defendants, Massachusetts Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted.

180

620.     Defendants' motive of increasing profits at the expense of the mental health disorders of Massachusetts consumers resulted in acts showing a reckless disregard of the rights of Massachusetts Plaintiffs and class members.

621.     WHEREFORE, Massachusetts Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Massachusetts Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so including incidental and consequential damages; (b) for punitive damages; (c) requiring Defendants to pay the costs of the suit, including attorneys' fees; (d) for prejudgment interest; and (e) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT V
### Massachusetts Breach of Implied Warranty of Merchantability

622.     Massachusetts Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

623.     Pursuant to Mass. Gen. Laws Ann. ch. 106, § 2-314:

§ 2-314. Implied Warranty: Merchantability; Usage of Trade

(1) Unless excluded or modified by section 2-316, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must at least be such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

181

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified by section 2-316, other implied warranties may arise from course of dealing or usage of trade.

624. Defendants' cannabis products came with an implied warranty that they were merchantable and fit for the ordinary purpose for which they would be used. Defendants breached the implied warranty of merchantability because their products were not in merchantable condition when sold; were defective when sold; posed significant health risks, including but not limited to, dangers of psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or cardiovascular disease, CHS, and/or cannabis use disorder, and/or significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits; lacked adequate warnings or instructions regarding these risks, rendering Defendants' products unreasonably dangerous and unfit for consumption in an ordinary manner; and did not conform to the promises and affirmations of fact made during Defendants' marketing scheme that their cannabis products had certain medicinal, therapeutic, or health benefits, including, but not limited to, cannabis products being capable of treating, easing, alleviating, being good for, aiding, or relieving or otherwise being medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical conditions, including, but not limited to, pain and glaucoma.

625. Defendants breached the warranty implied at the time of sale in that Massachusetts Plaintiffs and class members did not receive products with the purported benefits and, thus, the

182

goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, and advertised, or sold.

626.    Although not necessary, Massachusetts Plaintiffs and class members have had sufficient direct dealings with Defendants to establish privity of contract between Defendants, on the one hand, and Massachusetts Plaintiffs and class members, on the other hand.

627.    As a proximate result of the breach of warranties by Defendants, Massachusetts Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted or purchased products that they would not otherwise have purchased.

628.    Defendants' motive of increasing profits at the expense of the mental health of Massachusetts consumers was morally wrong and their acts showed a reckless disregard of the rights of Massachusetts Plaintiffs and class members.

629.    WHEREFORE, Massachusetts Plaintiffs and class members seek judgment against all Defendants: (a)  for damages to Massachusetts Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so including incidental and consequential damages; (b) for punitive damages; (c) requiring Defendants to pay the costs of the suit, including attorneys' fees; (d) for prejudgment interest; and (e) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT VI

**Massachusetts Breach of Implied Warranty of Fitness for a Particular Purpose**

630.    Massachusetts Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

631.    Pursuant to Mass. Gen. Laws Ann. ch. 106, § 2-315:

§ 2-315. Implied Warranty; Fitness for Particular Purpose

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

632.    Defendants' cannabis products came with an implied warranty that they were merchantable and fit for the particular purpose as advertised.  Defendants breached the warranty of fitness for a particular purpose because their products did not conform to the promises and affirmations of fact made during Defendants' marketing scheme that their cannabis products had medicinal, therapeutic, or health benefits, including, but not limited to, cannabis products being capable of treating, easing, alleviating, being good for, aiding, or relieving or otherwise being medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical conditions, including, but not limited to, pain and glaucoma.

633.    Defendants breached the warranty at the time of sale in that Massachusetts Plaintiffs and class members did not receive products with the purported benefits and, thus, the goods were not merchantable as fit for the particular purposes for which they were promoted, marketed, and advertised, or sold.

634.    Massachusetts Plaintiffs and class members have had sufficient direct dealings with Defendants to establish privity of contract between Defendants, on the one hand, and Massachusetts Plaintiffs and class members, on the other hand.

184

635.    As a proximate result of the breach of warranties by Defendants, Massachusetts Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted or purchased products that they would not otherwise have purchased.

636.    Defendants' motive of increasing profits at the expense of the mental health of Massachusetts consumers was morally wrong and their acts showed a reckless disregard of the rights of Massachusetts Plaintiffs and class members.

637.    WHEREFORE, Massachusetts Plaintiffs and class seek judgment against all Defendants: (a)  for damages to Massachusetts Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so including incidental and consequential damages; (b) awarding punitive damages; (c) requiring Defendants to pay the costs of the suit, including attorneys' fees; (d) for prejudgment interest; and (e) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

### COUNT VII
### Massachusetts Common Law Fraud

638.    Massachusetts Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

639.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose the facts and/or adequately warn Massachusetts Plaintiffs and class members that their cannabis products are addictive, not therapeutic or

medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

640. Defendants owed Massachusetts Plaintiffs and class members a duty to adequately disclose or warn of these facts because Defendants possess and has always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to Connecticut Plaintiffs and class members, concerning the manufacture, distribution, nature, and properties of their cannabis products and has at all relevant times been in a position to know, identify, and confirm the threats posed by their cannabis products; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' cannabis products posed an unreasonable risk of substantial injury; because disclosure of such facts was necessary to qualify Defendants' representations, and/or because Defendants made partial representations concerning the same subject matter as the omitted facts.

641. Defendants knew that their misrepresentations and/or omissions were false and misleading, or had a reckless disregard for their truth, and intended for consumers to rely on such misrepresentations and omissions and act upon them.

642. Massachusetts Plaintiffs and class members reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to rely on the misrepresentations and/or omissions under the circumstances.

643. Defendants' motive of increasing profits at the expense of the mental health of Massachusetts consumers was morally wrong and the acts showed a reckless disregard of the rights of Massachusetts Plaintiffs and class members.

644. Defendants' conduct directly caused actual damages to Massachusetts Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Massachusetts Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Massachusetts Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

645. WHEREFORE, Massachusetts Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Massachusetts Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' fraudulent conduct; (c) for punitive damages; (d) requiring Defendants to pay the costs of the suit, including attorneys' fees; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT VIII
### Massachusetts Unjust Enrichment

646. Massachusetts Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

647. Defendants were also enriched by their marketing and advertisements for and/or labeling of their cannabis products that concealed and/or failed to disclose the facts and/or adequately warn Massachusetts Plaintiffs and class members that their cannabis products are

addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety;  cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

648.    Defendants' conduct was unfair and unconscionable in that it included: a) the manufacture, distribution, possession, sale, and marketing of products that are illegal under federal law and cause and exacerbate serious and debilitating mental health and other physical conditions; and b) misrepresentations and omissions of material facts concerning the medicinal and therapeutic characteristics and safety of their cannabis products that are illegal under the Massachusetts Consumer Protection Act and the rules of the Cannabis Control Commission; offends public policy; was immoral, unethical, oppressive, and unscrupulous; was part of a pattern of sales conduct that would outrage and offend the public conscience; and caused substantial harm that greatly outweighs any benefits associated with the conduct.

649.    As a result of Defendants' deceptive, false, and misleading statements and illegal claims as to the health, medicinal, or therapeutic qualities of their products and actions and many violations of the law, Defendants were enriched at the expense of consumers, Massachusetts Plaintiffs and class members, who were impoverished through the payment of the purchase price for Defendants' products.

650.    Defendants requested and received a measurable benefit at the expense of Massachusetts Plaintiffs and class members in the form of payment for Defendants' cannabis products.

651.    There is no justification for Defendants' retention of this benefit.

652.    Defendants' retention of the benefit of these ill-gotten gains on the back of human misery and suffering caused by mental health disorders violates fundamental principles of justice, equity, and good conscience.

653.    Thus, it would be unjust for Defendants to retain the ill-gotten benefits that it received from Massachusetts Plaintiffs and class members without restitution to Massachusetts Plaintiffs and class members.

654.    Massachusetts Plaintiffs and class members plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

655.    WHEREFORE, Massachusetts Plaintiffs and class seek judgment against all Defendants: (a) for damages to Massachusetts Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (c) for punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

F.    Violations of Nevada Law Brought on Behalf of Nevada Subclass.

656.    Plaintiffs Edward Briscoe and Danielle Webster (together, "Nevada Plaintiffs") bring each of the following claims on behalf of the Nevada Subclass under Nevada law.

189

**COUNT 1**
**Violation of the Nevada Deceptive Practices Act (Nev. Rev. Stat. §598.0903 *et seq*.)**

657.    Nevada Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

658.    Pursuant to Nev. Rev. Stat. §598.0915, 598.0923, & 598.0925, "any person engages in a deceptive trade practice if, in the course of his or her business or occupation, he or she:"

     a.    "Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith." Nev. Rev. Stat. §§598.0915(5).

     b.    "Knowingly makes any other false representation in a transaction." Nev. Rev. Stat. §§598.0915(15).

     c.    "Violates a state or federal statute or regulation relating to the sale or lease of goods or services." Nev. Rev. Stat. §§598.0923(1)(c).

     d.    "Fails to disclose a material fact in connection the sale or lease of goods or services." Nev. Rev. Stat. §§598.0925(1)(a).

     e.    "Makes an assertion of scientific, clinical or quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true, unless, at the time the assertion is made, the person making it has possession of factually

190

objective scientific, clinical or quantifiable evidence which substantiates the assertion." Nev. Rev. Stat. §§598.0925(1)(b).

659. Defendants have engaged in unlawful and deceptive trade practices in violation of the Nevada Deceptive Trade Practices Act ("NDTPA"), Nev. Rev. Stat. 598.0903 et seq., as set forth above, independent of any contract or warranty.

660. Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of the material facts that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

661. These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

662. Defendants' conduct was illegal because it involved the manufacture, sale, and marketing of products that are illegal under federal law, including the federal Controlled Substances Act and the Racketeer Influenced and Corrupt Organizations Act.

663. In purchasing Defendants' products, Nevada Plaintiffs and class members relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

191

664. Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

665. Defendants' conduct proximately caused actual damages to Nevada Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Nevada Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Nevada Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

666. WHEREFORE, Nevada Plaintiffs and class members seek judgment against all Defendants: (a) for actual damages, exemplary and punitive damages pursuant to Nev. Rev. Stat. § 42.005 for Defendants' fraudulent, malicious, and oppressive conduct; (b) for statutory, multiplied, or other penalties in the maximum amount authorized by law; (c) for damages to Nevada Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (d) requiring Defendants to pay restitution on any money acquired as a result of Defendants' consumer fraud and deceptive practices; (e) requiring Defendants to disgorge their ill-gotten profits; (f) requiring Defendants to pay the costs of the suit, including attorneys' fees; (g) for prejudgment interest; and (h) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT II
### Nevada Negligent Misrepresentation

667. Nevada Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

192

668.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of the fact that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or cause or contribute to adverse cardiovascular events, CHS, and/or cause cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

669.    These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

670.    Defendants were careless or negligent in determining the truth of the above statements and/or omissions.

671.    At all relevant times, Defendants made these statements and/or omissions with the intent of inducing reliance on them by Nevada Plaintiffs and class members and with the intent to cause Nevada Plaintiffs and class members to purchase their cannabis products.

672.    Nevada Plaintiffs and class members did rely on these statements and/or omissions when purchasing cannabis products.

673.    Defendants' unlawful representations described herein are continuing in nature and are widespread practices.

674.    Defendants' conduct proximately caused actual damages to Nevada Plaintiffs and class members by exposing them to undisclosed health risks, loss of informed consumer choice, and purchase of products posing unreasonable safety risks, in addition to any economic losses.

193

Absent Defendants' unfair and fraudulent conduct, Nevada Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Nevada Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

675.    WHEREFORE, Nevada Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Nevada Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring restitution, disgorgement, and/or rescission of all monies wrongfully obtained by Defendants; (c) for injunctive and equitable relief to prevent further negligent and misleading practices; (d) for attorney's fees and costs as permitted by law; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court deems just, proper, and equitable.

## <u>COUNT III</u>
### Nevada Breach of Express Warranty (Nev. Rev. Stat. 104.2313)

676.    Nevada Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

677.    Defendants made affirmations of fact and promises to Nevada Plaintiffs and class members including but not limited to:

   a.  Warranties that cannabis, any constituent part of cannabis, or Defendants' cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

194

b.  Warranties that certain cannabis products can more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain health and mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma, when compared to other cannabis products.

c.  Warranties that there is credible medical or scientific evidence or scholarship that supports that cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

d.  Warranties that there is credible medical or scientific evidence or scholarship that supports that certain cannabis products can more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain health and mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma, when compared to other cannabis products.

e.  Warranties that cannabis products are healthy or health-promoting, not dangerous or hazardous to consumers' health, not addictive, or do not cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or do not cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS.

195

      f.    Warranties that there is credible scientific or medical evidence establishing that cannabis products are healthy or health-promoting, not dangerous or hazardous to consumers' health, not addictive, and/or do not cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or do not cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS.

678.    These affirmations became part of the basis of the bargain, creating express warranties under Nev. Rev. Stat. 104.2313.

679.    Defendants breached their express warranties because their products were not therapeutic or safe and did not conform to the affirmations and promises made.

680.    Nevada Plaintiffs and class members provided notice of breach within a reasonable time after discovery.

681.    As a direct and proximate result, Nevada Plaintiffs and class members suffered damages in the form of overpayment and loss of the benefit of their bargain.

682.    WHEREFORE, Nevada Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Nevada Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so including incidental and consequential damages; (b) requiring restitution, disgorgement, and/or rescission of all monies wrongfully obtained by Defendants; (c) for injunctive and equitable relief to prevent further false warranty claims and to require corrective disclosures; (d) for reasonable attorney's fees and costs as permitted by law;  (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court deems just, proper, and equitable.

## COUNT IV
### Nevada Breach of Implied Warranty of Merchantability (NRS 104.2314)

683. Nevada Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

684. Defendants' cannabis products came with an implied warranty that they were merchantable under Nev. Rev. Stat. 104.2314, warranting that such goods were fit for the ordinary purpose for which they would be used.

685. Defendants breached their implied warranty of merchantability because their products were not in merchantable condition when sold; were defective when sold; posed significant health risks, including but not limited to, dangers of psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety, and/or cardiovascular disease, CHS, and/or cannabis use disorder, and/or significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits; lacked adequate warnings or instructions regarding these risks, rendering Defendants' products unreasonably dangerous and unfit for consumption in their ordinary manner; and/or did not conform to the promises and affirmations of fact made during Defendants' marketing scheme that their cannabis products had medicinal, therapeutic, or health benefits, including, but not limited to, cannabis products being capable of treating, easing, alleviating, being good for, aiding, or relieving or otherwise being medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical conditions, including, but not limited to, pain and glaucoma.

686. Defendants breached the warranty implied at the time of sale in that Nevada Plaintiffs and class members did not receive products with the purported benefits and, thus, the

197

goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, advertised, or sold.

687. Defendants also breached the warranty implied at the time of sale in that Nevada Plaintiffs and class members did not receive products that were adequately contained, packaged, and labeled as required by the contract of sale.

688. Defendants' products were not fit for ordinary use because they posed significant health risks, were defectively marketed without adequate warnings, and did not conform to the promises and affirmations made.

689. Nevada Plaintiffs and class members have had sufficient direct dealings with Defendants to establish privity of contract between Defendants, on the one hand, and Nevada Plaintiffs and class members, on the other hand.

690. Nevada Plaintiffs and class members were third-party beneficiaries of Defendants' agreements with their distributors, dealers, and sellers for the distribution, dealing, and sale of Defendants' products to consumers. Specifically, Nevada Plaintiffs and class members are the intended beneficiaries of Defendants' implied warranties. Defendants' products are manufactured with the express purpose and intent of being sold to consumers.

691. Nevada Plaintiffs and class members provided notice of breach within a reasonable time after discovery.

692. As a direct and proximate result, Nevada Plaintiffs and class members suffered damages, including overpayment and loss of the benefit of their bargain.

693. WHEREFORE, Nevada Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Nevada Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done

198

so including incidental and consequential damages; (b) requiring restitution, disgorgement, and/or rescission of all monies wrongfully obtained by Defendants; (c) for injunctive and equitable relief to prevent further sales of unmerchantable products and to require corrective disclosures; (d) for reasonable attorney's fees and costs as permitted by law; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court deems just, proper, and equitable.

**<u>COUNT V</u>**
**Nevada Common Law Fraud**

694.    Nevada Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

695.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose the facts and/or adequately warn Nevada Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety;  cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

696.    Defendants owed Nevada Plaintiffs and class members a duty to adequately disclose or warn of these facts because Defendants possess and has always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to Nevada Plaintiffs and class members, concerning the manufacture, distribution, nature, and properties of their cannabis products and has at all relevant times been in a position to know, identify, and confirm the threats posed by their cannabis products; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in

199

question; because Defendants' cannabis products posed an unreasonable risk of substantial injury; and/or because Defendants made partial representations concerning the same subject matter as the omitted facts.

697.    Defendants knew that their misrepresentations and/or omissions were false and misleading, or had a reckless disregard for their truth, and intended for consumers to rely on such misrepresentations and omissions and act upon them.

698.    Nevada Plaintiffs and class members reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to rely on the misrepresentations and/or omissions under the circumstances.

699.    Defendants' motive of increasing profits at the expense of the mental health of Nevada consumers was morally wrong and the acts showed a reckless disregard of the rights of Nevada Plaintiffs and class members.

700.    Defendants' conduct directly caused actual damages to Nevada Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Nevada Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Nevada Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

701.    WHEREFORE, Nevada Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Nevada Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) for exemplary and punitive damages pursuant to Nev. Rev. Stat. § 42.005 on the grounds that Defendants acted with fraud, malice, and/or oppression; (c) requiring restitution,

disgorgement, and/or rescission of all monies wrongfully obtained by Defendants; (d) for injunctive and equitable relief to prevent further fraudulent and misleading practices; (e) for reasonable attorney's fees and costs as permitted by law; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court deems just, proper, and equitable.

## COUNT VI
### Nevada Unjust Enrichment

702.    Nevada Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

703.    Defendants created and implemented a scheme to create a market for cannabis and substantially increase sales of cannabis products through a pervasive pattern of false and/or misleading statements and/or omissions. At all times relevant to this Complaint, Defendants made and disseminated untrue, false, and misleading statements that are not supported by credible scientific or medical evidence to consumers to promote the sale and use of cannabis.

704.    Defendants' marketing, advertising, and labeling of their cannabis products concealed and failed to disclose the facts and/or adequately warn Nevada Plaintiffs and class members that the products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS; and/or poses significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

705.    Defendants were enriched at the expense of consumers, Nevada Plaintiffs, and class members through the payment of the purchase price for Defendants' products.

201

706. Defendants were unjustly enriched by receiving payments from Nevada Plaintiffs and class members for cannabis products sold through deception, fraud, and unlawful conduct.

707. Defendants' retention of these benefits is unjust and inequitable because it was obtained through false statements, material omissions, and the sale of unreasonably dangerous products.

708. This claim is pled solely in the alternative to Nevada Plaintiffs' legal claims without which Nevada Plaintiffs and class members will have no adequate remedy at law.

709. WHEREFORE, Nevada Plaintiffs and class members seek judgment against all Defendants: (a) requiring restitution, disgorgement, and/or rescission of all monies wrongfully obtained by Defendants; (b) for damages to Nevada Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (c) for injunctive and equitable relief to prevent Defendants' further unjust enrichment; (d) for reasonable attorney's fees and costs as permitted by law; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court deems just, proper, and equitable.

### G. Violations of New Jersey Law Brought on Behalf of New Jersey Subclass.

710. Plaintiffs Derylyn Stokes and Scott Zack (together, "New Jersey Plaintiffs") bring each of the following claims on behalf of the New Jersey Subclass under New Jersey law.

### COUNT I
### New Jersey Consumer Fraud and Deceptive Business Practices Act Violation

711. New Jersey Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

712. Pursuant to N.J. Stat. Anno. §56:8-2:

The act, use, or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice…

713.    Defendants have engaged in, used, or employed unconscionable commercial practices, deceptions, frauds, false pretenses, and misrepresentations in violation of the New Jersey Consumer Fraud Act (NJCFA), N.J. Stat. Ann. § 56:8-1 et seq., as set forth above.

714.    Defendants' marketing and advertisements for and labeling of their cannabis products concealed, suppressed, omitted, and/or failed to disclose or adequately warn of the material facts that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

715.    These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

716.    Defendants' conduct was unfair and unconscionable in that: a) it included the manufacture, sale, and marketing of products that are illegal under federal law and cause and/or exacerbate serious and debilitating mental health conditions; and b) it included misrepresentations and omissions of material facts concerning the medicinal and therapeutic characteristics and safety

203

of their cannabis products that violate New Jersey laws and regulations; c) it offends public policy; are immoral, unethical, oppressive, and unscrupulous; d) is part of a pattern of sales conduct that would outrage and offend the public conscience; and/or e) caused substantial harm that greatly outweighs any benefits associated with the conduct.

717.    Defendants' conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, cause confusion or misunderstanding to reasonable consumers including New Jersey Plaintiffs and class members. Reasonable consumers, including New Jersey Plaintiffs and class members, would have found it material to their purchasing decisions that: a) Defendants' cannabis products were not therapeutic or medicinal as represented by Defendants and could not treat, ease, alleviate, be good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma; b) there is no credible medical or scientific evidence or scholarship that supports that Defendants' cannabis  products are medicinal or therapeutic as represented by Defendants and/or can treat, ease, alleviate, be good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma as Defendants represent; c) certain of Defendants' cannabis  products do not uniquely or more effectively treat, ease, alleviate, be good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety when compared to other cannabis products and/or other medical disorders, including, but not limited to, pain and glaucoma; and d) Defendants' products cause, contribute to, and exacerbate

204

mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; adverse cardiovascular events, CHS, and/or cannabis use disorder.

718.    Knowledge of these facts would have been a substantial factor in New Jersey Plaintiffs' and class members' and class members' decisions to purchase cannabis products.

719.    Defendants owed New Jersey Plaintiffs and class members a duty to disclose or adequately warn of these facts because they were known and/or accessible exclusively to Defendants (and potentially other unnamed parties other than New Jersey Plaintiffs and class members), who had superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' cannabis products posed an unreasonable risk of substantial injury; and/or because Defendants made partial representations concerning the same subject matter as the omitted facts.

720.    Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading and intended for consumers, including New Jersey Plaintiffs and class members, to rely on such misrepresentations and omissions.

721.    Defendants' conduct proximately caused actual damages to New Jersey Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiff and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiff and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

722.    WHEREFORE, New Jersey Plaintiffs and class members seek damages against Defendants: (a) awarding New Jersey Plaintiffs and class members threefold their actual or

205

compensatory damages; (b) requiring Defendants to pay threefold restitution on any money acquired as a result of Defendants' consumer fraud and deceptive practices; (c) requiring Defendants to disgorge their ill-gotten profits; (d) for injunctive relief requiring Defendants to comply with the NJCFA and prohibiting Defendants from making any further misrepresentations or omissions regarding the medicinal, health, or therapeutic benefits of cannabis or cannabis products; (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT II
### New Jersey Negligent Misrepresentation

723.    New Jersey Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

724.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of the fact that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or cause or contribute to adverse cardiovascular events, CHS, and/or cause cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

725.    These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

726.    Defendants were careless or negligent in determining the truth of the above statements and/or omissions.

727.    At all relevant times, Defendants made these statements and/or omissions with the intent of inducing reasonable reliance on them by New Jersey Plaintiffs and class members and with the intent to cause New Jersey Plaintiffs and class members to purchase their cannabis products.

728.    New Jersey Plaintiffs and class members did rely on these statements and/or omissions when purchasing cannabis products.

729.    Defendants' unlawful representations described herein are continuing in nature and are widespread practices.

730.    Defendants' motive of increasing profits at the expense of the mental health of New Jersey consumers was intentional, willful, morally wrong and the acts showed gross recklessness.

731.    Defendants' conduct proximately caused actual damages to New Jersey Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, New Jersey Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced New Jersey Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

732.    WHEREFORE, New Jersey Plaintiffs and class members seek judgment against all Defendants: (a) for damages to New Jersey Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) for consequential and incidental damages resulting from Defendants' negligent

207

conduct; (c) for reasonable attorneys' fees, costs, and expenses incurred in bringing this action; (d) for punitive damages to the extent permitted by New Jersey law to punish Defendants' willful, intentional, and reckless conduct and to deter similar future misconduct; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court deems just, proper, and equitable.

## COUNT III
### New Jersey Breach of Express Warranty

733.    New Jersey Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

734.    Pursuant to N.J. Rev. Stat. §12A:2-313:

> (1) Express warranties by the seller are created as follows:
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to goods and becomes part of the basis of the bargain creates and express warranty that the good shall conform to the affirmation or promise.
> (b) Any description of the good which is made part of the basis of the bargain creates an express warranty that the good shall conform to the description….
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant" or guarantee" or that he have specific intention to make a warrant, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

735.    Defendants provided New Jersey Plaintiffs and class members with written and unwritten express warranties, including but not limited to, warranties that cannabis, any constituent part of cannabis, or their cannabis products can treat, ease, alleviate, are good for, aid, or relieve or otherwise are a medicine therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

208

736.    Defendants provided New Jersey Plaintiffs and class members with written and unwritten express warranties, including but not limited to, warranties that certain Defendants' products uniquely or more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

737.    Defendants provided New Jersey Plaintiffs and class members with written and unwritten express warranties, including but not limited to, warranties that that there is credible medical or scientific evidence or scholarship that supports that cannabis products are medicinal or therapeutic and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma

738.    Defendants breached these warranties resulting in damages to New Jersey Plaintiffs and class members who purchased Defendants' products, which did not have the purported benefits.

739.    New Jersey Plaintiffs and class members complied with the terms of the express warranty, and demanded Defendants fulfill its terms, and provided notice to Defendants within a reasonable time upon discovering their breach of this express warranty.

740.    As a proximate result of the breach of warranties by Defendants, New Jersey Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the

209

benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted.

741.    Defendants' motive of increasing profits at the expense of the mental health of New Jersey consumers was intentional, willful, morally wrong and the acts showed gross recklessness.

742.    WHEREFORE, New Jersey Plaintiffs and class members seek judgment against all Defendants: (a) for damages to New Jersey Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so including incidental and consequential damages; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (c) for punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## <u>COUNT IV</u>
### New Jersey Breach of Implied Warranty of Merchantability

743.    New Jersey Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

744.    Pursuant to N.J. Rev. Stat §12A:2-314:

(1) Unless excluded or modified (12A:2-316) a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this Section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
(2) Goods to be merchantable must be at least such as
   (a) pass without objection in the trade under the contract description; and
   (b) in the case of fungible goods, are of fair average quality within the description; and
   (c) are fit for the ordinary purposes for which such goods are used; and

210

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (12A:2-316) other implied warranties may arise from course of dealing or usage of trade.

745. Defendants' cannabis products came with an implied warranty that they were merchantable and fit for the ordinary purpose for which they would be used. Defendants breached their implied warranty of merchantability because their products were not in merchantable condition when sold; were defective when sold; posed significant health risks, including but not limited to, dangers of psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or cardiovascular disease, CHS, and/or cannabis use disorder, and/or significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits; lacked adequate warnings or instructions regarding these risks, rendering Defendants' products unreasonably dangerous and unfit for consumption in their ordinary manner; and/or did not conform to the promises and affirmations of fact made during Defendants' marketing scheme that their cannabis products had medicinal, therapeutic, or health benefits, including, but not limited to, cannabis products being capable of treating, easing, alleviating, being good for, aiding, or relieving or otherwise being medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical conditions, including, but not limited to, pain and glaucoma.

746. Defendants breached the warranty implied at the time of sale in that New Jersey Plaintiffs and class members did not receive products with the purported benefits and, thus, the

211

goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, and advertised, or sold.

747. Defendants also breached the warranty implied at the time of sale in that New Jersey Plaintiffs and class members did not receive products that were adequately contained, packaged, and labeled as required by the contract of sale.

748. New Jersey Plaintiffs and class members have had sufficient direct dealings with Defendants to establish privity of contract between Defendants, on the one hand, and New Jersey Plaintiffs and class members, on the other hand.

749. New Jersey Plaintiffs and class members provided Defendants with notice of the breach of implied warranty within a reasonable time after discovering, or when they should have discovered, the above-mentioned breaches.

750. As a proximate result of the breach of warranties by Defendants, New Jersey Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted or purchased products that they would not otherwise have purchased.

751. Defendants' motive of increasing profits at the expense of the mental health of New Jersey consumers was intentional, willful, morally wrong and the acts showed gross recklessness.

752. WHEREFORE, New Jersey Plaintiffs and class members seek judgment against all Defendants: (a) for damages to New Jersey Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not

212

have done so including incidental and consequential damages; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (c) for punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT V
### New Jersey Common Law Fraud

753.    New Jersey Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

754.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose the facts and/or adequately warn New Jersey Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

755.    Defendants' conduct was unfair and unconscionable in that: a) it included the manufacture, sale, and marketing of products that are illegal under federal law and cause and exacerbate serious and debilitating mental health and other physical conditions; b) it included misrepresentations and omissions of material facts concerning the medicinal and therapeutic characteristics and safety of their cannabis products that are illegal under New Jersey law; c) it offends public policy; d) is immoral, unethical, oppressive, and unscrupulous; e) is part of a pattern

213

of sales conduct that would outrage and offend the public conscience; f) and/or caused substantial harm that greatly outweighs any benefits associated with the conduct.

756. Defendants owed New Jersey Plaintiffs and class members a duty to adequately disclose or warn of these facts because Defendants possess and has always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to New Jersey Plaintiffs and class members, concerning the manufacture, distribution, nature, and properties of their cannabis products and has at all relevant times been in a position to know, identify, and confirm the threats posed by their cannabis products; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' cannabis products posed an unreasonable risk of substantial injury; and/or because Defendants made partial representations concerning the same subject matter as the omitted facts.

757. Defendants knew that their misrepresentations and/or omissions were false and misleading, or had a reckless disregard for their truth, and intended for consumers to rely on such misrepresentations and omissions and act upon them.

758. New Jersey Plaintiffs and class members reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to rely on the misrepresentations and/or omissions under the circumstances.

759. Defendants' motive of increasing profits at the expense of the mental health of New Jersey consumers was intentional, willful, morally wrong and the acts showed gross recklessness.

760. Defendants' conduct directly caused actual damages to New Jersey Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, New Jersey Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis

214

products or would have paid less for them. Defendants' misrepresentations and omissions induced New Jersey Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

761. WHEREFORE, New Jersey Plaintiffs and class members seek damages against all Defendants: (a) for damages to New Jersey Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) for consequential and incidental damages resulting from Defendants' fraudulent conduct; (c) requiring Defendants to pay restitution on any money acquired as a result of Defendants' fraudulent conduct; (d) for reasonable attorneys' fees, costs of suit, and expenses incurred in bringing this action; (e) for punitive damages to the extent permitted by New Jersey law to punish Defendants' willful, intentional, and reckless conduct and to deter similar future misconduct; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court deems just, proper, and equitable.

## COUNT VI
### New Jersey Unjust Enrichment

762. New Jersey Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

763. Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose the facts and/or adequately warn New Jersey Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS;

215

and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

764. Defendants' conduct was unfair and unconscionable in that it included: 1) the manufacture, distribution, possession, sale, and marketing of products that are illegal under federal law and cause and exacerbate serious and debilitating mental health and other physical conditions; and 2) misrepresentations and omissions of material facts concerning the medicinal and therapeutic characteristics and safety of their cannabis products are illegal under New Jersey law; offends public policy; is immoral, unethical, oppressive, and unscrupulous; are is part of a pattern of sales conduct that would outrage and offend the public conscience; and caused substantial harm that greatly outweighs any benefits associated with the conduct.

765. As a result of Defendants' deceptive, false, and misleading statements and illegal claims as to the health, medicinal, or therapeutic qualities of their products and actions and many violations of New Jersey law and the federal Controlled Substances Act, Defendants were enriched at the expense of consumers, New Jersey Plaintiffs, and class members through the payment of the purchase price for Defendants' products.

766. Defendants requested and received a measurable benefit at the expense of New Jersey Plaintiffs and class members in the form of payment for Defendants' cannabis products.

767. There is no justification for Defendants' retention of this benefit.

768. Defendants' retention of the benefit of these ill-gotten gains on the back of human misery and suffering caused by mental health disorders violates fundamental principles of justice, equity, and good conscience.

769. Defendants' motive of increasing profits at the expense of the mental health of New Jersey consumers was intentional, willful, morally wrong and the acts showed gross recklessness.

216

770.    Thus, it would be unjust for Defendants to retain the ill-gotten benefits that it received from New Jersey Plaintiffs and class members without restitution to New Jersey Plaintiffs and class members.

771.    New Jersey Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

772.    WHEREFORE, New Jersey Plaintiffs and class members seek judgment against all Defendants: (a) for damages to New Jersey Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (c) for punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

### H.  Violations of New York Law Brought on Behalf of New York Subclass.

773.    Plaintiffs Jeremy Cavolo and Stacey Pysock (collectively, "New York Plaintiffs") bring each of the following claims on behalf of the New York Subclass under New York law.

### COUNT I

### New York General Business Law ("GBL") §349 Violation

774.    New York Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

775.    Pursuant to GBL §349 (a), "[d]eceptive acts or practices in conduct of any business, trade, or commerce or in the furnishing of any service in this state are hereby declared unlawful."

217

776. Defendants have engaged in deceptive acts or practices in conduct of their business, trade, and commerce and in furnishing services in violation of GBL §349.

777. Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of the fact that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and anxiety; cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

778. These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

779. Defendants' conduct occurred, and continues to occur in the course of Defendants' business.

780. Defendants knowingly and willfully violated this section.

781. Defendants' conduct proximately caused actual damages to New York Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, New York Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced New York Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

782.    Further, GBL §349(a) provides that, "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, and action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."

783.    WHEREFORE, New York Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages increased to three times the actual damages; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' consumer fraud and deceptive practices; (c) requiring Defendants to disgorge their ill-gotten profits; (d) for the costs of the suit, including attorneys' fees; (e) requiring injunctive relief prohibiting Defendants from making any further misrepresentations or omissions regarding the medicinal, health, or therapeutic benefits of cannabis or cannabis products; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT II
### New York GBL §350 Violation

784.    New York Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

785.    Pursuant to GBL §350, "false advertising in the conduct of any business, trade or commerce in the furnishing of any service in this state is hereby declared unlawful."  "False advertising" under GBL §350-a means advertising, including labeling, of a commodity…if such advertising is misleading in a material respect…In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the

219

commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual."

786.    Defendants created and implemented a scheme to create and increase the market for cannabis and substantially increase sales of cannabis products through a pervasive pattern of false and misleading statements and omissions in advertising.  At all times relevant to this Complaint, Defendants made numerous statements regarding the health, medicinal, and therapeutic benefits of cannabis.

787.    Defendants' statements were deceptive, and illegal under the Cannabis Law and applicable regulations, because  Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose the facts and/or adequately warn New York Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and anxiety; cause or contribute to adverse cardiovascular events and/or CHS; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

788.    Defendants knowingly and willfully violated this section.

789.    Defendants' conduct proximately caused actual damages to New York Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct New York Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced New York Plaintiffs and class members to purchase Defendants' cannabis products they

220

would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

790. WHEREFORE, New York Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages increased to three times the actual damages; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' consumer fraud and deceptive practices; (c) requiring Defendants to disgorge their ill-gotten profits; (d) for Defendants to pay the costs of the suit, including attorneys' fees; (e) requiring injunctive relief necessary to preclude Defendants from making any further misrepresentations medicinal, health, or therapeutic claims regarding cannabis; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT III
### New York Negligent Misrepresentation

791. New York Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

792. Defendants created and implemented a scheme to create and increase the market for cannabis and substantially increase sales of cannabis products through a pervasive pattern of false and misleading statements and omissions.

793. Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose the facts and/or adequately warn New York Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and anxiety; cause or contribute to adverse cardiovascular events and/or CHS; and/or pose significant

risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

794.    These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

795.    Defendants knew or should have known that such representations were false or unsupported by credible scientific evidence.

796.    Defendants were in a special position of confidence and trust with New York Plaintiffs and class members because it held itself out as possessing specialized or superior knowledge regarding the medical and health effects of cannabis products.

797.    Defendants supplied this information for the purpose of influencing consumer's purchasing decisions.

798.    At all relevant times, Defendants made these statements and/or omissions with the intent of inducing reliance on them by New York Plaintiffs and class members and with the intent to cause New York Plaintiffs and class members to purchase their cannabis products.

799.    New York Plaintiffs and class members did reasonably rely on these statements and/or omissions when purchasing cannabis products.

800.    Defendants' unlawful representations described herein are continuing in nature and are widespread practices.

801.    Defendants' conduct was willful, wanton, malicious, and in reckless disregard of the rights and safety of New York Plaintiffs and the public at large. Defendants engaged in a pattern of deliberate deception and concealment that demonstrates a high degree of moral culpability and

222

wanton dishonesty, evincing a conscious and reckless indifference to the health and safety of consumers.

802.    Defendants' conduct proximately caused actual damages to New York Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, New York Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced New York Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

803.    WHEREFORE, New York Plaintiffs and class members seek judgment against all Defendants: (a) for damages to New York Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (c) requiring Defendants to pay the costs of the suit, including attorneys' fees; (d) for prejudgment interest; and (e) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT IV
**New York Breach of Express Warranty**

804.    New York Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

805.    Pursuant to New York General Business Law §2-313:

> (1) Express warranties by the seller are created as follows:
>> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to goods and becomes part of the basis of the bargain creates an express warranty that the good shall conform to the affirmation or promise.

223

    (b) Any description of the good which is made part of the basis of the bargain creates an express warranty that the good shall conform to the description

           …

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or guarantee" or that he have specific intention to make a warrant, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

806. Defendants provided New York Plaintiffs and class members with written and unwritten express warranties, including but not limited to warranties that cannabis, any constituent part of cannabis, or their cannabis products can treat, ease, alleviate, are good for, aid, or relieve or otherwise are a medicine therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

807. Defendants provided New York Plaintiffs and class members with written and unwritten express warranties, including but not limited to, warranties that certain Defendants' products uniquely or more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute a medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

808. Defendants provided New York Plaintiffs and class members with written and unwritten express warranties, including but not limited to, warranties that there is credible medical or scientific evidence or scholarship that supports that cannabis products are medicinal or therapeutic as described by Defendants and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar

224

disorder, PTSD, depression, and anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

809.   Defendants breached these warranties resulting in damages to New York Plaintiffs and class members who purchased Defendants' products, which did not have the purported benefits.

810.   New York Plaintiffs and class members complied with the terms of the express warranty, and demanded Defendants fulfill its terms, and provided notice to Defendants within a reasonable time upon discovering their breach of this express warranty.

811.   As a proximate result of the breach of warranties by Defendants, New York Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted.

812.   Defendants' conduct was willful, wanton, malicious, and in reckless disregard of the rights and safety of New York Plaintiffs and the public at large. Defendants engaged in a pattern of deliberate deception and concealment that demonstrates a high degree of moral culpability and wanton dishonesty, evincing a conscious and reckless indifference to the health and safety of consumers.

813.   WHEREFORE, New York Plaintiffs and class members seek judgment against all Defendants: (a) for damages to New York Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so including incidental and consequential damages; (b) requiring Defendants to pay

225

restitution on any money acquired as a result of Defendants' breach; (c) for punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT V
### New York Breach of Implied Warranty of Merchantability

814.    New York Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

815.    Pursuant to New York General Business Law 2-314:

(1) Unless excluded or modified (Section 2-316) a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this Section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (Section 2-316) other implied warranties may arise from course of dealing or usage of trade.

226

816.  Defendants' cannabis products came with an implied warranty that they were merchantable and fit for the ordinary purpose for which they would be used. Defendants breached their implied warranty of merchantability because their products were not in merchantable condition when sold; were defective when sold; posed significant health risks, including but not limited to, dangers of psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety, and/or cardiovascular disease and/or cannabis use disorder, and/or significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits; lacked adequate warnings or instructions regarding these risks, rendering Defendants' products unreasonably dangerous and unfit for consumption in their ordinary manner; and/or did not conform to the promises and affirmations of fact made during Defendants' marketing scheme that their cannabis products had medicinal, therapeutic, or health benefits, including, but not limited to, cannabis products being capable of treating, easing, alleviating, being good for, aiding, or relieving or otherwise being medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical conditions, including, but not limited to, pain and glaucoma.

817.  Defendants breached the warranty implied at the time of sale in that New York Plaintiffs and class members did not receive products with the purported benefits and, thus, the goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, and advertised, or sold.

818.  Defendants also breached the warranty implied at the time of sale in that New York Plaintiffs and class members did not receive products that were adequately contained, packaged, and labeled as required by the contract of sale.

227

819.    New York Plaintiffs and class members have had sufficient direct dealings with Defendants to establish privity of contract between Defendants, on the one hand, and New York Plaintiffs and class members, on the other hand.

820.    New York Plaintiffs and class members provided Defendants with notice of the breach of implied warranty within a reasonable time after discovering, or when they should have discovered, the above-mentioned breaches.

821.    As a proximate result of the breach of warranties by Defendants, New York Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for products that did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted or purchased products that they would not otherwise have purchased.

822.    Defendants' conduct was willful, wanton, malicious, and in reckless disregard of the rights and safety of New York Plaintiffs and the public at large. Defendants engaged in a pattern of deliberate deception and concealment that demonstrates a high degree of moral culpability and wanton dishonesty, evincing a conscious and reckless indifference to the health and safety of consumers.

823.    WHEREFORE, New York Plaintiffs and class members seek judgment against Defendants: (a) for damages to New York Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so including incidental and consequential damages; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' breach; (c) for punitive damages; (d)

228

requiring Defendants to disgorge their ill-gotten profits; (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT VI
**New York Common Law Fraud**

824.    New York Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

825.    Defendants made numerous false and misleading statements and omissions of material fact concerning the nature, safety, and purported therapeutic qualities of their cannabis products.

826.    Defendants created and implemented a scheme to create a market for cannabis and substantially increase sales of cannabis products through a pervasive pattern of false and misleading statements and omissions.

827.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose the facts and/or adequately warn New York Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and anxiety; cause or contribute to adverse cardiovascular events and/or CHS; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

828.    Defendants' conduct was unfair and unconscionable in that it included: a) the manufacture, sale, and marketing of products that are illegal under federal law and cause and exacerbate serious and debilitating mental health and other physical conditions; b) the

229

misrepresentations and omissions of material facts concerning the medicinal and therapeutic characteristics and safety of their cannabis products that are illegal under New York law and public policy; c) conduct that is immoral, unethical, oppressive, and unscrupulous; d) conduct that is part of a pattern of sales conduct that would outrage and offend the public conscience; and e) conduct that caused substantial harm that greatly outweighs any benefits associated with the conduct.

829.    Defendants owed New York Plaintiffs and class members a duty to adequately disclose or warn of these facts because Defendants possess and has always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to New York Plaintiffs and class members, concerning the manufacture, distribution, nature, and properties of their cannabis products and has at all relevant times been in a position to know, identify, and confirm the threats posed by their cannabis products; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' cannabis products posed an unreasonable risk of substantial injury; and/or because Defendants made partial representations concerning the same subject matter as the omitted facts.

830.    Defendants knew that their misrepresentations and/or omissions were false and misleading, or had a reckless disregard for their truth, and intended for consumers to rely on such misrepresentations and omissions and act upon them.

831.    New York Plaintiffs and class members reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to rely on the misrepresentations and/or omissions under the circumstances.

832.    Defendants' motive of increasing profits at the expense of the mental health of New York consumers was morally wrong and the acts showed a reckless disregard of the rights of New York Plaintiffs and class members.

833.    Defendants' conduct directly caused actual damages to New York Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, New York Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced New York Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

834.    WHEREFORE, New York Plaintiffs and class members seek judgment against all Defendants: (a) for damages to New York Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' fraudulent conduct; (c) requiring Defendants to pay the costs of the suit, including attorneys' fees; (d) for prejudgment interest; and (e) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT VII
### New York Unjust Enrichment

835.    Defendants created and implemented a scheme to create a market for cannabis and substantially increase sales of cannabis products through a pervasive pattern of false and/or misleading statements and/or omissions. At all times relevant to this Complaint, Defendants, violated the N.Y. GBL §349 AND N.Y. GBL §350 by making and disseminating untrue, false,

231

and misleading statements that are not supported by credible scientific or medical evidence to New York consumers to promote the sale and use of cannabis.

836. Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose the facts and/or adequately warn New York Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal  as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and anxiety; cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

837. Defendants' conduct was unfair and unconscionable in that it included: a) the manufacture, distribution, possession, sale, and marketing of products that are illegal under federal law and cause and exacerbate serious and debilitating mental health and other physical conditions; and b) misrepresentations and omissions of material facts concerning the medicinal and therapeutic characteristics and safety of their cannabis products that are illegal under New York laws; c) conduct that offends public policy and is immoral, unethical, oppressive, and unscrupulous; d) conduct that is part of a pattern of sales conduct that would outrage and offend the public conscience; and e) conduct that caused substantial harm that greatly outweighs any benefits associated with the conduct.

838. As a result of Defendants' deceptive, false, and misleading statements and illegal claims as to the health, medicinal, or therapeutic qualities of their products and actions and many violations of New York Laws and the federal Controlled Substances Act, Defendants were

enriched at the expense of consumers, New York Plaintiffs, and class members through the payment of the purchase price for Defendants' products.

839.    Defendants requested and received a measurable benefit at the expense of New York Plaintiffs and class members in the form of payment for Defendants' cannabis products.

840.    There is no justification for Defendants' retention of this benefit.

841.    Defendants' retention of the benefit of these ill-gotten gains on the back of human misery and suffering caused by mental health disorders violates fundamental principles of justice, equity, and good conscience.

842.    Thus, it would be unjust for Defendants to retain the ill-gotten benefits that it received from New York Plaintiffs and class members without restitution to New York Plaintiffs and class members.

843.    New York Plaintiffs and class members plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

844.    WHEREFORE, New York Plaintiffs and class members seek judgment against all Defendants: (a) for damages to New York Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations or omissions; (c) for punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) for prejudgment interest; and (g) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## I.    Violations of Ohio Law Brought on Behalf of Ohio Subclass.

845.    Plaintiffs Antonio Deena, and Jason Howell (collectively, "Ohio Plaintiffs") bring each of the following claims on behalf of the Ohio Subclass under Ohio law.

**COUNT I**
**Violation of the Ohio Consumers Sales Practices Act (Ohio Rev. Code §1345.01 *et seq.*)**

846.    Ohio Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

847.    Pursuant to Ohio Rev.  Ann. §1345.02, §1345.03 (West 2025), it constitutes an unfair, deceptive, or unconscionable act or practice for a supplier, in connection with a consumer transaction, to:

   a.  Represent "[t]hat the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have." Ohio Rev. Code Ann. § 1345.02 (B)(1).

   b.  Represent "[t]hat the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not." Ohio Rev. Code Ann. § 1345.02 (B)(3).

   c.  Knowingly take advantage of the inability of the consumer to reasonably protect the consumer's interests because of the consumer's ignorance. *See* Ohio Rev. Code Ann. § 1345.03(B)(1).

   d.  Know at the time of the transaction of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction. *See* Ohio Rev. Code § 1345.03(B)(3).

   e.  Knowingly make a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment. *See* Ohio Rev. Code § 1345.03(B)(6).

234

848.    Defendants have engaged in unlawful and deceptive business practices in violation of the Ohio Consumer Sales Practices Act, Ohio Rev. Code §1345.01 et seq. ("OCSPA")

849.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of, and knowingly made misleading statements of opinion about, the material fact that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

850.    These omissions were misleading, unfair, and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

851.    In purchasing Defendants' products, Ohio Plaintiffs and class members relied on these misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

852.    Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, intended for consumers to rely on such misrepresentations and omissions, and that Ohio Plaintiffs and class members were ignorant of the facts that cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse

cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

853. Defendants' conduct proximately caused actual damages to Ohio Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Ohio Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Ohio Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

854. WHEREFORE, Ohio Plaintiffs and class members seek judgment against all Defendants: (a) for actual damages sustained as a result of Defendants' violations of the OCSPA, and, where applicable, treble damages pursuant to Ohio Rev. Code Ann. §1345.09; (b) for statutory, multiplied, or other penalties in the maximum amount authorized by law; (c) for reasonable attorneys' fees and costs; and (d) for equitable and injunctive relief, including but not limited to, an order enjoining Defendants from engaging in the unlawful practices alleged herein; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court may deem just, proper, and equitable.

## COUNT II
### Violation of the Ohio Deceptive Practices Act (Ohio Rev. Code Ann. §4165.01 *et seq.*)

855. Ohio Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

856. Pursuant to Ohio Rev. Code Ann. §4165.02 (West 2025), it constitutes an unfair, deceptive, or unconscionable act or practice for a supplier, in connection with a consumer transaction, to:

236

a. Represent[] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have.

b.  Represent[] that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

c. Advertise[] goods or services with intent not to sell them as advertised.

857.    Defendants have engaged in unlawful and deceptive business practices in violation of the Ohio Deceptive Practices Act, Ohio Rev. Code Ann. § 4165.01 et seq. ("ODPA").

858.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of the material fact that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

859.    These omissions were misleading, unfair, and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

860.    In purchasing Defendants' products, Ohio Plaintiffs and class members relied on the misrepresentations and/or omissions.  Reasonable consumers would have been expected to have relied on the misrepresentations and omissions.

237

861.    Defendants knew or should have known that their misrepresentations and/or omissions were false and misleading, intended for consumers to rely on such misrepresentations and omissions, and that Ohio Plaintiffs and class members were ignorant of the facts that cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, CHS, and/or cannabis use disorder; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavioral deficits.

862.    Defendants' conduct proximately caused actual damages to Ohio Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Ohio Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Ohio Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

863.    WHEREFORE, Ohio Plaintiffs and class members seek judgment against all Defendants: (a) for actual damages sustained by Ohio Plaintiffs and class members, or statutory damages as permitted by Ohio Rev. Code Ann. §1345.09; (b) for declaratory and injunctive relief enjoining Defendants from continuing the unfair, deceptive, and unconscionable practices alleged herein; (c) requiring rescission of purchase contracts where appropriate and restitution of monies paid; (d) for reasonable attorneys' fees, costs, and expenses of litigation as provided by Ohio Rev. Code §1345.09(F); (h) for prejudgment interest; and (e) for such other and further relief as this Honorable Court deems just, proper, and equitable.

## COUNT III
### Ohio Negligent Misrepresentation

864. Ohio Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

865. Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose or adequately warn of the fact that their cannabis products are not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or cause or contribute to adverse cardiovascular events, CHS, and/or cause cannabis use disorder, and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

866. These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as medicinal and therapeutic.

867. Defendants were careless or negligent in determining the truth of the above statements and/or omissions.

868. At all relevant times, Defendants made these statements and/or omissions with the intent of inducing reliance on them by Ohio Plaintiffs and class members and with the intent to cause Ohio Plaintiffs and class members to purchase their cannabis products.

869. Ohio Plaintiffs and class members did reasonably and justifiably rely on these statements and/or omissions when purchasing cannabis products.

870. Defendants' unlawful representations described herein are continuing in nature and are widespread practices.

239

871.    Defendants' conduct proximately caused actual damages to Ohio Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Ohio Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Ohio Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

872.    WHEREFORE, Ohio Plaintiffs and class members seek judgment against Defendants: (a) for damages to Ohio Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done so; (b) requiring restitution and/or disgorgement of all monies wrongfully obtained by Defendants, and, where appropriate, rescission of purchase contracts entered into as a result of Defendants' conduct; (c) for equitable or injunctive relief as the Court deems proper to prevent continuing negligent and misleading practices; (d) for reasonable attorneys' fees and costs where authorized by law; (e) for prejudgment interest; and (f) for such other and further relief as this Honorable Court deems just, proper, and equitable.

## COUNT IV
### Breach of Express Warranty (Ohio Rev. Code §1302.26)

873.    Ohio Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

874.    Defendants made affirmations of fact and promises to Ohio Plaintiffs and class members including but not limited to:

    a.  Warranties that cannabis, any constituent part of cannabis, or Defendants' cannabis products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy

for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

b. Warranties that certain cannabis products can more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain health and mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma, when compared to other cannabis products.

c. Warranties that there is credible medical or scientific evidence or scholarship that supports that cannabis  products have certain medicinal or therapeutic properties and/or can treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma.

d. Warranties that there is credible medical or scientific evidence or scholarship that supports that certain cannabis products can more effectively treat, ease, alleviate, are good for, aid, or relieve or otherwise constitute medicine or therapy for certain health and mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical disorders, including, but not limited to, pain and glaucoma, when compared to other cannabis products.

e. Warranties that cannabis products are healthy or health-promoting, not dangerous or hazardous to consumers' health, not addictive, or do not cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar

241

disorder, suicidal ideation, depression, and/or anxiety and/or do not cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS.

f.  Warranties that there is credible scientific or medical evidence establishing that cannabis products are healthy or health-promoting, not dangerous or hazardous to consumers' health, not addictive, and/or do not cause, contribute to, and/or exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety and/or do not cause or contribute to adverse cardiovascular events, cannabis use disorder, and/or CHS.

875.   These affirmations became part of the basis of the bargain, creating express warranties under Ohio Rev. Code 1302.26.

876.   Defendants breached their express warranties because their products were not therapeutic or safe and did not conform to the affirmations and promises made.

877.   Ohio Plaintiffs and class members provided notice of breach within a reasonable time after discovery.

878.   As a direct and proximate result, Ohio Plaintiffs and class members suffered incidental and consequential damages in the form of overpayment and loss of the benefit of their bargain.

879.   WHEREFORE, Ohio Plaintiffs and class members seek judgment against all Defendants: (a) requiring Defendants to pay Ohio Plaintiffs' and class members' damages for breach of express warranty, including restitution, rescission, and incidental and consequential damages as permitted under Ohio Rev. Code 1302.88; (b) requiring disgorgement of all monies wrongfully obtained by Defendants; (c) requiring Defendants to pay the costs of the suit, including

attorneys' fees; (d) for prejudgment interest; and (e) for such other and further relief as this Honorable Court deems just, proper, and equitable.

## COUNT V
### Breach of Implied Warranty of Merchantability (Ohio Rev. Code 1302.27)

880.    Ohio Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

881.    Defendants' cannabis products came with an implied warranty that they were merchantable under Ohio Rev. Code §1302.27, warranting that such goods were fit for the ordinary purpose for which they would be used.

882.    Defendants breached their implied warranty of merchantability because their products were not in merchantable condition when sold; posed significant health risks; and did not conform to marketing promises, including but not limited to, dangers of psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety, and/or cardiovascular disease, CHS, and/or cannabis use disorder, and/or significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits; lacked adequate warnings or instructions regarding these risks, rendering Defendants' products unreasonably dangerous and unfit for consumption in their ordinary manner; and/or did not conform to the promises and affirmations of fact made during Defendants' marketing scheme that their cannabis products had medicinal, therapeutic, or health benefits, including, but not limited to, cannabis products being capable of treating, easing, alleviating, being good for, aiding, or relieving or otherwise being medicine or therapy for certain mental health disorders such as bipolar disorder, PTSD, depression, and/or anxiety and/or other medical conditions, including, but not limited to, pain and glaucoma.

243

883.    Defendants breached the warranty implied at the time of sale in that Ohio Plaintiffs and class members did not receive products with the purported benefits and, thus, the goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, advertised, or sold.

884.    Defendants also breached the warranty implied at the time of sale in that Ohio Plaintiffs and class members did not receive products that were adequately contained, packaged, and labeled as required by the contract of sale.

885.    Defendants' products were not fit for ordinary use because they posed significant health risks, were defectively marketed without adequate warnings, and did not conform to the promises and affirmations made.

886.    Ohio Plaintiffs and class members have had sufficient direct dealings with Defendants to establish privity of contract between Defendants, on the one hand, and Ohio Plaintiffs and class members, on the other hand.

887.    Ohio Plaintiffs and class members were third-party beneficiaries of Defendants' agreements with their distributors, dealers, and sellers for the distribution, dealing, and sale of Defendants' products to consumers. Specifically, Ohio Plaintiffs and class members are the intended beneficiaries of Defendants' implied warranties. Defendants' products are manufactured with the express purpose and intent of being sold to consumers.

888.    Ohio Plaintiffs and class members provided notice of breach within a reasonable time after discovery.

889.    As a direct and proximate result, Ohio Plaintiffs and class members suffered incidental and consequential damages, including overpayment and loss of the benefit of their bargain.

244

890.    WHEREFORE, Ohio Plaintiffs and class members seek judgment against all Defendants: (a) requiring Defendants to pay Ohio Plaintiffs' and class members' damages for breach of implied warranty of merchantability, including restitution, rescission, and incidental and consequential damages as permitted under Ohio Rev. Code 1302.88; (b) requiring disgorgement of all monies wrongfully obtained by Defendants; (c) for prejudgment interest as permitted by law; (d) requiring Defendants to pay the costs of the suit, including attorneys' fees; and (e) for such other and further relief as this Honorable Court deems just, proper, and equitable.

## COUNT VI
## Ohio Common Law Fraud

891.    Ohio Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

892.    Defendants' marketing and advertisements for and/or labeling of their cannabis products concealed and/or failed to disclose the facts and/or adequately warn Ohio Plaintiffs and class members that their cannabis products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events and/or CHS; and/or poses significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

893.    Defendants owed Ohio Plaintiffs and class members a duty to adequately disclose or warn of these facts because Defendants possess and has always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to Ohio Plaintiffs and class members, concerning the manufacture, distribution, nature, and properties of their cannabis products and has at all relevant times been in a position to know, identify, and confirm the threats

245

posed by their cannabis products; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' cannabis products posed an unreasonable risk of substantial injury; and/or because Defendants made partial representations concerning the same subject matter as the omitted facts.

894.    Defendants knew or acted with reckless disregard as to whether their misrepresentations and/or omissions were false and misleading and intended for consumers to rely on such misrepresentations and omissions and act upon them.

895.    Ohio Plaintiffs and class members reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to rely on the misrepresentations and/or omissions under the circumstances.

896.    Defendants' motive of increasing profits at the expense of the mental health of Ohio consumers was morally wrong and the acts showed a reckless disregard of the rights of Ohio Plaintiffs and class members.

897.    Defendants' conduct directly caused actual damages to Ohio Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Ohio Plaintiffs and class members would have behaved differently and would not have purchased Defendants' cannabis products or would have paid less for them. Defendants' misrepresentations and omissions induced Ohio Plaintiffs and class members to purchase Defendants' cannabis products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

898.    WHEREFORE, Ohio Plaintiffs and class members seek judgment against all Defendants: (a) for damages to Ohio Plaintiffs and class members who overpaid for Defendants' cannabis products or purchased Defendants' products when they otherwise would not have done

246

so; (b) requiring rescission and restitution, or alternatively disgorgement of all profits, revenues, and benefits unjustly retained by Defendants; (c) for punitive damages sufficient to punish and deter Defendants' willful, wanton, and reckless conduct; (d) for prejudgment interest; (e) for costs of suit, including reasonable attorneys' fees where authorized; and (f) for such other and further relief as this Honorable Court deems just, proper, and equitable.

## COUNT VII
### Ohio Unjust Enrichment

899.    Ohio Plaintiffs and class members re-allege and incorporate by reference all foregoing paragraphs of this Complaint as if they were fully stated herein.

900.    Defendants created and implemented a scheme to create a market for cannabis and substantially increase sales of cannabis products through a pervasive pattern of false and/or misleading statements and/or omissions. At all times relevant to this Complaint, Defendants made and disseminated untrue, false, and misleading statements that are not supported by credible scientific or medical evidence to consumers to promote the sale and use of cannabis.

901.    Defendants' marketing, advertising, and labeling of their cannabis products concealed and failed to disclose the facts and/or adequately warn Ohio Plaintiffs and class members that the products are addictive, not therapeutic or medicinal as represented by Defendants, but rather can cause, contribute to, and exacerbate mental health disorders such as schizophrenia, psychosis, bipolar disorder, suicidal ideation, depression, and/or anxiety; cause or contribute to adverse cardiovascular events, cannabis sue disorder, and/or CHS; and/or pose significant risks to fetuses and children from prenatal exposure, including increased risk of death, low birth weight, preterm birth, and long-term cognitive and behavior deficits.

902. Defendants were enriched at the expense of consumers and class members through the payment of the purchase price for Defendants' products and accepted these payments with awareness of the benefits conferred.

903. Defendants were unjustly enriched by receiving payments from Ohio Plaintiffs and class members for cannabis products sold through deception, fraud, and unlawful conduct.

904. Defendants' retention of these benefits is unjust and inequitable because it was obtained through false statements, material omissions, and the sale of unreasonably dangerous products.

905. Ohio Plaintiffs and class members have no adequate remedy at law if Defendants are allowed to retain these ill-gotten gains.

906. WHEREFORE, Ohio Plaintiffs and class members seek judgment against all Defendants: (a) requiring restitution and disgorgement of all monies and benefits unjustly obtained by Defendants from Ohio Plaintiffs and class members; (b) impose a constructive trust over such monies and benefits for the benefit of Ohio Plaintiffs and class members; (c) for prejudgment interest as permitted by law; (d) requiring Defendants to pay the costs of the suit, including attorneys' fees; and (e) for such other and further relief as this Honorable Court deems just, proper, and equitable.

## X. **PRAYER FOR RELIEF**

907. Plaintiffs, on behalf of themselves and the proposed classes, respectfully demand that the Court determine that this action may be maintained as a class action pursuant to pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), direct that reasonable notice of this action be given to the classes, declare Plaintiffs as the named representatives of the classes, and appoint Plaintiffs' counsel as class counsel. Plaintiffs further request that the Court enter judgment against

Defendants and in favor of Plaintiffs and the classes, award damages including statutory, punitive, and multiple damages as provided by law, and order restitution to the classes in an amount to be determined at trial, together with interest in accordance with law. Plaintiffs also seek disgorgement from Defendants, an award of costs of suit including reasonable attorneys' fees, and such further relief as may be just and proper under the circumstances.

## XI.    LACK OF ADEQUATE REMEDIES AT LAW

908.    To the extent that equitable relief is sought under any of the above claims, Plaintiffs plead such claims in the alternative to any legal claims and further plead that their legal claims do not provide adequate remedies at law. Until discovery and other pretrial matters are complete, the extent to which the legal claims may provide the same relief for the same harms as could be available under claims providing equitable relief is unknown. Restitution may, for example, be measured differently than legal damages and provide a different amount of relief. The difference between the value of restitutionary and legal relief will therefore remain unknown until, at the earliest, the completion of expert reports and discovery.

## XII.    DEMAND FOR JURY

909.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and the classes, demand a trial by jury on all issues triable.


Dated: May 4, 2026                                    Respectfully Submitted,

/s/ Neal L. Moskow
Neal L. Moskow                                        Michael Piggins (*pro hac vice* forthcoming)
**MOSKOW LAW GROUP, LLC**                              **WEITZ & LUXENBERG PC**
**CT Bar Number: 04516**                               3011 W. Grand Blvd., Fl. 24
425 Kings Highway East                                 Detroit, MI 48202
Fairfield, Connecticut 06825                           Phone: 231-366-3108
Phone: (475) 999-4177                                  mpiggins@weitzlux.com
neal@moskowlaw.com

249

James Bilsborrow
(*pro hac vice* forthcoming)
**WEITZ & LUXENBERG PC**
700 Broadway
New York, NY 10003
Phone: 212-558-5500
jbilsborrow@weitzlux.com

Patrick Kenneally
(*pro hac vice* forthcoming)
**BURKE LAW GROUP, P.L.L.C.**
205 N. Michigan Ave, Suite 810
Chicago, IL 60601
Phone: 847-651-8525
patrick.kenneally@burkegroup.law

Jack D. Franks
(*pro hac vice* forthcoming)
**FRANKS GERKIN PONITZ
GREELEY, P.C.**
19333 E. Grant Hwy.
Marengo, IL 60152
Phone: 815-923-2107
jfranks@fgpglaw.com

Matthew F. Pawa
(*pro hac vice* forthcoming)
**PAWA LAW GROUP, P.C.**
1280 Centre Street, Suite 230
Newton Centre, MA 02459
Phone: (617) 641-9550
mp@pawalaw.com

*Counsel for Plaintiffs*

250